**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff O'Connell

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICOLE O'CONNELL, Individually and on Behalf of all Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>CELLCEUTIX CORPORATION, LEO EHRLICH, AND KRISHNA MENON,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nicole O'Connell ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cellceutix Corporation ("Cellceutix" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that

1

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Cellceutix securities between May 10, 2013 and August 6, 2015, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors.

2.     Cellceutix is a clinical stage biotechnology company focused on discovering small molecule drugs for hard to treat diseases, including drug-resistant cancers, psoriasis, autism and inflammatory disease.

3.     Kevetrin is a drug owned by Cellceutix which is currently undergoing clinical studies in order to treat cancer.

4.     Brilacidin is a drug owned by Cellceutix which is currently undergoing clinical studies in order to treat and kill bacterial infections.

5.     Throughout the Class Period, Defendants made materially false and misleading statements as well as failed to disclose material adverse facts about the Company's business, operational, and financial performance. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Brilacidin is not effective; (2) Kevetrin does not activate the p-53 gene, which is a tumor suppressor; and (3) Defendant Menon did not earn his

PhD in Pharmacology from Harvard University. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### PARTIES

10.      Plaintiff, as set forth in the accompanying Certification, purchased Cellceutix securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

11.      Defendant Cellceutix is a clinical stage biotechnology company that engages in the development of treatments for cancerous and degenerative diseases. The Company is incorporated in Nevada with principal executive offices located in Beverly, MA. Cellceutix's common stock trades on the OTC Pink marketplace under the ticker symbol "CTIX."

12.     Defendant Krishna Menon ("Menon") is one of the co-founders of the Company and served as the Company's President and Director at all relevant times.

13.     Defendant Leo Ehrlich ("Ehrlich") is one of the co-founders of the Company and served as the Company's Chief Executive Officer ("CEO"), Chairman of the Board of Directors and Chief Financial Officer ("CFO") at all relevant times.

14.     The Defendants Menon and Ehrlich are sometimes referred to herein as the "Individual Defendants."

15.     Defendant Cellceutix and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Cellceutix purports to be in the business of developing innovative small molecule therapies to treat diseases with significant medical need, particularly in the areas of cancer and inflammatory disease.

### Materially False and Misleading Statements Issued During the Period

17.     On May 10, 2013, *Future Woman* published a profile article on Defendant Menon, which he was interviewed for. In the article Defendant Menon confirmed earning his PhD in Pharmacology from Harvard University.

18.     On September 9, 2013, the Company issued a press release announcing the purchase of Brilacidin from PolyMedix, Inc. pursuant to an asset purchase agreement approved by the Bankruptcy Court for the District of Delaware. The Company touted the efficacy of Brilacidin in combating acute bacterial skin and skin structure infections ("ABSSSI") stating in part:

Cellceutix Corporation (OTCBB: CTIX) (the "Company"), a clinical stage biopharmaceutical company focused on discovering small molecule drugs to treat unmet medical conditions, including drug-resistant cancers and autoimmune diseases, is pleased to announce that it has acquired substantially all of the assets of the company formerly known as PolyMedix, Inc., and previously traded as PYMX, a clinical stage biotechnology company which developed small-molecule drugs for the treatment of infectious diseases and innate immunity disorders. The acquisition includes the PolyMedix pipeline of nine compounds as well as the substantial equipment assets at PolyMedix's 25,000-square-foot headquarters and laboratory.

*The acquisition includes PolyMedix's flagship drug candidate Brilacidin, a first-in-class defensin-mimetic antibiotic that has completed a Phase 2a clinical trial demonstrating safety, tolerability and efficacy in patients with acute bacterial skin and skin structure infections ("ABSSSI") caused by Staphylococcus aureus.* In the clinical trial, Brilacidin hit its primary endpoints with high and low doses outperforming Cubist Pharmaceuticals' Cubicin in the control arm of the study.

PolyMedix filed for Chapter 7 bankruptcy protection on April 1, 2013. Following a due diligence process, Cellceutix submitted a "stalking horse" bid for the PolyMedix assets in August. On Wednesday, September 4, the Bankruptcy Court for the District of Delaware approved the asset purchase agreement. In the transaction, Cellceutix assumes none of the debt associated with PolyMedix. The purchase price was $2.1 million in cash and 1.4 million shares of CTIX stock.

[Emphasis added].

19.     On January 20, 2015, the Company issued a press release reporting the near complete disappearance of a lesion in the spleen of a Stage 4 ovarian cancer patient who was enrolled in the Company's Phase 1 clinical trial of anti-drug Kevetrin. The Company touted Kevetrin's ability to activate the p-53 gene, which suppresses cancer tumors:

Cellceutix Corporation (OTC: CTIX) (the "Company"), a clinical stage biopharmaceutical company developing innovative therapies with oncology, dermatology and antimicrobial applications, is pleased to report the near complete disappearance of a metastatic lesion in the spleen of a Stage 4 ovarian cancer patient who was enrolled in the Company's Phase 1 clinical trial of anti-cancer drug candidate Kevetrin™ being conducted at Harvard Cancer Center's Dana-Farber Cancer Institute and Beth Israel Deaconess Medical Center. According to information supplied by the hospital, the patient, who successfully completed three Kevetrin 3-dose cycles before discontinuing the trial, experienced increased energy, while scans showed a reduction in the amount of peritoneal fluid (ascites) during treatment with Kevetrin. Subsequent to the second and third Kevetrin

cycles, scans showed the spleen lesion to be essentially undetectable and the patient's disease to be clinically stable.

With the completion of the ninth cohort, and commencement of tenth cohort at 450 mg/m2, the hospital has continued research to determine the effect of Kevetrin on p21, the key biomarker tightly controlled by the tumor suppressor protein p53. ***p53 is often referred to as the "Guardian Angel Gene" because of its crucial role in controlling cell mutations. In nearly all cancers, p53 is deficient or mutated, thus failing to perform its role as a master cell regulator, which exacerbates tumor progression and metastasis. As such, a drug to reactivate p53 to its normal state is a prime target for a next generation cancer therapy.*** Because p21 is a recognized downstream target of activated p53, increased levels of p21 in peripheral blood cells suggest that ***Kevetrin is having an impact on returning p53 to its effectiveness as a tumor suppressor.***

[Emphasis added].

20.     Between April 25-28 2015, Defendants displayed a poster at the 2015 European Congress of Clinical Microbiology and Infectious Diseases ("ECCMID") in Copenhagen, Denmark, which touted Brilacidin's ability to kill bacteria such as Staphylococcus aureus ("S. aureus") and Escherichia coli ("E. coli"). The poster states in part:

# RESULTS

## Brilacidin has broad spectrum in vitro antimicrobial activity

MIC for antimicrobial activity was assessed for brilacidin. Brilacidin has potent Gram positive activity, Gram negative coverage, but low cytotoxicity against mammalian cells.

| Brilacidin | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Gram + MIC90s (µg/ml) | | | Gram – MIC range (µg/ml) 2 – 3 clinical isolates | | | Mammalian cytotoxicity (EC50, µM) | | |
| MSSA | MRSA | CoNS | E. coli | E. pneumos. | Entero bacter spp. | RBCs | 3T3 | HepG2 |
| 1 | 1 | 0.5 – 1 | 1 – 2 | 1 – 4 | 0.5 – 4 | >500 | 430 | 1,031 |

### Brilacidin has rapid (0.5 to 6 hrs) bactericidal activity



CFU/mL after exposure of E. coli D32 or S. aureus 27660 to brilacidin.

Importantly, brilacidin has a low risk for development of resistance.

- FSR was <10$^{-11}$ at 3 times the MIC against MRSA 33591.



Brilacidin has potent and rapid bactericidal activity against stationary phase cultures of MSSA and MRSA



- time-kills at >10$^3$log$_{10}$ reductions of ≤2 hrs at two 2X MIC
- daptomycin had little antimicrobial activity up to 10x the MIC (not shown)

# CONCLUSIONS

Oral ulcerative mucositis is a common, painful, dose-limiting toxicity of cancer therapy with minimal treatment options. The well-tolerated and efficacious HDP mimetic, brilacidin, in the OM hamster model supports its further development as a topical therapeutic for OM.

While we believe the efficacy in the OM model is primarily the result of brilacidin's immunomodulatory activities, its antimicrobial function can also play a role in treating the lesions. Based on these promising studies, a Phase 2 clinical trial in radiation induced OM is ongoing.

## For further information

Please contact Cellceutix Corporation at 978-236-8717          info@cellceutix.com
More information on this and related projects can be obtained at www.cellceutix.com

21.     Between May 29-June 2 2015, the Company presented a poster at the 2015 American Society of Clinical Oncology ("ASCO") Annual Meeting in Chicago, Illinois, which touted Kevetrin's anti-tumor activity. Specifically, the Company claimed Kevetrin had the unique ability to activate wild type p-53 gene. The poster states in part:

## INTRODUCTION

**Background**: Thioureidobutyronitrile, Kevetrin, induced apoptosis in wild type p53, mutant p53 and p53 null cell lines (*Shapiro 2013*). In A549 lung carcinoma cells, wild type p53 was stabilized by Kevetrin. Kevetrin induced non-genotoxic activation of the p53 signaling pathway (*Kumar 2012*). Kevetrin also induced p21 and PUMA, known transcriptional targets of p53 (*Kumar 2011*). Kevetrin caused accumulation of monoubiquitinated p53 and induced transcriptional independent apoptosis. In p53 mutant breast carcinoma cells (MDA-MB-231), Kevetrin induced degradation of hyperstable oncogenic mutant p53 and induced apoptotic cell death (*Kumar 2011*). Apoptotic cell death was also induced in K-562, a p53 null CML cell line. ***Consistent with in vitro data, Kevetrin showed potent antitumor activity in wild type p53*** (A549), mutant p53 (MDA-MB-231), and p53 null (K-562) human tumor xenograft models (*Chafai-Fadela 2010*). ***Kevetrin has the unique ability to target both wild type and mutant p53 tumors controlling tumor growth in various preclinical tumor models*** (*Kumar 2012, Shapiro 2013*).

Based on the pre-clinical data, a Phase I study was initiated with Kevetrin for solid carcinomas at Dana-Farber/Harvard Cancer Center in 2012. Participating sites include Dana Farber Cancer Institute and Beth Israel Deaconess Medical Center.

**Methods**: Adults with refractory locally advanced or metastatic solid tumors, acceptable liver, kidney function, and hematologic status were eligible. Objectives include determination of DLT, MTD, pharmacokinetics, pharmacodynamics, and evaluating preliminary evidence of antitumor activity.

Kevetrin is given as an intravenous infusion once weekly for 3 weeks in a 28-day cycle. The starting dose was 10 mg/m2. In a 3+3 design, groups of 3-6 subjects are evaluated for toxicity at each dose level. Dose escalation is based upon the number and intensity of adverse events in cycle 1. Kevetrin PK is characterized for the first and last doses given in cycle 1.

Kevetrin induced increases in p21 levels in lymphocytes in nonclinical studies *(Kumar 2011)*; therefore p21 expression in peripheral blood mononuclear cells is measured as a pharmacodynamic biomarker. Antitumor activity by RECIST 1.1 criteria and serum tumor markers are assessed. The p53 status of tumors of selected subjects is determined.

*     *     *

## SUMMARY

The Phase 1 study with Kevetrin, CTIX-0000, is in progress at Dana-Farber/Harvard Cancer Center in subjects with various solid carcinomas; the majority of which are gynecological cancers.

10 cohorts of subjects have been completed; the 11th cohort is ongoing. Only 1 DLT has been observed to date, but the MTD has not yet been reached. The current dose is 750 mg/m2, 75-fold greater than the starting dose.

***Kevetrin was shown to activate wild type p53 and degrade mutant p53***. Since Kevetrin activates both transcriptional-dependent and transcriptional-independent pathways to promote apoptosis through wild type p53 activation and degrades oncogenic mutant p53, Kevetrin can function as a major inducer of apoptosis in many types of tumors independent of p53 mutation status.

In this Phase 1 study, the biomarker, p21 expression levels in peripheral blood, were increased in 68% of subjects and 48% had an increase in p21 expression at a level of $\geq 10\%$. These results suggest that Kevetrin activates p53 by inducing p21 gene expression.

[Emphasis added].

22.    The statements referenced in ¶¶17-21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, products, and directors' backgrounds, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Brilacidin is not effective; (2) Kevetrin does not activate the p-53 gene, which is a tumor suppressor; and (3) Defendant Menon did not earn his PhD in Pharmacology from Harvard University. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

23.     On August 6, 2015, *SeekingAlpha.com* published a report on the Company

("*SeekingAlpha* Report") asserting the following:

- Cellceutix is run out of what appears to be an empty office building, and no one answers the phone - it appears that this is nothing more than a shell corporation.
- CTIX science is demonstrably unviable, rendering this public shell likely worth substantially less than its current value.
- The company is run by a management team with a long history of self-enrichment and shareholder value destruction. One of these insiders has repeatedly issued false statements about his background.
- CTIX is a black hole of related party transactions, enriching consulting agreements, and financing arrangements with known Ponzi scheme fraudsters as financing partners.
- The company's fair value is 96-99% lower than the current price. CTIX should be avoided. This stock is dangerous.

    [Emphasis added].

24.     Specifically, the *SeekingAlpha* Report asserts that Defendant Menon did not earn

his PhD in Pharmacology at Harvard University as claimed, stating in part:

> *Menon's prior biography in official SEC materials claims he attended Harvard for his PhD on multiple occasions. After reviewing this in detail, it appears he never received a PhD from Harvard. I spoke with a representative at Harvard, and also checked Menon's PhD claim at studentclearinghouse.org, a website that verifies degrees.* It is illegal to provide false educational information in SEC documents.

> **Krishna Menon Did Not Receive a PhD from Harvard**

> In what may be the saddest part of the Cellceutix story, ***Krishna Menon has misled investors about earning his PhD at Harvard. This was verified by Student Clearing House. The response is below:***
> ***"We are unable to verify a degree for this individual based on the information you provided."***

> The search criterion was ***Krishna Menon, PhD Pharmacology, Harvard, 1984, which is what Krishna claims to have achieved. Menon simply did not graduate from Harvard, and to claim otherwise is wrong.*** Unfortunately, he has made these claims many times.

In the most recent CTIX 10-K, Menon claims he earned his PhD from Kerala University in India. He no longer mentions Harvard at all. I confirmed with Kerala University that Menon did actually receive a PhD there, so this is true.

[Emphasis added].

25.     Specifically, the *SeekingAlpha* Report also asserts that Brilacidin is not effective in combating and treating: (1) ABSSSI; (2) EBSL Enterobacteriaceae; and (3) gram-negative bacteria, such as S. aureus and E. coli. The report states in part:

- Brilacidin would be extremely difficult to commercialize.
- In a phase 2 trial, Brilacidin did not work in 7/8 types of bacterial infection, including the most common types of infection.
- In the remaining 1/8, there is meaningful evidence that Brilacidin will fail.
- Brilacidin causes adverse side effects and will likely not be approved.

*       *       *

When we look into the ABSSSI trial results, out of eight bacterial variants/strains, **Brilacidin has no activity against seven strains, including Pseudomonas aeruginosa, certain species of Enterobacteriaceae, Acinetobacter species, including Acinetobacter baumannii - which are the common infectious organisms that cause serious and life-threatening ABSSSI infections.** The results clearly showed Brilacidin's inefficacy against several bacterial strains except for one - EBSL Enterobacteriaceae.

Inefficacy is not the only problem of Brilacidin. Incidence of sensory nerve symptoms, such as numbness and tingling of the extremities and elevated blood pressure due to unknown problems were reported as serious adverse events in 65-87% of Brilacidin-treated patients. This alone means that the drug is unlikely to get approved, in my view.

Our scientific review has shown that Brilacidin is not effective even against EBSL Enterobacteriaceae, unlike what Cellceutix claims. **This means that Brilacidin is not effective against any of the eight bacteria strains targeted in the Phase II clinical trial, will almost certainly not be approved, and is essentially without value. In my view, this is why CTIX was able to acquire the failed Polymedix assets at a low price - because real biotechnology companies knew this drug was likely without value. This is how the drug ended up in an OTC shell run by stock promoters.**

*       *       *

**Brilacidin is simply not effective**

11

All these disease-causing bacteria, including S. aureus, Pseudomonas, and E. coli, have been tested by Cellceutix to prove Brilacidin's efficacy. **It is now clear for us that the drug is not effective any of the infectious bacteria that cause serious, life-threatening problems in a clinical care setting.**

According to research studies, like gram-negative bacteria, gram-positive bacteria, including Pseudomonas aeruginosa, Enterococcus fecalis and Mycobacterium tuberculosis (TB bacteria), possess drug resistance mechanism by reducing net negative charge in the outer membrane to repel all positive charged molecules that comes into contact, including Brilacidin. According to the same study, Cellceutix has claimed that Brilacidin, a cationic AMP, is highly effective against these three microbial pathogens - which seem to be a blatant false, as per our above review.

**Despite this scientific rationale, the company has been maintaining that Brilacidin is effective against gram-negative bacteria, and incidence of resistance is "unlikely" - which seems to be joke.**

 [Emphasis added].

26.    Specifically, the *SeekingAlpha* Report also asserts that Kevetrin does not activate

the p-53 gene as the Company claims, stating in part:

### Kevetrin's untold story: It does not stop cancer stem cells

*Cellceutix has claimed that Kevetrin treatment can activate the wild-type p53 (normal, without mutational changes), as well as mutated p53, which seems to be a tall claim.*

*If we look into the molecular basis of cancer, it is impossible to activate the wild-type p53 without inhibiting the release of MDMX and MDM2 proteins, which are the natural inhibitors of p53. Meaning, these two molecules naturally inhibit p53 expression in the cells. Kevetrin just acts on p53, but not on MDMX and MDM2, which can lead to persistent inhibition and unavailability of wild-type p53. So, it is important to target MDMX and MDM2 proteins prior to Kevetrin treatment to achieve complete treatment benefits.*

When we look into the clinical trial protocols, Cellceutix has not considered any of these issues; still, management reports "remarkable" treatment benefits in ovarian cancer patients. It seems that Krishna Menon and Cellceutix have not considered the basic molecular biology of cancer before developing the Kevetrin molecule. The "science" here appears very sloppy. Is this intentionally so?

If Kevetrin can prevent cancer development by curbing abnormal cell multiplication and by maintaining a normal cell cycle, what will the effect be on already developed cancer cells? Maybe Cellceutix's answer is - induction of "cell-

suicide" in cancer cells. In reality, cancer cells can evade almost all the anti-cancer mechanisms, including programmed cell death (apoptosis), and remain immortal.

## Kevetrin's ineffective clinical trial design

You may wonder why cancer treatments often fail, despite much advancement in science and technology. It is because almost all anti-cancer drugs either target the cancer cells or the cancer-causing genes, like p53. In a tumor, the cancer cells are unlimitedly supplied by cancer stem cells, which is the root cause of the problem. Cancer stem cells are present inside the tumor itself. Any anti-cancer treatment will fail if these cancer stem cells remain untouched. Clearly, Keventrin is not a panacea for cancer treatment and is no superior than other anti-cancer drug, because it cannot eliminate cancer stem cells effectively.

If Kevetrin can degrade mutant p53, what is the mechanism of action? The activation of p53 is via a different pathway. It doesn't make sense. Mutant p53 degradation involves several chemical (enzymatic) and genetic (molecular biological) reaction/mechanisms, such as caspase-induced mechanisms and both transcriptional-dependent and transcriptional-independent pathways. The company has not disclosed Kevetrin's exact mechanism of action on mutant p53. To overcome these clinical problems, Kevetrin should be tested alongside other medications, including conventional anti-cancer drugs, to see the potential drug interactions. But in the clinical trials, Cellceutix has not co-administered any other drugs.

Certain cancer patients have tumors without wild-type p53 and with defective genetic makeup in p53 with the presence of only one functional allele (variant of the gene) instead of two. In addition, some patients can lack certain regions of the gene or have other p53 gene variants, such as p.S106R. The binding mechanism of Kevetrin with p53 cannot work with these defective variants, due to structural variations. Cellceutix has not considered these limitations, as most of the reported benefits were based on animal studies, not in humans.

[Emphasis added].

27.     On this news, shares of Cellceutix fell $0.73 per share or approximately 30% from its previous closing price to close at $1.71 per share on August 6, 2015.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cellceutix securities traded on the OTC Pink marketplace during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cellceutix securities were actively traded on the OTC Pink marketplace. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cellceutix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cellceutix;

- whether the Individual Defendants caused Cellceutix to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Cellceutix securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cellceutix securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the OTC Pink marketplace, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Cellceutix securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

36. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cellceutix securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cellceutix securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

41.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cellceutix securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cellceutix's finances and business prospects.

42.     By virtue of their positions at Cellceutix, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

43.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Cellceutix, the Individual Defendants had knowledge of the details of Cellceutix's internal affairs.

44.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Cellceutix. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cellceutix's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Cellceutix's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Cellceutix's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cellceutix securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

45.     During the Class Period, Cellceutix's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cellceutix securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cellceutix securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Cellceutix's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

46.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

48.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49.     During the Class Period, the Individual Defendants participated in the operation and management of Cellceutix, and conducted and participated, directly and indirectly, in the conduct of Cellceutix's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Cellceutix's business practices.

50.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cellceutix's financial condition and results of operations, and to correct promptly any public statements issued by Cellceutix which had become materially false or misleading.

51.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cellceutix disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cellceutix to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cellceutix within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cellceutix securities.

52.     Each of the Individual Defendants, therefore, acted as a controlling person of Cellceutix. By reason of their senior management positions and/or being directors of Cellceutix, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cellceutix to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Cellceutix and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

53.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cellceutix.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: September 11, 2015                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             /s/Phillip Kim_____
                                             Phillip Kim, Esq. (PK 9384)
                                             Laurence M. Rosen, Esq. (LR 5733)
                                             275 Madison Avenue, 34th Floor
                                             New York, NY 10016
                                             Phone: (212) 686-1060
                                             Fax: (212) 202-3827

                                             *Counsel for Plaintiff O'Connell*