F.ci6zagc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    GARY ZAGAMI,

4                   Plaintiff,

5              v.                            15 Civ. 7194 (KPF)

6    CELLCEUTIX CORPORATION, et al.,
                                            Conference
7                   Defendants.

8    ------------------------------x

9                                           New York, N.Y.
                                            December 18, 2015
10                                          3:30 p.m.

11   Before:

12             HON. KATHERINE POLK FAILLA

13                                          District Judge

14

15

16

17

               APPEARANCES
18

19

     THE ROSEN LAW FIRM P.A.
20        Attorneys for Plaintiff
     BY:  PHILLIP C. KIM
21        JONATHAN STERN

22

     ASHCROFT LAW FIRM PLC/ASHCROFT SULLIVAN
23        Attorneys for Defendants
     BY:  MICHAEL J. SULLIVAN
24

25

2

1          (Case called)

2          THE COURT:  Good afternoon.

3          This is, as best I can understand, both our initial

4     pretrial conference and a pre-motion conference, and it is also

5     the resolution of pending motions to serve as lead plaintiff

6     and to approve lead counsel.  Mr. Sullivan, let me speak to

7     you, sir.  I'm not sure you have a horse in this race; am I

8     correct?  The issues of lead plaintiff and lead counsel are

9     really for the putative plaintiffs and the actual plaintiffs in

10    this case to deal with, is that correct, sir?

11         MR. SULLIVAN:  That's correct, your Honor.

12         THE COURT:  Then I'm going to focus on your colleagues

13    at the front table.

14         Mr. Kim and Mr. Stern, I would hear you on your

15    motions.  It might be quite short, because it would appear you

16    are the only game in town in terms of those who have applied.

17    Is that correct?

18         MR. KIM:  That's right, your Honor.  Notice was issued

19    timely.  Mr. Zagami has a material interest.  He bought 5,000

20    shares, lost over $6,000.  He is an experienced shareholder.

21    About six years ago he served as lead plaintiff in a securities

22    class action in Dallas federal court, and we were successful in

23    that case, recovering a couple of million dollars for share-

24    holders.  So he is experienced.  He is a good candidate to be

25    lead plaintiff.

1          THE COURT:  Is he just unlucky, sir, that he has

2     bought securities that have required him twice to be involved

3     in class action litigation?

4          MR. KIM:  Between six, seven years, given the GFC, I

5     think he did okay as to losses.  In that sense I think he did

6     okay.

7          With respect to our motion, he is the presumptive lead

8     plaintiff.  He is the only movant.  We did issue notice.  Under

9     the statute, putative class members have an opportunity to

10    object; no one has objected.

11         Given that his motion is unopposed, as to my firm, we

12    have served as lead counsel in a number of actions in this

13    court and in others, as noted in our firm résumé.  We have

14    recovered tens of millions of dollars for shareholders in

15    similarly size cases such as this.  I would ask that the Court

16    grant the motion so that we may proceed with the merits of the

17    case.

18         THE COURT:  May I understand, please, Mr. Zagami is

19    alleged to be the biggest loser, or is that just among those

20    who have put in as plaintiffs in this case?

21         MR. KIM:  That's correct: of the people before the

22    Court.

23         THE COURT:  There are two people before the Court,

24    correct, Ms. O'Connell and Mr. Zagami?  Are there others?

25         MR. KIM:  No.  Actually, there is only one plaintiff.

1    We substituted in Mr. Zagami during the pendency of the case.

2         THE COURT:  Ms. O'Connell still shows up on ECF.  I

3    will have to see what I can do so she doesn't show up on ECF.

4    My case as it is staring me in the face is captioned O'Connell

5    v. Cellceutix.  But you have no control over that.  By saying

6    he is the largest loser in this, he is also the smallest loser

7    of the putative plaintiffs because he is the only one who is in

8    this litigation thus far as the plaintiff, correct?

9         MR. KIM:  Yes, he is the only named plaintiff at this

10   juncture.

11        THE COURT:  That is a lovely way of saying it.  Have a

12   seat for a moment, please.

13        In dealing with these motions, I am going to grant

14   both of them, in large measure because Mr. Zagami and The Rosen

15   Law Firm have demonstrated themselves to qualify for these

16   positions and no one else has asked to be.

17        With respect to the motion to serve as lead plaintiff,

18   there was the appropriate notice given, the deadline came and

19   went, and only Mr. Zagami has moved.  No opposition has been

20   filed to the application.  And the PSLRA still provides a

21   rebuttable presumption that the most adequate plaintiff to

22   serve as lead plaintiff is the one who either filed the

23   complaint, made a motion in response to the notice, in the

24   determination of the court has the largest financial interest

25   in the relief sought, and otherwise satisfies the requirements

1    of rule 23 of the Federal Rules of Civil Procedure.

2         Mr. Zagami filed the instant motion to serve as lead

3    plaintiff, satisfying the first requirement.  In the named

4    plaintiffs, he has lost the most.  And there is no other

5    potential lead plaintiff with a greater loss who has come

6    forward or been identified.

7         It would appear that he meets at this juncture the

8    other requirements of rule 23.  Having satisfied that

9    presumption, it can be rebutted only upon proof by another

10   purported class member that Mr. Zagami would not fairly and

11   adequately protect the interests of the class or is subject to

12   unique defenses that render him incapable of adequately

13   representing the class, and I see neither here.

14        With respect to the motion to approve lead counsel,

15   here, too, the PSLRA gives the lead plaintiff the authority to

16   choose lead counsel subject to my approval.  My decision to

17   intervene or to choose someone else to represent the lead

18   plaintiff's interests should occur only when necessary and only

19   to protect the interests of the class.  I agree with Mr. Kim

20   that The Rosen Law Firm has extensive experience in this area.

21   There is no indication that they cannot adequately serve the

22   class in this case.  They have been active in Mr. Zagami's case

23   thus far.  Given that, I will in fact allow them to be

24   appointed as lead counsel.

25        I would like now to talk about the merits of the case.

1   Mr. Kim, let me talk to you first, sir.  Unless, of course, Mr.

2   Stern is actually going to be taking the laboring oar.  I

3   suppose you will pass off to him as need be.

4        MR. KIM:  That's correct, your Honor.

5        THE COURT:  Perhaps I was misunderstanding the letter

6   that was filed by your adversaries.  In the defendants' letter,

7   what was suggested to me is there is a concern that the time

8   period between the announcement of the drop in the stock price

9   and the filing of the complaints was really quite small, it

10   happened on the same day.  I believe the response that you gave

11   was that it was true that these individuals had the opportunity

12   to and reviewed the complaints before they were filed.  That's

13   fine.

14        I'm just trying to understand, was everyone expecting

15   this announcement to take place such that there was a complaint

16   that was already ready, or was this a case for which you had

17   prior complaints that could very quickly be turned around to

18   meet the specifics of this?  I'm trying to figure out how it

19   came to be so quick that Ms. O'Connell was able to file the

20   lawsuit.

21        MR. KIM:  Your Honor, we have no relationship with

22   Mako Research.  We had no idea they were going to issue a

23   report.  We saw it at the same time everyone else saw it.

24   That's pretty clear.  I don't think anyone is suggesting that

25   we did.

7

FciS120oc

1        That being said, as to the case, we do monitor the

2   news, just being a plaintiff securities firm, and we do receive

3   tips from shareholders.  I don't recall in this specific

4   instance whether this was something we discovered or a

5   shareholder had tipped us to, but that's when we issued our

6   investigative notice, which is typical in this practice.  You

7   can follow other stocks that have similar issues, whether it's

8   a restatement, a short seller report, etc.

9        Then we issued the investigative and clients contacted

10  us, including Ms. O'Connell.  She filled out a form with

11  respect to the case.  But there was a delay between when we

12  issued the announcement and when we actually filed the case.

13  When we filed the case, Ms. O'Connell had reviewed the

14  complaint and had approved it, same as Mr. Zagami when we

15  amended the complaint.

16        We didn't file the complaint right way.  We wanted to

17  check it out.  That's part of our obligation.  We certainly

18  take the allegations that Mr. Sullivan had made in his letter

19  very seriously.

20        THE COURT:  As do I, yes.

21        MR. KIM:  We had been looking at this issue prior to

22  us filing the case.  We consulted an industry expert who we

23  asked for an initial review -- does this sound right? does this

24  look okay? -- and he concurred.  We took a further look at it.

25  Since then, we have consulted an FDA regulatory expert that we

 1   have used in other cases and looked at the issues even further.

 2        So, in that sense we didn't file the complaint right

 3   away.  The clients reviewed the complaint.  Mr. Zagami had

 4   reviewed the complaint when we amended it.  That's what we said

 5   in our letter.  So the case was filed.

 6        If the Court permits us to amend or at least gives us

 7   that period of time to prepare the amended complaint and allow

 8   us to further consult these experts that we have consulted so

 9   far, if we determine what Mr. Sullivan says is true, perhaps we

10   won't amend.  But at this point it looks like we want to amend.

11   Certainly we are asking for that time.

12        Typically in a case like this, where there is a lead

13   plaintiff, and I understand the named plaintiff is the lead

14   plaintiff --

15        THE COURT:  Yes.

16        MR. KIM:  Ordinarily, you would want a lead plaintiff

17   to file a complaint so that it can represent the putative

18   class, so to speak.  If you look to rule 15 and of course the

19   recent decision from the Second Circuit Loreley v. Wells Fargo,

20   the standard for granting leave to replead is very liberal.  In

21   this case if you look at the factor of undue delay, when Mr.

22   Sullivan wrote his letter, immediately we said we want to

23   address this by trying to amend the complaint, let's figure

24   this out.  It took about 30 days for all the defendants to get

25   back to us, and ultimately this issue was before the Court.

1          Bad faith, there is no bad faith.  We want to amend.

2     We want to address these issues.  We are not working with the

3     short sellers.  There is no such conspiracy.  Even if you look

4     at the rule 11 letter, they specifically say we are not

5     suggesting that you have any impropriety with these short

6     sellers, because there isn't.

7          The other thing is undue prejudice.  We cited the

8     Second Circuit case.  The fact that you need to litigate is not

9     undue prejudice for rule 15 purposes.  In any event, nothing

10    has really been done in the case.  Discovery has been stayed.

11         THE COURT:  Sir, I want to stop you for a moment

12    because I think you are putting the cart before the horse.  I

13    do appreciate the rule 15 factors and I understand how they

14    play out in this case.  The issue that I thought you identified

15    in your letter, which is where I wanted to begin, is on some

16    level Mr. Sullivan's letter was premature because at the time I

17    wasn't even aware of an amended complaint that you wished to

18    file.  It was not until your letter of the 24th that I became

19    aware or at least there was a hint that you did wish to file an

20    amended complaint.

21         I am also aware that it frequently happens in cases of

22    this type that after the appointment of a lead plaintiff, there

23    is permission given to amend the complaint.  I would note that

24    I think in that last regard Mr. Sullivan has the better of the

25    argument, because it really can't be said that there is much to

Foizzago

1    change here inasmuch as this is not a situation where there are

2    multiple competing plaintiffs and you are trying to get

3    together different complaints and consolidate them or things of

4    that nature or trying to speak to a number of individuals.

5    Your client, Mr. Zagami, is I think the only person we know

6    about in this case.

7          I wanted to talk first with you about what you

8    contemplated as an amendment before we go to whether I would

9    allow you to amend.  I believe what you said in your letter,

10   and I'm looking at the second page of that letter, was that you

11   believed that Mr. Sullivan's letter should be stricken as

12   procedurally improper.  Once again, I wanted to know what the

13   complaint was before you started talking about whether you

14   could do it.  What, sir, do you intend to amend your complaint

15   to include?

16         MR. KIM:  I'll defer at the appropriate time to Mr.

17   Stern, who is working on that.  We intend to add facts

18   particularly with the regulatory process and the clinical

19   trials.  I think one of the allegations in the report was that

20   the clinical trial was not set up properly.  There were some

21   allegations in rebuttal about the company, about Mr. Menon's

22   background at Harvard.

23         We want to add some additional information related to

24   that, that it is a material misstatement, particularly when you

25   are dealing with a company here where you are trying to have

11

1    investors believe that this particular product has a likelihood

2    of success.  Our view is I think it is relevant that you know

3    the chief research officer was allegedly claiming that he

4    received a Ph.D from Harvard when he didn't.

5             THE COURT:  Did he or did he not?

6             MR. KIM:  He did not.

7             THE COURT:  Did he show up?  Did he audit a class?

8    Was he in the vicinity of Cambridge at some period of time?

9             MR. KIM:  It's just a false statement, your Honor,

10   that is our contention.  They claim it was a mistake.  I guess

11   it's a question of fact we would say.  We think that is

12   relevant because the investors are trying to assess whether or

13   not the people behind this product and this technology have a

14   likelihood of success.  Certainly you would like to know the

15   background relating to this individual.

16             Apparently, according to news reports in India, he had

17   run a for-profit medical school that was unaccredited, being

18   sued for fraud.  Apparently there were some people within the

19   management of the corporation that were affiliated with known

20   or reputed boiler rooms or stock promoters.

21             Those additional details, some may be repetitive.

22   However, I think in a PSLRA case, when the court has to

23   consider the totality of the circumstances, particularly with

24   respect to scienter, when you have additional facts all sort of

25   pointing in one direction that leads to the inference, it is up

1   to the Court whether it is a strong inference or not, which is

2   the standard, whether certain statements were made with

3   scienter or not.  There are facts relating to that.

4          We also want to add additional information with

5   respect to scientific experts.  There is a dispute as to the

6   science here.  And of course, this additional time as well will

7   let us determine if it turns out, based upon our experience

8   after consulting with these scientific experts, that perhaps a

9   particular false statement may not be actionable but some

10  others may, and it may give us time to narrow this as well.

11         THE COURT:  I understood everything you said until

12  this last point.  I understand that you do not know until you

13  know, and I haven't made the decision yet, that you are going

14  to be given leave to amend.  I can understand that you were

15  preparing and trying to get things squared away.  I don't

16  understand the last thing you were saying.  It may just be my

17  inability to comprehend.

18         What I think you are saying is that you need 45 days

19  from now to figure out whether certain things are material or

20  not material, certain claims should or shouldn't be made.  I

21  guess I'm trying to understand why that couldn't be done, for

22  example, back at or about the time of your letter of November

23  21st.  November 24th, excuse me.

24         MR. KIM:  We have been continuing to look at it.  The

25  defendants have put us on notice.  If you look at rule 15 in

1   the context of leave to amend, within rule 15 is a built-in

2   mechanism where if defendants make a motion to dismiss, there

3   is a procedure where, rather than answering, one could amend as

4   a matter of right.

5          THE COURT:  Yes, sir.

6          MR. KIM:  I think our conduct thus far in that regard

7   is reasonable.

8          THE COURT:  Sir, let me try and ask the question more

9   pointedly.  I'm sorry.  We are talking past each other.  Why do

10  you need 45 days to do everything you just outlined?

11         MR. KIM:  We don't need 45 days.

12         THE COURT:  That's correct.  Good.

13         MR. KIM:  I apologize.  It's Friday at 3:30.  I'm

14  sorry.

15         THE COURT:  That's okay.

16         MR. KIM:  We don't need 45 days from today.  I think

17  given the holidays, we could get something done by the middle

18  of January.  If you exclude Christmas and New Year's, that

19  gives us a few weeks.  Certainly, whatever the Court is

20  inclined to grant, we will work hard to meet that schedule.

21  I'm sorry.

22         THE COURT:  Thank you.  I need to ask more precise

23  questions at 3:30 on a Friday.  Now we both understand.

24         I do understand your rule 15 analysis.  If there is

25  anything you think I'm missing, I will hear from you.  Then I

1   want to hear from Mr. Sullivan as to why I should not permit

2   you to do this.

3          MR. KIM:  Thank you.

4          THE COURT:  That's it.  Mr. Sullivan, I will hear from

5   you, sir.

6          MR. SULLIVAN:  Thank you, your Honor.  I'm sure you

7   will shut me off at some point in time if I am giving you

8   redundant facts that you are already familiar with.

9          Your Honor, I thought the chronology of this matter is

10  important to restate.

11         THE COURT:  Okay.

12         MR. SULLIVAN:  It was an anonymous posted article on

13  August 6th of this year that made wild accusations against this

14  company Cellceutix.  Within hours that article was tagged by

15  The Rosen Law Firm, and within hours there was a certification

16  by the first named plaintiff that she had reviewed the

17  complaint and found the complaint to be factually accurate.

18  Hours after that, the now lead plaintiff, Mr. Zagami, certified

19  that he reviewed the complaint.

20         So I sit here wondering, your Honor, the same

21  questions that you were asking at the outset.  How does a

22  plaintiff's law firm, regardless of whether it is a PSLRA case

23  or any type of litigation that is being filed, how are they

24  able to do the proper due diligence, make the proper inquiries,

25  do the type of investigation that is expected before a

1    complaint is filed, within hours have a complaint that can be

2    certified by not one but by two, and the only two plaintiffs,

3    your Honor, that been identified in this matter?

4         Mr. Kim says he has no relationship with Mako

5    Research.  I don't know if he does or doesn't, your Honor.

6         THE COURT:  Sir, he made that representation to me as

7    an officer of the court.  Bad things will happen to him if that

8    turns out to be false.  Let's not go impugning his integrity

9    just yet.

10        MR. SULLIVAN:  I am not, your Honor.  Our

11   investigation indicated he was the sixth follower of Mako

12   Research.  I never heard of Mako Research until they published

13   this particular article.  I don't know how somebody becomes the

14   sixth follower of an entity they have no relationship with,

15   your Honor.

16        THE COURT:  It may be part of his line of work, sir,

17   to keep up with stuff like this.

18        MR. SULLIVAN:  It could be, your Honor.  Within hours,

19   essentially two plaintiffs claimed that they reviewed and filed

20   a certification that the complaint was factually accurate.

21   Within a month, your Honor, I guess within five weeks, The

22   Rosen Law Firm filed the first complaint.  Several weeks after

23   that, they amended it with Mr. Zagami.  That was their first

24   amended complaint.

25        We took, I thought, an extraordinary step, your Honor,

1    and put them on notice under rule 11 and outlined all the

2    deficiencies in their complaint.  I should point out, your

3    Honor, their complaint mirrors that anonymous article that was

4    posted online.  All the factual information that is in that

5    complaint, including what Mr. Kim is now representing as new

6    evidence that they want to explore, is also in that Mako

7    Research article, your Honor.  The issue concerning Dr. Menon's

8    degree --

9            THE COURT:  Did he go for Harvard, sir?

10           MR. SULLIVAN:  He did not.

11           THE COURT:  Why did he say he did?

12           MR. SULLIVAN:  He did, your Honor, years ago, and he

13   claimed it was a mistake.

14           THE COURT:  Hold on, Mr. Kim.  Stop.  You do have to

15   have a poker face here.  Thank you.

16           Go ahead, Mr. Sullivan.

17           MR. SULLIVAN:  He made that claim years ago, your

18   Honor, and claimed it was a mistake.  Then all the public

19   filings, your Honor, were corrected concerning Dr. Menon, where

20   he earned his degrees, long before this class period, well

21   before either of these two plaintiffs purchased stock.  In all

22   the public documents that had been available during this class

23   period, Dr. Menon's actual qualifications are listed

24   accurately.  So the issue about Harvard predates the purported

25   class period.

1          We went through the extraordinary steps of outlining

2     all the deficiencies in the complaint, your Honor.  In addition

3     to that, some level of due diligence even after filing would

4     have pointed out a Boston Business Journal article that refuted

5     many of the facts in the Mako Research anonymous article.  In

6     fact, the author of the Boston Business Journal identified who

7     he was, did an investigation, went up and checked out the

8     company, and posted an article in the Boston Business Journal.

9          THE COURT:  Sir, when you say the Boston Business

10    Journal identified who he was, is he the anonymous poster?

11         MR. SULLIVAN:  I'm sorry, your Honor.  No.

12         THE COURT:  There are a couple of individuals here.  I

13    want to make sure I understand what the pronoun refers to.

14         MR. SULLIVAN:  The anonymous post, your Honor, is

15    anonymous under the pseudonym Mako Research.

16         THE COURT:  Have we identified who Mako Research is?

17         MR. SULLIVAN:  We have not, your Honor.  He continues

18    to be undisclosed notwithstanding the efforts of trying to

19    identify who he is.

20         Secondly, after the Mako Research article was posted,

21    you can imagine the impact of not just the article, but then

22    the announcement by The Rosen Law Firm that they were pursuing

23    a class action suit, the impact on the valuation of the company

24    plummeted.  They lost about 50 percent valuation when the Rosen

25    law firm announced that they were seeking a potential class

1   action lawsuit against the company.

2          The Boston Business Journal, because the company is

3   headquartered in Massachusetts, went out and conducted their

4   own investigation.  There is an author of a Boston Business

5   Journal article that refutes many of these outrageous

6   allegations that were included in the Mako Research article.

7   That's been available to The Rosen Law Firm.

8          THE COURT:  Sir, I don't think they are under an

9   obligation to accept that.  Are they?  It may well be that

10  their still additional independent research may show that there

11  are areas of dispute between the Mako Research article, the

12  Boston Business Journal article, and the truth as we will come

13  to know it.

14          I just want to confirm this.  You are not saying that

15  they had an obligation to withdraw their complaint upon seeing

16  the Boston Business article; what you are saying instead, sir,

17  is they are on notice that they had some research to be doing

18  when the Boston Business Journal was released?

19          MR. SULLIVAN:  Correct.

20          THE COURT:  Thank you.  Please continue, sir.

21          MR. SULLIVAN:  Beyond that, your Honor, our argument

22  is their due diligence, their investigation, should have taken

23  place in advance of racing to the courthouse with a complaint,

24  and they failed to do that.  They are now asking the Court to

25  essentially give them some additional time to file a third

1    amended complaint --

2         THE COURT:  Second amended complaint.

3         MR. SULLIVAN:  I'm sorry, second amended complaint, a

4    third complaint.

5         -- second amended complaint with, as the Court pointed

6    out, a plaintiff that has been a plaintiff of this firm, who

7    Mr. Kim represented has been a plaintiff of this firm

8    previously, Mr. Zagami, and who has certified back on August

9    7th of this year that he had read the complaint and the

10   complaint was accurate.  They are now saying we need even more

11   time to essentially determine whether or not there are merits

12   to these claims.  That was never the intent in terms of the

13   PSLRA.

14        THE COURT:  I understand that, although I thought Mr.

15   Kim was saying that he had merit in his initial complaint and

16   he wanted to augment and perhaps give a little bit more detail

17   to demonstrate that the merit he thought he had when he filed

18   initially he still thinks he has or thinks he has even more so.

19   But I'll let him speak for himself.  But I understand.  Your

20   point, sir, is he has had enough time to file an appropriate

21   complaint.

22        MR. SULLIVAN:  Absolutely, your Honor.

23        THE COURT:  And he should not be permitted to file

24   another complaint.

25        MR. SULLIVAN:  Absolutely, your Honor.

1      THE COURT:  I understand that.  Now, sir, you have not

2   responded to said complaint, right, because we are having this

3   motion instead?

4      MR. SULLIVAN:  Exactly, your Honor.

5      THE COURT:  If it turns out, and I'm still exploring

6   the issue, that I permit him a brief period of time to file a

7   second amended complaint with the understanding that there is

8   highly unlikely to be a third, is it your contemplation that

9   there will be a motion to dismiss?

10      MR. SULLIVAN:  Based on the claims that he has

11   represented thus far, your Honor, and based on what he has

12   represented in this courtroom, absolutely.  The claims are

13   completely frivolous, your Honor.  We will implore the court

14   not to give him any additional time.

15      He is saying his complaint still has merit.  He can

16   essentially explain to the Court in response to a motion to

17   dismiss why his claim has merit.  To me, your Honor, PSLRA's

18   heightened pleading standard was putting plaintiffs' firms in

19   particular and plaintiffs on notice, get it right at the

20   outset.  It's completely unfair to essentially put companies

21   through frivolous claims at great capital cost and the

22   inability to raise capital, the inability to pursue some of

23   their life-changing and potentially life-saving drug therapies.

24      All we are asking your Honor is to let the first

25   amended complaint stand, give us an opportunity to file a

1    motion to dismiss, and hear us on the merits whether or not the

2    claim is sufficient.  We believe it won't survive.  I suspect

3    Mr. Kim knows that.  That's the reason why he is asking for a

4    further amendment to the complaint.

5          He was on notice before he filed it, your Honor.  He

6    was on notice with the motion under rule 11.  He has ignored

7    both of those.  And here we are well in excess of four months

8    into this matter, your Honor.  He has had ample time to cure

9    any deficiencies, if there are deficiencies, or to supplement,

10   and he has failed to do that, your Honor.  We would ask the

11   Court not to allow any further amendments and give us an

12   opportunity to file a motion to dismiss.

13         THE COURT:  Mr. Sullivan, while you are standing, can

14   I understand -- and I realize, sir, that all you can speak to

15   is the operative complaint that we have before us -- what would

16   your motion to dismiss look like?

17         MR. SULLIVAN:  Thank you, your Honor.  We would lay

18   out all the factual inaccuracies with regard to the

19   representation as it relates to the drug therapies.

20         THE COURT:  Let me stop you right there.  You will

21   excuse me if I'm misremembering things.  It would be in the

22   context of a 12(b)(6) motion, correct, sir?

23         MR. SULLIVAN:  Yes, your Honor, correct.

24         THE COURT:  So I will have to accept all well-pleaded

25   allegations as true?

1          MR. SULLIVAN:  Scienter I think is going to be a

2     tremendous challenge, your Honor.

3          THE COURT:  I understand.  That's where I thought you

4     were headed.  But when you are saying you want to show the

5     factual inaccuracies, are these things where it is simply

6     demonstrably false and material that I may appropriately

7     consider in a 12(b)(6)?

8          MR. SULLIVAN:  Yes, your Honor.

9          THE COURT:  Good.  Please continue, sir.

10         MR. SULLIVAN:  Principally scienter, your Honor, the

11    factual inaccuracies, the failure to do the proper due

12    diligence with regard to the pleading itself, the fact that

13    they didn't timely respond to a motion under rule 11, which we

14    think still has merit to pursue.

15         THE COURT:  I'm sorry, sir.  I want to make sure I

16    understand that.  Are you saying that I should dismiss the

17    complaint based on their failure to respond to the rule 11

18    motion?

19         MR. SULLIVAN:  No, I am not, your Honor.

20         THE COURT:  Thank you.  I was misunderstanding.  Go

21    ahead.

22         MR. SULLIVAN:  We could be asking, I think, your

23    Honor --

24         THE COURT:  At some later date I understand you may be

25    asking me for something.  This I understand.  But I'm really

1   focused on trying to get in my head what the 12(b)(6) motion is

2   going to look like.  It's going to be basically a challenge to

3   the factual allegations and, more fundamentally, whether the

4   factual allegations as alleged or as revealed by your contrary

5   materials you submit to me in connection with your motion,

6   whether that amounts to scienter.  It is your view that it just

7   can't?

8              MR. SULLIVAN:  Correct, your Honor.

9              THE COURT:  Anything else you would like to bring up?

10             MR. SULLIVAN:  Nothing else at this point, your Honor.

11             THE COURT:  Thank you very much, sir.

12             Mr. Kim, may I hear from you, please.

13             MR. KIM:  Just a quick couple of points.  To this idea

14  that we did not respond to their rule 11 letter, we did

15  respond.  We said we wanted to amend the complaint.

16  Immediately we said would you like to agree to a briefing

17  schedule.  Certainly 30 days had elapsed.  Certainly if he had

18  agreed to that, we would have stuck by that; perhaps by now we

19  would have had an amended complaint.  We weren't dragging our

20  feet or trying to have protracted motion practice here.  I

21  would like to clear that up.

22             The other point about being a follower of Mako

23  Research.  As part of my job, I monitor the news of investment

24  sites.  To the fact on seeking out where you can bookmark

25  various authors, again, I have no relationship with Mako

1    Research.  We did not know about the article when it was coming

2    out.  I learned about it the first time I read it on the

3    Internet.

4         THE COURT:  Sir, while we are here, have you read the

5    Boston Business Journal article?

6         MR. KIM:  The Boston Business Journal article I

7    believe was an article prompted when the company had reached

8    out to them.  This was after the fact.  If I remember

9    correctly, they showed some people in the office.  That's after

10   the fact.  If I remember correctly, there was a line in there

11   that said the company seemed less suspicious.  So it is not

12   this watershed sort of exculpation that the defendant suggests.

13   Multiple syllabic words.  It is not this watershed disclosure

14   as the company suggests.

15        And there is case law out there sort of in a different

16   context where a company does an initial investigation and there

17   are findings to that investigation, and on a motion to dismiss

18   courts have said even the internal investigation's findings

19   that we find no wrongdoing is a question of fact.  It is not

20   something that you could use at the motion to dismiss stage.

21        I sort of use that as an analogy here.  It is not even

22   as strong as that.  This is just an article saying they

23   interviewed some people, and when they went to the office,

24   there were some people there.  The article was made, and the

25   article was post-mortem.

1          THE COURT:  My question was, again, so much simpler

2     than that, sir.

3          MR. KIM:  Sure.

4          THE COURT:  Did you read the article?

5          MR. KIM:  Yes, I read the article.

6          THE COURT:  Having read the article, you still believe

7     there is merit to the lawsuit you wish to file?

8          MR. KIM:  I believe there is merit to file a lawsuit,

9     to proceed.

10          THE COURT:  I am going to ask you to remain here for a

11     moment and be patient.  I'm going to look at some things and

12     talk to you in a moment.  I will stay on the bench.

13          (Pause)

14          Thank you very much for your patience.  I am going to

15     permit this amendment of the complaint.  Mr. Sullivan, you

16     heard Mr. Kim mention the Wells Fargo case.  You don't need to

17     stand.  Thank you.  The Wells Fargo case is a very interesting

18     one that came up over the summer.  It's a Judge Calabresi

19     decision that gently rebuked a colleague of mine, Richard

20     Sullivan, who engaged in a practice that I engage in, which is

21     this pre-motion conference practice.

22          The case itself speaks largely to the issue of

23     premotion conferences, but arguably it can speak more broadly

24     to the issue of the propriety of allowing or being especially

25     liberal in the allowing of amendments to complaints at this

1    stage in the litigation.  I had Wells Fargo on the brain.  But

2    more than that, I had rule 15 on the brain.

3              I think it is appropriate to allow amendment here, or

4    at least it is not inappropriate to allow amendment here.  But

5    in no way is 45 days necessary.  What I am going to do is the

6    following.  I'm going to ask for the complaint, the amended

7    complaint, to be filed on or before the 6th of January.  That

8    is enough time.  Then, Mr. Sullivan, I think you are quite

9    ready to do your motion to dismiss.

10             What I would like to do is right now set a schedule

11   for that motion to dismiss rather than have you engage in what

12   I think would be unnecessary premotion discovery and conduct.

13   Let's do this.  Rather than having a case management plan, the

14   complaint will be in on the 6th of January.  Your motion will

15   be due, opening brief, on the 5th of February.  The responsive

16   brief will be due on the 7th of March.  And the reply brief, if

17   one is desired, would be due on the 21st of March.

18             Mr. Sullivan, earlier you heard me talk to you about

19   what documents may and may not be considered.  I'm sure you

20   know what is appropriate.  I'm only saying this because in the

21   very recent past I have had two motions to dismiss where the

22   parties, understandably but improperly, tried to get other

23   documents before me.  They were very interesting documents and

24   one might say dispositive of certain issues; I just couldn't

25   consider them.  I'm asking you to learn from your predecessors'

27

1    mistakes.

2           We'll set a scheduling order that will come out, if

3    not today, then on Monday, that has this schedule.  I don't

4    anticipate there will be a need for a third amended complaint.

5    Again, I know Wells Fargo.  The parties may ask for leave to

6    amend in the course of responding to his, Mr. Sullivan's,

7    motion to dismiss.  We'll see.  It seems to me we have had a

8    very thoughtful discussion about what the various issues are.

9    We'll see if any is needed.

10          I believe that's all I have.  I wanted to get the

11   motions resolved that existed and to deal with this issue.  I

12   note, and I just note, the parties have views about each other.

13   They are embodied in the rule 11 letter.  They are embodied in

14   the discussions that each side has had regarding the other in

15   this case.  I have allowed it to go on for today.  At some

16   point, if it crosses a threshold where I think it goes into ad

17   hominem attacks, I will stop it.

18          You both are allowed to be passionate about your

19   clients and about your positions.  You will just have to trust

20   in my ability to resolve these issues without the need to turn

21   it up to 11 each time.  And excuse me for the Spinal Tap

22   reference if you are not getting it.  I don't need you to

23   attack each other.  I can figure this out without that.

24          What I am going to ask is that the parties get a copy

25   of this transcript because we have actually had substantive

1    discussions about the issues and I find them useful.  If you

2    order it, I will receive it automatically, you don't need to

3    send it to me.

4           Let me ask, Mr. Kim, is there anything else we should

5    talk about today, sir?

6           MR. KIM:  Nothing, your Honor.  Thank you.

7           THE COURT:  Thank you very much.

8           Mr. Sullivan, anything else today, sir?

9           MR. SULLIVAN:  No, your Honor.  Thank you very much.

10          THE COURT:  Thank you all very much.  Mr. Stern, next

11   time we let you speak.  Happy holidays to all of you.

12          (Adjourned)