**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jonathan Stern, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: jstern@rosenlegal.com

Counsel for Plaintiff Zagami

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY ZAGAMI, Individually and on Behalf of all Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>CELLCEUTIX CORPORATION, LEO EHRLICH, and KRISHNA MENON,<br><br>    Defendants. | Case No. 1:15-cv-7194 (KPF)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Gary Zagami ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to herself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cellceutix Corporation ("Cellceutix" or the "Company"), analysts' reports and advisories about the

Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Cellceutix securities between May 10, 2013 and September 11, 2015, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors.

2.      Cellceutix is a clinical stage biotechnology company focused on discovering small molecule drugs for hard to treat diseases, including drug-resistant cancers, psoriasis, autism and inflammatory disease.  It is developing several drugs for approval by the FDA, including the drugs Kevetrin and Brilacidin.  Kevetrin is a drug being developed by Cellceutix as a cancer treatment. Brilacidin being developd by Cellceutix as an antibiotic.

3.      Throughout the class period, Defendants misrepresented numerous aspects of Cellceutix's business. Defendants exaggerated the usefulness of Brilacidin, claiming that it could be used to treat notoriously difficult to treat gram-negative bacteria and that it could be used as an antibiotic for "oral mucositis," a common side effect of chemotherapy.  Defendants also misrepresented the nature of the clinical trials they were performing on Kevetrin, claiming that a test they were performing during the Phase 1 clinical trial demonstrated Kevetrin's efficacy, when in fact the scientific evidence indicates the opposite.  Defendants misrepresented the

difficulty and expense of taking Brilacidin to market, failing to disclose that in order to complete the work required to obtain FDA approval of Brilacidin Cellceutix must drastically more money than it had raised previously.  Defendants also failed to disclose that nobody at Cellceutix had any experience with Phase 3 trials.

4.     In addition, Krishna Menon, Cellceutix's president and chief scientific officer misrepresented his own credentials, claiming to have invented two drugs he only played an insignificant role in working on, and pretending to have received a PhD from Harvard. His fabricated record helped drive up the price of Cellceutix stock by giving the Company unearned credibility.

5.     This fraud began to be exposed when the short seller Mako Research issued a report on August 6, 2015, stating that 1) Brilacidin was ineffective against gram-negative bacteria, and was ineffective as an antibiotic oral rinse; 2) that Kevetrin's Phase 1 trial did not establish Brilacidin's efficacy, contrary to Defendants' misrepresentations; 3) that Menon lied about receiving a PhD from Harvard; 4) that Menon was not the inventor of the blockbuster drugs as he had claimed. These revelations corrected misrepresentations in the market and drove down the price of Cellceutix's stock.  The next day, Defendants issued a press release attacking the Mako Research report, but in doing so they admitted 1) that Brilacidin was not effective against gram-negative bacteria; 2) that Defendants did not believe that Brilacidin was an effective antibiotic when used as an oral rinse to treat oral mucositis; 3) that Menon did not attend Harvard; and 4) that a patient who had been treated with Kevetrin and who Defendants claimed as a result had "essentially undetectable" levels of cancer cells, when in fact tests showed signs of her cancer returning, causing her doctor to discontinue treatment with Kevetrin.

As a result, Cellceutix's rebuttal failed to sway the market, and Cellceutix's price remained deflated.

6.      On September 11, 2015, the market also learned, in the form of Cellceutix's 10-K for 2015, that no employee or officer of Cellceutix had experience with Phase III clinical trials and that in order to obtain Phase 3 approval for Brilacidin, Defendants would be required to comply with specific guidance previously issued by the FDA in October 2013.  This news further reduced the price of Cellceutix's stock.

7.      Defendants were well aware of the fraud.  Cellceutix was a tiny company throughout the class period with fewer than a dozen employees.  Menon was the Chief Scientific Officer of the company, one of the inventors of Kevetrin, and was therefore fully apprised of the status of Cellceutix's various clinical trials.  Both Ehrlich and Menon made statements that contradicted information they possessed.  Ehrlich was both the CFO and the CEO of the company, and by virtue of this dual role was particularly well aware of the goings on within the very small company that he ran.

## II.    **JURISDICTION AND VENUE**

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

III.    **PARTIES**

12.    Plaintiff, as set forth in the Certification previously filed with the Court, purchased Cellceutix securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.    Defendant Cellceutix is a clinical stage biotechnology company that engages in the development of treatments for cancerous and degenerative diseases. The Company is incorporated in Nevada with principal executive offices located in Beverly, MA. Cellceutix's common stock trades on the OTC Pink marketplace under the ticker symbol "CTIX."

14.    Defendant Krishna Menon ("Menon") served as President of Cellceutix Pharma since inception in June 2007. Following the Company's acquisition of Cellceutix Pharma in 2007, Dr. Menon served as President, Chief Scientific Officer and a director of the Company. Additionally, he serves as Chairman of the Board of the Company. Dr. Menon, simultaneously therewith, also serves as the Chief Operating Officer at Kard Scientific, Inc. Menon originally trained as a veterinary surgeon. Menon has also simultaneously worked for Nanoviricides, Inc., as Chief Regulatory Officer, from 2006 to the present.  Defendants failed to disclose Menon's employment with Nanoviricides in the 10-Ks filed throughout the class period.

15.    In 1982, Menon began working at the Dana Farber Cancer Research Institute. From 1985 to 1990, Dr. Menon was a Research Scientist at Dana Farber Cancer Research Institute. He then worked as a Senior Research Scientist at In Vivo Research (Cancer), at Bayer

Pharmaceuticals (Miles Laboratories) until 1993. Dr. Menon then began a veterinary oncology and drug development consultancy practice at Eli Lilly, and one year later, became a Group Leader, Cancer In Vivo Research and Clinical Development, for Eli Lilly, where he worked in 2001. Menon earned his PhD in Pharmacology from Kerala University, where his work focused on anti-folate therapy of various cancers. Defendant Leo Ehrlich ("Ehrlich") has served as the Company's Chief Executive Officer since November 5, 2010, as well as a director and CFO of Cellceutix, roles he assumed after the acquisition by Cellceutix of Cellceutix Pharma in December 2007. Prior to Cellceutix's acquisition of Cellceutix Pharma, Ehrlich served as Chief Financial Officer of Cellceutix Pharma since its inception in June 2007. From September 1999 to December 2008, Ehrlich served as a director of StatSure Diagnostic Systems, Inc. From September 1999 to March 2005, Ehrlich was CEO of StatSure. From September 1999 to March 2005, Ehrlich was also Chairman of the Board of StatSure. Mr Ehrlich was also CFO of StatSure from September 1999 to at least November 2008. StatSure, which developed tests for HIV, ran large and unsustainable deficits for several years, but managed to achieve a market capitalization of over $100 million, before defaulting on its debts in 2005. The company narrowly avoided being forced into bankruptcy, but remained in default on its debts through 2008, when, with the value of its stock reduced to 30 cents per share, and its market capitalization down to $1.2 million, it withdrew its registration with the SEC. Defendants disclosed that Ehrlich was a director of StatSure, but never disclosed that he was CFO during the period of StatSure's default and dramatic decline in value. Mr. Ehrlich previously practiced as a Certified Public Accountant and received his BBA from Bernard Baruch College of the City University of New York.

16.     The Defendants Menon and Ehrlich are sometimes referred to herein as the "Individual Defendants."

17.     Defendant Cellceutix and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV.     **BACKGROUND**

18.     Cellceutix purports to be in the business of developing innovative small molecule therapies to treat diseases with significant medical need, particularly in the areas of cancer and inflammatory disease.

19.     Cellceutix was founded as EconoShares, Inc. on August 1, 2005.  On December 6, 2007 the Company acquired Cellceutix Pharma, Inc., which was founded, and owned, by Menon. The company then changed its name to Cellceutix Corporation.   Cellceutix began development of an anti-cancer medication called Kevetrin.  Kevetrin is intended to activate the gene P53.  P53 is involved in regulating cell duplication, and mutations in P53 are a common cause of cancer. In September of 2013, Cellceutix acquired the assets of Polymedix, a bankrupt biotech company. Among those assets were the rights to develop Brilacidin, an antibiotic, which was in Phase 2 of development at the time of Polymedix's bankruptcy.

20.     Cellceutix began a Phase 1 trial for Kevetrin on October of 2012, that is estimated to be complete in August of 2016.  Cellceutix also completed a phase IIb study of Brillacidin, which began in February of 2014 and ended in October of 2014.  This study compared Brilacidin with Daptomycin for the treatment of acute bacterial skin and skin and skin structure infection caused by the bacterium Staphylococcus.  Cellceutix also began a phase II study for the use of Brillacidin for the treatment of Oral Mucositis, an atrophying of the mucosal lining of the mouth due to chemotherapy or radiation.  Cellceutix has claimed that Brilacidin's antibacterial and anti-

inflammatory properties contribute to the efficacy of Brilacidin in treating oral mucositis.  The phase 2 Oral Mucositis study began in May of 2015 and will end in December of 2016.

21.     Cellceutix participated in an "end of phase 2" meeting with the FDA in July of 2015 regarding Brilacidin for treatment of acute bacterial skin and skin structure infections or "ABSSSI".  At that meeting Cellceutix discussed the procedures for a Phase 3 trial.  Defendants did not disclose this fact at the time, but instead included the disclosure in its 10-K at the end of the class period in September 2015.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE PERIOD

### A.     Menon Falsely Claimed to Attend Harvard

22.     On May 10, 2013, *Future Woman* published a profile article on Defendant Menon, which he was interviewed for. In the article, Defendant Menon confirmed earning his PhD in Pharmacology from Harvard University.[1]

23.     The foregoing statement was false and misleading because Menon did not obtain a PhD at Harvard.

### B.     Ehrlich Failed to Correct Menon's False Claim to have Attended Harvard

24.     Prior to the Class period, Defendants' 10-K for the year ending June 30, 2009, dated October 8, 2009 falsely claimed that Menon received a PhD from Harvard.  Throughout the class period, Ehrlich had a duty to correct this misstatement, and did not do so.

---

[1]   Indeed, Menon falsely stated for the article: "Tom made Menon a scientist at his laboratory in Harvard. But as per Harvard's law, one should have doctorate to work there. As Menon didn't have a PhD, it was a major challenge before him. But Tom was not ready to give up. He admitted Menon as a PhD student under his guidance. And it's the time for Menon to act. He took his first PhD in pharmacology in 34 months."

**C.**     **Defendants Falsely Claimed that Brilacidin Was Effective against Gram Negative Bacteria**

25.     Between April 25-28 2015, Defendants displayed a poster at the 2015 European Congress of Clinical Microbiology and Infectious Diseases ("ECCMID") in Copenhagen, Denmark, which touted Brilacidin's ability to kill gram-negative bacteria such as Escherichia coli ("E. coli"). The poster states in part:

## RESULTS

### Brilacidin has broad spectrum in vitro antimicrobial activity

MIC for antimicrobial activity was assessed for brilacidin. Brilacidin has potent Gram positive activity, Gram negative coverage, but low cytotoxicity against mammalian cells.

| Brilacidin | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Gram + MIC90s (µg/ml) | | | Gram - MIC range (µg/ml) 2 – 3 clinical isolates | | | Mammalian cytotoxicity (EC50, µM) | | |
| MSSA | MRSA | CoNS | E. coli | K. pneumos. | Entero bacter spp. | RBCs | 3T3 | HepG2 |
| 1 | 1 | 0.5 - 1 | 1 - 2 | 1 - 4 | 0.5 - 4 | >500 | 430 | 1,033 |

### Brilacidin has rapid (0.5 to 6 hrs) bactericidal activity



CFU/mL after exposure of E. coli D32 or S. aureus 27660 to brilacidin.

Importantly, brilacidin has a low risk for development of resistance.
- FSR was <10^-11 at 3 times the MIC against MRSA 33591.



Brilacidin has potent and rapid bactericidal activity against stationary phase cultures of MSSA and MRSA



- time-kills at >10³log₁₀ reductions of ≤2 hrs at two 2X MIC
- daptomycin had little antimicrobial activity up to 10x the MIC (not shown)

## CONCLUSIONS

Oral ulcerative mucositis is a common, painful, dose-limiting toxicity of cancer therapy with minimal treatment options. The well-tolerated and efficacious HDP mimetic, brilacidin, in the OM hamster model supports its further development as a topical therapeutic for OM.

While we believe the efficacy in the OM model is primarily the result of brilacidin's immunomodulatory activities, its antimicrobial function can also play a role in treating the lesions. Based on these promising studies, a Phase 2 clinical trial in radiation induced OM is ongoing.

### For further information

Please contact Cellceutix Corporation at 978-236-8717          info@cellceutix.com
More information on this and related projects can be obtained at www.cellceutix.com

10

26.     The foregoing statement was false and misleading because it suggested that Brilacidin could be used to treat gram negative bacteria, whereas in reality, as defendants conceded in the August 7 Press Release, Defendants conceded that Brilacidin was not being developed for treating gram negative bacteria and was not likely an effective treatment against a broad spectrum of gram negative bacteria.

**D.     Defendants Falsely Claimed that Brilacidin's Antbiotic Properties Were Effective in Treating Oral Mucositis**

27.     In Defendants' Form 10-K for the fiscal year ending June 30, 2014, filed September 15, 2014, Defendants stated "in animal models of oral mucositis, an oral rinse containing Brilacidin was shown to reduce the occurrence of severe ulcerative oral mucositis by more than 90% compared to placebo.  Brilacidin and related compounds have shown antibacterial, anti-biofilm and anti-inflammatory properties in various pre-clinical studies. We believe that the combination of these attributes contribute to the efficacy of Brilacidin in these animal models." This statement was repeated in Cellceutix's 10Q dated November 10, 2014, filed September 30, 2014, Cellceutix's 10Q dated February 9, 2015, for the period ending December 31, 2014, and Cellceutix's 10Q dated May  11, 2015 for the period ending March 31, 2015.  Each of the documents in this paragraph was signed by Defendants Menon and Ehrlich.

28.     The foregoing statement was false and misleading because, as Defendants admitted in the August 7 Press Release the Mako Report was correct, Brilacidin's alleged antibiotic properties could not be effective in treating oral mucositis.  Instead in the August 7 Press Release, Defendants admitted it was solely Brilacidin's purported "anti-inflammatory properties" that were responsible for its claimed affect on Oral Mucositis.  Therefore, when it is

developed for Oral Mucositis, Brilacidin will not be eligible to receive a "qualified infectious disease product" designation that would allow a fast-track approval process as an antibiotic.[2]

### E.   Defendants Falsely Claimed that Kevetrin's Activation of P21 was Clinically Meaningful

29.    In a publicly disseminated interview with a pseudonymous shareholder of Cellceutix, KarenCA, dated March 14, 2013, Defendant Ehrlich was asked: "Cellceutix has identified p21 as a biomarker as a barometer of p53 expression for the clinical trial. Seeing activity of p53 without toxic side effects could be the Holy Grail for developing a new cancer treatment. When do you expect results from testing of the p21 biomarker? What are your expectations?"

30.    Defendant Ehrlich responded: "We are anticipating the tests to be run in mid-March and the results to follow shortly thereafter. Honestly, we were extremely pleased that the Dana-Farber laboratory is running these tests so early in the trial. It is a "no lose" situation for us as we did not anticipate biomarker testing, nor did we expect to see any activity, at this early stage and low dosing levels. If p21 activity is shown, we think that we have hit a home run, but if activity is not demonstrated, we will not be the least bit disappointed at this juncture in the trial. We will simply then wait for the testing at higher doses as we expected, where we are very optimistic that we will see p21 expression at that time."

31.    In Defendants' Form 10-K for the fiscal year ending June 30, 2013, filed September 30, 2014, Defendants stated "We identified the increased expression of p21 as a

---

[2]  In its June 30, 2015 10-K Cellceutix stated:  "Receiving QIDP designation means that Brilacidin is now eligible for additional FDA incentives in the approval and marketing path, including Fast Track designation and Priority Review for development and a five-year extension of market exclusivity."  Thus, while this benefit may apply to Brilacidin when used to treat ABSSSI, it will not be available for Brilacidin for the treatment of Oral Mucositis.

potential biomarker in our clinical trial for Kevetrin. Preliminary data on the p21biomarker suggests that Kevetrin slightly affected p21 in some low-dose patients, but these tests require being redone and reanalyzed at higher doses to confirm that Kevetrin is indeed activating p21." The Form 10-K was signed by defendants Ehrlich and Menon.

32.     In Defendants' Form 10-K for the fiscal year ending June 30, 2014, filed September 15, 2014, Defendants stated "We identified the increased expression of p21 as a potential biomarker in our clinical trial for Kevetrin. Preliminary data on the p21biomarker suggests that Kevetrin slightly affected p21 in some low-dose patients, but these tests require being redone and reanalyzed at higher doses to confirm that Kevetrin is indeed activating p21." The Form 10-K was signed by defendants Ehrlich and Menon.

33.     Defendants Form 8-K filed September 24, 2014, discussing preliminary results to a Phase 1 Kevetrin trial, stated "[t]he biomarker p21 increased in 6 of 14 patients at relatively low doses of Kevetrin and we expect a higher percentage of p21 expression when the data is evaluated from higher doses. Another tumor marker, CEA, was decreased and the tumor size remained stable over 4 months in a pancreatic carcinoma patient."  The Form 8-K was signed by Ehrlich

34.     The statements in the foregoing paragraphs were false and misleading because Defendants claimed that P21 was a biomarker, which means in the context of clinical trials that it is indicative of a clinically meaningful outcome for treatment, i.e. reduced mortality of cancer. In reality, P21 has not been shown to be correlated with improved clinical outcomes for cancer. As Kyle Strimbu and Jorje A. Tavel, M.D. explained in the article What are Biomarkers, Curr Opin HIV AIDS. 2010 Nov; 5(6): 463–466, "[w]hen used as outcomes in clinical trials, biomarkers are considered to be surrogate endpoints; that is, they act as surrogates or substitutes

for clinically meaningful endpoints."  For instance, as Strimbu and Tavel state, a the "gold standard" endpoint for an HIV trial would be survival, but other clinically relevant variables, such as stroke, myocardial infarction, and opportunistic infection occurrence, are also used.  If a biomarker is to be used in a clinical trial, "there must be solid scientific evidence (e.g., epidemiological, therapeutic, and/or pathophysiological) that a biomarker consistently and accurately predicts a clinical outcome, either a benefit or harm."  Therefore, use of P-21 would only properly be called a biomarker if it consistently and accurately predicted cancer survival, or perhaps tumor reduction.  But the scientific research done to date has shown that P-21 is not correlated with patient prognosis.  *Association of p21, p21 p27 and p21 p53 Status to Histological Subtypes and Prognosis in Low-stage Epithelial Ovarian Cancer*, Ingiridur Skirnisdottir And Tomas Seidal, Cancer Genomics and Proteomics January-February 2013 vol. 10 no. 1 27-34.  Therefore, Defendants' claim that P-21 is a biomarker is misleading and Defendants' suggestion that Kevetrin's claimed affect on P-21 is indicative of its ability to effectively fight cancer is particularly misleading.

### F.    Defendants Misrepresented A Kevetrin Patient's Results

35.    On January 20, 2015, Defendants stated, in a press release, that Cellceutix

is pleased to report the near complete disappearance of a metastatic lesion in the spleen of a Stage 4 ovarian cancer patient who was enrolled in the Company's Phase 1 clinical trial of anti-cancer drug candidate Kevetrin™ being conducted at Harvard Cancer Center's Dana-Farber Cancer Institute and Beth Israel Deaconess Medical Center.  According to information supplied by the hospital, the patient, who successfully completed three Kevetrin 3-dose cycles before discontinuing the trial, experienced increased energy, while scans showed a reduction in the amount of peritoneal fluid (ascites) during treatment with Kevetrin.  Subsequent to the second and third Kevetrin cycles, scans showed the spleen lesion to be essentially undetectable and the patient's disease to be clinically stable.

36.    The foregoing misstatement is misleading for failing to disclose that the reason that the patient discontinued the trial was that her cancer had returned.  After the Mako Report

stated that Cellceutix's account of the patient's clinical experience was misleading, Defendants admitted, on August 7, 2015, "that the patient's CA125 count was elevated (a common occurrence in cancer patients) and she was advised to discontinue the trial by her physician." CA125 is a biomarker for ovarian cancer – meaning that the physician discontinued treatment because a commonly accepted test for cancer recurrence indicated that the patient's cancer had in fact returned.  Therefore, Defendants' claim that following treatment with Kevetrin the patient's disease became clinically stable was highly misleading.

G.    **Defendants Failed to Disclose Material Risks Created by the Purchase of the Rights to Brilacidin**

37.    On September 9, 2013, the Company issued a press release announcing the purchase of Brilacidin from PolyMedix, Inc. pursuant to an asset purchase agreement approved by the Bankruptcy Court for the District of Delaware. However, in the 10-K dated September 30, 2013, there was no disclosure that the acquisition of Cellceutix created a new material risk of Cellceutix's inability to fund expensive clinical trials to get Brilacidin through FDA approval, nor were such risks ever disclosed during the class period.  In reality, this purchase created two new substantial material risks, both due to the fact that Brilacidin was close to completing Phase II and entering Phase III of the FDA approval process.  First, Brilacidin massively increased the need for fundraising in the short term.  Defendants spent $632,805 and $1,509,881 for research and development expenses, in the fiscal years ending June 30, 2012 and 2013, respectively. However, to obtain Phase III approval for Brilacidin, Cellceutix will be required to spend well in excess of $100 million in research and development expenses over two to four years to complete the two phase 3 trials necessary for FDA approval. This will require greatly increased fundraising by Cellceutix, which Cellceutix is unlikely to be able to complete.  Defendants

disclosed, in their 10-K for the period ended June 30, 2015, filed September 11, 2015, that the FDA is requiring them to conform to its October 2013 guidance regarding approval for ABSSSI treatments.  This guidance indicates that, in order to obtain approval, Cellceutix would be required to perform two large Phase III trials.  In the FDA's example, these two trials would require 310 persons in each branch of a two branch trial, for 1240 individuals recruited in total. As Cellceutix admitted, in an article published by the Boston Business Journal on October 30, 2015, they will be recruiting 1400 patients for their two Phase 3 trials. By contrast, Cellceutix has only completed two clinical trials to date, with a total of 233 subjects. For purposes of comparison, Durata Pharmaceuticals recently obtained approval for Dalbavancin, an antibiotic to treat ABSSSI.  Dalbavancin is very similar to Brilacidin and if Brilacidin were ever approved, Dalbavancin would directly compete with it.  The approval process for Dalbavancin, including the phase 3 clinical trials required, was substantially the same as that required by the FDA for the approval of Brilacidin.  Durata, which had no ongoing projects other than developing dalbavancin, spent $145,605,000 over four years developing dalbavancin, using two Phase 3 studies with a total of 1312 subjects. Since its inception in 2007, Cellceuitx has not been able to raise more than approximately $30 million from investors in total.  Given all the here is a substantial risk that Cellceutix will not be able to persuade investors to fund the $145 million required to complete Brilacidin's phase 3 trials.  This risk was material to investors and should have been disclosed.

38.     Defendants also failed to disclose the material risk of their undertaking a Phase 3 study because none of Defendants' officers had experience in obtaining Phase 3 approval, until admitting to it in the Form 10-K filed September 11, 2015, when they stated that "[w]e have not previously conducted a Phase 3 or later stage clinical trial such as the Phase 3 clinical trials

planned for our most advanced drug candidate." This omission was material and should have been disclosed in Defendants 10-Ks that were filed in September of 2013 and 2014 because Defendants inexperience with Phase 3 trials raised a material risk with respect to the hiring of personnel, Defendants' ability to realistically budget for, and manage, the clinical trials, the likelihood of future investors agreeing to raise capital, and whether Defendants would make mistakes in the drug development process due to their inexperience.

## VI.   THE TRUTH EMERGES

39.   On August 6, 2015, *SeekingAlpha.com* published a report by the short seller Mako Research on the Company ("Mako Report").

40.   The Mako Report asserts that Defendant Menon did not earn his PhD in Pharmacology at Harvard University as claimed, stating in part:

> ***Menon's prior biography in official SEC materials claims he attended Harvard for his PhD on multiple occasions. After reviewing this in detail, it appears he never received a PhD from Harvard. I spoke with a representative at Harvard, and also checked Menon's PhD claim at studentclearinghouse.org, a website that verifies degrees.*** It is illegal to provide false educational information in SEC documents.
>
> **Krishna Menon Did Not Receive a PhD from Harvard**
>
> In what may be the saddest part of the Cellceutix story, ***Krishna Menon has misled investors about earning his PhD at Harvard. This was verified by Student Clearing House. The response is below:***
> ***"We are unable to verify a degree for this individual based on the information you provided."***
>
> The search criterion was ***Krishna Menon, PhD Pharmacology, Harvard, 1984, which is what Krishna claims to have achieved. Menon simply did not graduate from Harvard, and to claim otherwise is wrong.*** Unfortunately, he has made these claims many times.
>
> [Emphasis added].

41.    The Mako Report also asserts that Brilacidin is not effective in treating gram negative bacteria.

42.    The Mako Report also asserts that P-21, being used to evaluate the effectiveness of Kevetrin, is not a valid biomarker, noting that recent evidence has shown that P21 activity does not correlate with cancer prognosis. *Association of p21, p21 p27 and p21 p53 Status to Histological Subtypes and Prognosis in Low-stage Epithelial Ovarian Cancer*, Ingiridur Skirnisdottir And Tomas Seidal, Cancer Genomics and Proteomics January-February 2013 vol. 10 no. 1 27-34.

43.    The Mako Report also stated that "Cellceutix has made misleading claims about cancer regression from patients who discontinued the trial" and stated that Cellceutix's claim to have caused tumor elimination in a patient in the Phase 1 trial appeared to be misleading.

44.    On this news, shares of Cellceutix fell $0.73 per share or approximately 30% from its previous closing price to close at $1.71 per share on August 6, 2015.

45.    The following day, Cellceutix issued a press release responding to the allegations in the Mako Report, but in doing so contradicted, and confirmed as false, several of Defendants previous statements that Mako had identified as false.  Defendants admitted "Brilacidin is for treating gram positive infections such as acute bacterial skin and skin structure infections (ABSSSI) caused by Staphylococcus aureus, including methicillin-resistant strains (MRSA), and was not developed for the treatment of Gram-negative infections. … [and] Brilacidin is not designed for use against Gram negatives." This contradicts prior statements that Brilacidin is effective against both gram positive and gram negative bacteria.

46.    Cellceutix's press release also stated "While patients with oral mucositis are at risk of infection through open ulcers, the disease is not caused by infection.  Accordingly,

brilacidin's efficacy in oral mucositis is not based on its antibiotic properties.  Rather, it is based on its immunomodulatory properties.  Indeed, positive data from reliable animal models of oral mucositis (without evidence of concomitant bacterial infection) support an immunomodulatory, rather than antimicrobial, mechanism of action."  This contradicts Defendants' previous statements that Brilacidin's efficacy in treating oral mucositis is due in part to its purported antibacterial properties.

47.    Cellceutix's press release also admitted that a cancer patient who was earlier described as having achieved significant tumor reduction due to treatment with Kevetrin was discontinued from the trial at a physician's recommendation because her cancer had returned.

48.    On Septemeber 11, 2015, Defendants issued a Form 10-K for the period ending June 30, 2015.  That form 10-K disclosed that Defendants do not have experience with Phase 3 clinical trials.  "We have not previously conducted a Phase 3 or later stage clinical trial such as the Phase 3 clinical trials planned for our most advanced drug candidate [Brilacidin]."  The 10-K also revealed that during the meeting with the FDA, it was determined that Cellceutix would be required to perform two Phase 3 ABSSSI studies that met the FDA Guidance issued in October 2013.  This guidance required that each wing of each study have at least 310 individuals, for a total of at least 1240 individuals enrolled across both studies.  Defendants later disclosed to the Boston Business Journal that in fact the two studies would have a total of 1,400 patients.  As noted above, a similar set of studies cost Durata Pharmaceuticals $145,605,000. Therefore, when the 10-K was released, investors learned that a Phase 3 trial would require the raising of drastically more money, and that Defendants were not experienced in conducting such trials.

49.     Over the following three trading days, shares of Cellceutix fell $.29 per share or approximately15.5% from its previous closing price to close at $1.58 per share on September 15, 2015.

50.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII.   ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

### A.     Menon's Scienter

51.     Menon has a long history of wildly exaggerating and outright misrepresenting his professional qualifications and accomplishments.   Both Menon and Ehrlich have repeatedly misled investors and others about Menon's background.   Menon's willingness to mislead others about his past demonstrates his scienter, and Ehrlich's repeated participation in this conduct demonstrates his scienter as well.

52.     For instance, in 2008, Defendants sent a press release to the publication India New England that claimed that "Dr. Menon is a well known pharmaceutical scientist with an unparalleled track record of taking a compound from the chemist's bench to FDA approval…. While at Eli Lilly & Company, he codeveloped two blockbuster cancer compounds, Gemzar and Alimta, which have produced billions of dollars in revenues."  India New England investigated these claims and learned that Menon's role in development of the drugs was insignificant. Edward C. Taylor, a professor at Princeton University who holds the Altima Patent, stated that he had never heard of Menon, and that while it was possible that he played a very minor role, he is in no position to take credit as a co-developer or lead developer.  Joe Shih, a distinguished research fellow at Eli Lilly, stated that Menon did not play a significant role in the development

of those drugs, that he was working as a technician, and that his claims were "completely untrue". "Bob Marchesani, head of world-wide marketing for Alimta at Eli Lilly, made similar comments. 'We do not feel it's credible for Mr. Menon to claim to have played a major role in Alimta.'" Marchesani also indicated that this wasn't the first time Menon had misrepresented his role in the development of these blockbuster drugs. In fact, as Defendants admitted in the 10-K filed on September 11, 2015, neither Menon nor anyone else has experience with developing drugs through Phase 3.

53.   In Cellceutix's 10-K for the fiscal year ended June 30, 2009, Menon claimed to have received a PhD from Harvard, when in reality he never received any degree from Harvard. Although after 2009 Cellceutix's filings with the SEC omitted this claim, Defendants never corrected this information and it began to appear in other fora. For instance, the Harvard claim appeared in Menon's profile for the website "Crunchbase" beginning in 2014. It appeared on the website for Nanoviricides, Inc., where Menon was chief regulatory officer, from 2007 to 2012. Menon also repeated this claim in an interview with *Future Women*, which published a profile of him on May 10, 2013.

54.   Menon also exaggerated his role in the creation of Kevetrin, claiming to be *the* inventor of the drug in the Company's 10-Ks dated October 8, 2009 through September 30, 2010. In reality, Defendants were forced to admit that Wayne Aruda was the co-inventor of Kevetrin, and after Aruda sued him, Menon agreed to provide Aruda with 16 million shares of Menon's personal Cellceutix stock as well as 50% of the royalty payments originally promised to Menon.

55.   Additional false statements intended to inflate the value of Cellceutix stock also appeared on the Company's website in 2008, when the Company falsely claimed that two

prominent scientists, Dr. Emil Frei, director and physician-in-chief emeritus at the Dana Farber

Cancer Institute, and Har Gobind Khorana, a 1968 Nobel Prize winner, were scientific advisors

for Cellceutix.  India New England revealed that Dr. Frei could not remember how or why he

heard Menon's name, and a close family member of Dr. Frei revealed that Dr. Frei was suffering

from Parkinson's Disease, and was not acting as a scientific advisor for Menon's company.  The

India New England Report also confirmed that Dr. Khorana was not an advisor to Cellceutix.

Dr. Menon claimed to India New England that Dr. Frei forgot that he was an advisor because of

his Parkinson's disease.

56.     Menon has also concealed other pertinent facts from investors in Cellceutix.  In its

10-Q for the period ending December 31, 2013, filed February 14, 2014, Nanoviricides disclosed

that Menon resigned from his post due to health reasons.  In the form 10-K filed in September

29, 2014, for the period ending June 30, 2014, Nanoviricides modified that statement, stating that

Menon intended to reduce his involvement with Nanoviricides for health reasons.  Over the next

year, Nanoviricides alternated between the two claims, stating that Menon had resigned in a

Preliminary Proxy statement dated November 17, 2014, in a definitive Proxy statement filed on

December 5, 2014, and in the definitive proxy statement filed on December 8, 2015.   In

Defendants' 10-Ks filed on September 15, 2015, and in a corrected 10-K filed on February 23,

2015, Nanoviricides only claimed that Menon intended to resign for health reasons.  At no point,

however, did any statement by Cellceutix indicate that Menon was suffering from any health

issues that might interfere with his employment, despite the fact that his responsibilities to

Cellceutix were larger and more time consuming than his responsibilities to Nanoviricides.

57.     Menon also had motive to commit fraud because he needed to use Cellceutix

money and stock to finance his personal legal liabilities.   Krishna Menon owned and ran a

private company called KARD, Inc, which, according to Cellceutix's securities filings, manufactured small quantities of experimental drugs for Cellceutix.  Kard, Inc, had a lease for a property in North Reading, Massachsetts.  Menon signed a personal guarantee of the lease.  Kard failed to pay rent on the lease and, on or about November 29, 2007, Kard's landlord obtained a judgment for $328,708.00 against Menon.  Kard then failed to tender payment pursuant to the judgment and on May 21, 2010, the landlord sued Menon for $193,708.  Menon eventually settled that case in February of 2013.  In August of 2014, Menon agreed to provide 16 million shares of Cellceutix stock to Aruda in order to settle that claims that Menon had misappropriated his rights to the patent for Kevetrin.  At the time, this stock was worth more than $30 million.

58.    Menon's scienter can further be inferred from the small size of the company.  During the class period, Cellceutix had between 9 and 14 individuals and thus as president, Chief Scientific Officer, and Chairman of the Board, Menon was aware of all of the details concerning Cellceutix's business operations and drug development programs.

59.    Menon's scienter can also be inferred because the fraud alleged herein concerns core operations of the company.  Cellceutix's business is entirely devoted to conducting clinical development of drugs, and the misstatements alleged herein relate to two of the three drugs that Cellceutix was developing during the class period.

60.    Menon's scientific background also suggests his scienter.  As one of the two initial creators of Kevetrin, Menon was sufficiently well versed in the scientific literature to know that P-21 was not a biomarker, and was sufficiently scieintifically well versed in general to understand that Brilacidin was not effective in gram-negative Bacteria, and that Brilacidin was not effective as an antibiotic when used as an oral rinse to treat oral mucositis.

B.      **Ehrlich's Scienter**

61.     Ehrlich's scienter can be inferred from his serial violations of Regulation FD. Regulation FD forbids an issuer of securities, or any person acting on its behalf from disclosing material nonpublic information to "a holder of the issuer's securities, under circumstances in which it is reasonably foreseeable that the person will purchase or sell the issuer's securities on the basis of the information" unless that information is simultaneously disclosed to the public.

62.     Ehrlich, in violation of Regulation FD, repeatedly provided material nonpublic information to individual shareholders who emailed him.  On or about January 10, 2013, Ehrlich assured a shareholder who was worried about a trial delay that the trial was moving "full speed ahead." On or about January 30, 2015, Ehrlich received an email that stated, in pertinent part: "Hello Mr. Ehrlich, I couldn't be more excited about reaching these latter stages of the Kevetrin Phase 1 trial. With the incredible results PRd the other week (and presented at Biotech Showcase), I'm even more excited about cohort 10. If you have a chance, I was wondering if you could answer a few questions: 1) has dosing in cohort 10 at 450mg begun? 2) is Cellceutix planning on being at ASCO 2015?"  Ehrlich responded "Regarding your question as to the 10th cohort at 450mg/m2, the answer is yes. Patients have been dosed and it is continuing. Dr Alexander the other week in San Francisco mentioned that it was starting."  On or about May 15, 2015, Ehrlich received an email from a shareholder that stated, in pertinent part, that "Is the NASDAQ uplisting still on track and will the 10Q be released this week ? Thanks as I'm sincerely hoping that the company and the shareholders have some positive news to stop the carnage on the share price."  Ehrlich responded "Hi, Yes and Yes. Of course the share price bothers me but as we have said, we are catching up. We are hopeful that progress and events over the coming weeks will show the potential of CTIX."  In this email, Ehrlich not only

revealed the timing of a NASDAQ uplisting (which can have a significant stock price impact) and the timing of the 10-Q, but also suggested that information would be revealed in the following weeks that would have a positive effect on Cellceutix's stock price. On December 18, 2015, Ehrlich revealed to a shareholder that information about a Cellceutix trial was incorrect, and that the trial was past the recruiting phase. Because Cellceutix is a development stage biotech company with no revenues, news about the progress of clinical trials is highly material to investors.

63.     Ehrlich's scienter can further be inferred from his participation in Menon's repeated exaggerations of his professional qualifications and experience. Ehrlich's claim that "Dr. Menon is a well known pharmaceutical scientist with an unparalleled track record of taking a compound from the chemist's bench to FDA approval" was a fabrication of Menon's experience, since Menon had no experience with obtaining FDA approval for drugs. Ehrlich also made false exculpatory statements when he defended the Company's false claims that Emil Frei and Har Gobind Khorana were scientific advisors of Cellceutix.

64.     Ehrlich's scienter can also be inferred from his failure to admit his own prior failings. Cellceutix's 10-Ks prior to the class period only state that Ehrlich "had been a director at StatSure Diagnostic Systems, Inc. and has held different executive officer positions at that company including CEO, President, and CFO." Ehrlich failed to disclose that in fact he was CFO from 1999 until 2008, and that during the latter part of his tenure the company was a failure, the value of StatSure dropped to 1 cent per share and the stock was delisted.

65.     Ehrlich's scienter can further be inferred from the small size of the company. During the class period, Cellceutix had between 9 and 14 individuals and thus as Chief Financial

Officer and a director, Ehrlich was aware of all of the details concerning Cellceutix's business operations and drug development programs.

66.     Ehrllich's scienter can also be inferred because the fraud alleged herein concerns core operations of the company.  Cellceutix's business is entirely devoted to conducting clinical development of drugs, and the misstatements alleged herein relate to two of the three drugs that Cellceutix was developing during the class period.

67.     Ehrlich also had access to information that would have revealed the fraud. Ehrlich regularly supervised personnel with scientific expertise, and consulted with, or was reckless for not consulting with, such individuals prior to filing periodic reports and press releases that made representations of scientific fact.  Therefore Ehrlich knew, or was reckless for not knowing, that P-21 was not a biomarker, that Brilacidin was not effective in gram-negative Bacteria, and that Brilacidin was not effective as an antibiotic when used as an oral rinse to treat oral mucositis.

## C.     **Corporate Scienter**

68.     Due to their senior positions, the individual defendants' scienter can be attributed to Cellceutix under the doctrine of *Respondeat Superior*.

## VIII.   **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

69.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cellceutix securities traded on the OTC Pink marketplace during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cellceutix securities were actively traded on the OTC Pink marketplace. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cellceutix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- •     whether the federal securities laws were violated by Defendants' acts as alleged herein;

- •     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cellceutix;

- whether the Individual Defendants caused Cellceutix to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Cellceutix securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

74. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

75. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cellceutix securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the OTC Pink marketplace, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Cellceutix securities between the time the Defendants failed to disclose or misrepresented material

facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

76.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

77.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**Count I:**     **Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants**

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cellceutix securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cellceutix securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cellceutix securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cellceutix's finances and business prospects.

82.     By virtue of their positions at Cellceutix, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

83.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Cellceutix, the Individual Defendants had knowledge of the details of Cellceutix's internal affairs.

84.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Cellceutix. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cellceutix's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Cellceutix's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Cellceutix's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cellceutix securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

85.     During the Class Period, Cellceutix's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cellceutix securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff

and the Class, the true value of Cellceutix securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Cellceutix's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**Count II:**      **Violation of Section 20(a) of The Exchange Act Against The Individual Defendants**

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, the Individual Defendants participated in the operation and management of Cellceutix, and conducted and participated, directly and indirectly, in the conduct of Cellceutix's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Cellceutix's business practices.

90.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to

Cellceutix's financial condition and results of operations, and to correct promptly any public statements issued by Cellceutix which had become materially false or misleading.

91.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cellceutix disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cellceutix to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cellceutix within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cellceutix securities.

92.     Each of the Individual Defendants, therefore, acted as a controlling person of Cellceutix. By reason of their senior management positions and/or being directors of Cellceutix, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cellceutix to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Cellceutix and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cellceutix.

IX.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, and allowable costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**X.    DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2016                                   Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Jonathan Stern
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jonathan Stern, Esq.
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Counsel for Plaintiff Zagami*