UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                       :

GARY ZAGAMI, *individually and on behalf*  :
*of all others similarly situated,*              :
                                         :

                          Plaintiff,  :        15 Civ. 7194 (KPF)
                                         :

                       v.              :       OPINION AND ORDER
                                       :

CELLCEUTIX CORPORATION, *et al.,*      :
                                       :

                    Defendants. :
                                       :
-----------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: June 8, 2016_____

KATHERINE POLK FAILLA, District Judge:

       Following the online posting of a scathing article by an admitted (and thus admittedly self-interested) short seller, Plaintiff Gary Zagami brought the instant matter as a putative class action against Defendants Cellceutix Corporation, Krishna Menon, and Leo Ehrlich, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants now move to dismiss Plaintiff's Second Amended Complaint in its entirety. For the reasons stated in the remainder of this Opinion, Defendants' motion is granted.

**BACKGROUND**[1]

### A.    Factual Background

Defendant Cellceutix Corporation ("Cellceutix") is a clinical stage biotechnology company developing several drugs for approval by the Food and Drug Administration (the "FDA"), including the drugs Kevetrin and Brilacidin. (SAC ¶¶ 2, 13). Defendant Krishna Menon has served as President, Chief Scientific Officer, Director, and Chairman of the Board of Cellceutix since 2007. (*Id.* at ¶ 14). Defendant Leo Ehrlich (together with Cellceutix and Menon, "Defendants") has served as Chief Financial Officer and Director of Cellceutix since 2007, and as the company's Chief Executive Officer since 2010. (*Id.* at ¶ 15).

### B.    Procedural Background

On August 6, 2015, a short seller[2] of Cellceutix using the pseudonym "Mako Research" posted an article at the website *Seeking Alpha*, in which the

---

[1]    This Opinion draws on facts from Plaintiff's Second Amended Complaint (or "SAC") (Dkt. #32), which facts are taken as true for purposes of this motion. *See Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)). Additional facts are drawn from documents relied upon by or integral to the Complaint; these are attached as exhibits to defense counsel's declaration, and are referred to using the convention "Sullivan Decl. Ex. [ ]." (Dkt. #39). *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). For convenience, the brief filed by Defendants in support of their motion to dismiss (Dkt. #36) will be referred to as "Def. Br."; Plaintiff's opposition (Dkt. #41) as "Pl. Opp."; and Defendants' reply brief (Dkt. #46) as "Def. Reply."

[2]    *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 96 (2d Cir. 2007):

> An investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker. *See Levitin* v. *PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998). At a later date, he "covers" his short position by purchasing the security and returning it to the lender. *Id.* A short seller speculates that the price of the security will drop. *Id.* If the price drops, the investor

author contended that Cellceutix was a "sham" company and listed various purported misrepresentations and omissions of material fact in the company's public statements.  (*See* Sullivan Decl. Ex. 1 (Mako Research posting); *see also* SAC ¶ 5 (alleging that Defendants' fraud "began to be exposed" with the Mako Research posting)).  Cellceutix responded the next day with a press release (the "August 7 Press Release") that provided information regarding, among other things, four clinical trials in which it was involved.  (*See* Sullivan Decl. Ex. 2; SAC ¶¶ 28, 42-43; *see also* SAC ¶ 5 (alleging that press release confirmed the falsity of certain of Defendants' prior public statements)).

A few hours after the Mako Research posting, the original plaintiff in this case authorized the filing of a securities class action complaint.  (Dkt. #1-1).  One month later, on September 11, 2015, that plaintiff filed the initial complaint in this matter.  (Dkt. #1).  The suit was brought individually and on behalf of all similarly situated individuals, alleging that Defendants had made a number of misrepresentations or omissions of material fact in relation to Cellceutix's operations and product development, in violation of the Exchange Act and the corresponding rules issued by the Securities and Exchange Commission (the "SEC").  In large measure, the lawsuit tracked the Mako Research posting.  (*Compare* Dkt. #1, *with* Sullivan Decl. Ex. 1).

Plaintiff Gary Zagami filed his First Amended Complaint, as of right, on September 24, 2015; in it, among other things, he substituted himself for the

---

profits by covering for less than the short sale price.  *Id.*  If, on the other hand, the price increases, the investor takes a loss.

original plaintiff.  (Dkt. #10).  On October 8, 2015, Plaintiff notified the Court that he had published the Early Class Notice, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), *see* 15 U.S.C. § 78u-4(a)(3)(A), on September 11, 2015.  (Dkt. #11).  Accordingly, on October 8, 2015, the Court issued an Order — amended by Order issued on October 29, 2015 — setting November 10, 2015, as the deadline for members of the putative class to move to serve as lead plaintiff, and December 10, 2015, as the deadline for opposition to any motion for appointment of lead plaintiff. (Dkt. #12-13).

Plaintiff filed the only motion to serve as lead plaintiff, moving also to appoint the Rosen Law Firm as counsel, on November 10, 2015.  (Dkt #14). The Court granted the motion in its entirety following a conference on December 18, 2015.  (Dkt. #25).  The Court additionally granted Plaintiff's request to file a Second Amended Complaint (the "SAC"), and set a briefing schedule for Defendants' proposed motion to dismiss.  (Dkt. #24).

Plaintiff filed the SAC on January 11, 2016.  (Dkt. #32).  Defendants filed their motion to dismiss the SAC, as well as a request for the Court to take judicial notice of certain documents, on February 10, 2016.  (Dkt. #36-39). Plaintiff filed his opposition to Defendants' motion on March 11, 2016 (Dkt. #41), as well as his own request for judicial notice and his partial opposition to Defendants' request for judicial notice (Dkt. #43-45).  Defendants filed their reply in support of their motion to dismiss on March 25, 2016, thereby concluding the briefing of the instant motion.  (Dkt. #46).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court is not limited to the face of the complaint.  The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Goel* v. *Bunge, Ltd.*, — F.3d —, No. 15-3023-cv, 2016 WL 1696597, at *2-3 (2d Cir. Apr. 28, 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)).

### 2.   The Securities Exchange Act of 1934

Plaintiff asserts claims against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (SAC ¶¶ 78-87).  Rule 10b-5 prohibits, in relevant part, any person from using

> any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  A private action under Section 10(b) and Rule 10b-5 requires "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and

6

the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

In addition to his claims under Section 10(b) and Rule 10b-5, Plaintiff alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Individual Defendants Menon and Ehrlich.  (SAC ¶¶ 88-93).  Section 20(a) states that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The Second Circuit has made clear that "[t]o establish a *prima facie* case of control person liability [under Section 20(a)], a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI,* 493 F.3d at 108; *accord Ganino* v. *Citizens Utils. Co.,* 228 F.3d 154, 170 (2d Cir. 2000); *Boguslavsky* v. *Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998); *S.E.C.* v. *First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996).

**B.      Analysis**

**1.      Plaintiff Has Adequately Pleaded Venue**

Before addressing the merits of Plaintiff's fraud claims, the Court must first consider certain antecedent issues raised by Defendants, including a challenge to venue.  When a motion to dismiss for improper venue is made pursuant to Rule 12(b)(3), the plaintiff has the burden of pleading venue. *Person* v. *Google Inc.*, 456 F. Supp. 2d 488, 493 (S.D.N.Y. 2006).  However, "the Court accepts facts alleged in the complaint as true and draws all reasonable inferences in plaintiff's favor." *Id.* (brackets removed) (quoting *Caremark Therapeutic Servs.* v. *Leavitt*, 405 F. Supp. 2d 454, 457 (S.D.N.Y. 2005)).  To defeat the motion, the plaintiff need only make a *prima facie* showing of venue.  *Gulf Ins. Co.* v. *Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005).

The Exchange Act contains a special venue provision, 15 U.S.C. § 78aa, which provides for venue in any district where the defendant lives or transacts business, or where "any act or transaction constituting the violation occurred." *Id.*  Where, as here, a violation consists of a defendant's fraudulent representations, "misrepresentations and omissions are deemed to 'occur' in the district where they are transmitted or withheld."  *In re Collins & Aikman Corp. Sec. Litig.,* 438 F. Supp. 2d 392, 397 (S.D.N.Y. 2006) (internal quotation marks omitted).

Defendants argue that Plaintiff has failed to plead venue in this District, as Cellceutix is not incorporated or headquartered in New York, it conducts no

business in New York, and no misrepresentations are alleged to have occurred in New York. (Def. Br. 2). Plaintiff responds that Defendant Cellceutix is traded on over-the-counter ("OTC") Pink Sheets, which are maintained by a company located in New York City, and that venue in New York is therefore proper. (Pl. Opp. 11-13). Additionally, he argues that a series of investor presentations occurred in New York; according to Plaintiff, these presentations formed a part of Defendants' fraudulent scheme, and therefore establish venue in this District. (*Id.* at 13).

While the Court might disagree with Plaintiff as to the relevance of the investor presentations, none of which is alleged to have included any misrepresentations, it nevertheless finds that venue is proper in this District. Misrepresentations "occur" not only in the district in which they are made, but also the district or districts in which they are received. *See Meszaros* v. *Klick*, No. 09 Civ. 765S (WMS), 2011 WL 5238488, at *3 (W.D.N.Y. Oct. 29, 2011) (collecting cases); *In re AES Corp. Sec. Litig.*, 240 F. Supp. 2d 557, 559 (E.D. Va. 2003) ("As more than one district court has put it: 'Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district.'" (citation omitted) (collecting cases)). The SAC alleges misrepresentations that were widely disseminated via documents publicly filed with the SEC and popular media, and which defrauded a broad class of investors — including class members in New York. (SAC ¶¶ 1, 6, 10, 22, 27). Consequently, this case may be brought in the Southern District of

New York.  *Cf. In re Geopharma, Inc.,* No. 04 Civ. 9463 (SAS), 2005 WL 1123883, at *1 n.12 (S.D.N.Y. May 11, 2005) ("Indeed, because GeoPharma was a publicly traded company on the NASDAQ National Market and the alleged misstatements were widely disseminated and defrauded a nationwide class, plaintiffs could theoretically have brought suit under section 27 in any district in the United States."); *S.E.C.* v. *Jean-Pierre*, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015) (finding venue where, among other things, information was submitted on behalf of issuer to "Pink Sheets, which is headquartered in the Southern District of New York").

### 2. Defendants' Request for Judicial Notice Is Granted in Part, and Plaintiff's Request Is Denied as Moot

Separately, the parties have each requested that the Court take judicial notice of several documents.  *See generally Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b) motion to dismiss, we have acknowledged that the court 'may also consider matters of which judicial notice may be taken.'" (quoting *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991))); Fed. R. Evid. 201.  Specifically, Defendants have identified seven Forms 10-K filed by Defendants with the SEC; eight statements or documents referenced or relied upon by Plaintiff in his SAC; four documents that Defendants contend may be noticed as adjudicative facts under Federal Rule of Evidence 201; and the PSLRA Early Notice filed on the docket by Plaintiff. (Dkt. #38 at 2-5).

Defendants' request for judicial notice is granted in regard to the Forms 10-K (Sullivan Decl. Ex. 3-8), which the Second Circuit has acknowledged may be considered on a motion to dismiss, *see ATSI*, 493 F.3d at 98; as well as in regard to the Mako Research posting (Sullivan Decl. Ex. 1), the August 7 Press Release (*id.* Ex. 2), the May 2013 *Future Woman* Article (*id.* Ex. 10), the January 20, 2015 Press Release (*id.* Ex. 13), and the poster concerning Brilacidin displayed at the 2015 European Congress of Clinical Microbiology and Infectious Diseases (*id.* Ex. 15), all of which were expressly relied upon by Plaintiff in bringing his claims (*see* SAC ¶¶ 5, 25-26, 28, 36, 45-47, 22, 35). As the Court does not find consideration of the remaining documents for which Defendants have requested notice to be necessary for the adjudication of the instant motion, the Court denies the remainder of their request as moot.[3]

Similarly, Plaintiff has requested judicial notice of three items: a screenshot from the OTC Pink Marketplace website (Stern Decl. Ex. 1); a screenshot of the Cellceutix website *(id.* Ex. 2); and a screenshot from the National Institutes of Health webpage explaining the phases of a clinical trial (*id.* Ex. 3).  To the extent the websites from which these screenshots were taken set forth information generally known in this District (such as the location of the OTC Pink Market headquarters) or information that cannot be reasonably questioned (such as the National Institutes of Health's general

---

[3]     Because the Court does not rely on Exhibit 20 to the Sullivan Declaration, it denies as moot Plaintiff's request that the Court deny Defendants' request for judicial notice of that document.

description of the phases of a clinical trial), the Court will consider the underlying sources to the degree relevant and appropriate.  It therefore denies as moot Plaintiff's request for judicial notice of the proffered screenshots.

> **3.**     **Plaintiff Fails to State a Claim for Securities Fraud**

In the SAC, Plaintiff identifies a series of public statements made by Cellceutix and its officers and argues that subsequent statements made by the company and other information confirm the falsity of the original statements. As detailed in the remainder of this section, Plaintiff's allegations fail.

> **a.**     **Defendants Are Not Liable for the False Statement in the *Future Woman* Article**

Plaintiff advances two fraud claims relating to Defendant Menon's credentials.  Menon, who has held positions in Cellceutix since its inception in 2007, has an extensive scientific background: He trained as a veterinary surgeon, and subsequently worked as a Research Scientist at the Dana-Farber Cancer Research Institute, first in 1982, and then from 1985 to 1990, before moving on to other positions within the field of pharmaceutical research and development.  (SAC ¶¶ 14-15).  Menon received a Ph.D. in Pharmacology from Kerala University, where his work focused on anti-folate therapy for various cancers.  (*Id.* at ¶ 15).

In 2009, Cellceutix filed a Form 10-K with the SEC for the fiscal year ending June 30, 2009, stating that Menon had "earned his [Ph.D.] in Pharmacology from Harvard University."  (Sullivan Decl. Ex. 3 at 7; SAC ¶ 24). The Forms 10-K filed by Cellceutix in 2010, 2011, 2012, 2013, and 2014

edited this statement to say that Menon "earned his [Ph.D.] in Pharmacology from Kerala University." (*Id.* Ex. 4-8).

On May 10, 2013, an online magazine based in India, *Future Woman*, published an article on Menon; the article included quotes from Menon describing how he moved from veterinary to human medicine. (SAC ¶ 22; Sullivan Decl. Ex. 10). The article incorrectly states that Menon received his Ph.D. from Harvard. (Sullivan Decl. Ex. 10). Plaintiff contends that this statement constitutes a materially false representation by Menon in his capacity as an officer of Cellceutix. (SAC ¶¶ 22-23). Defendants contend that the article in question fails to support a valid claim because, *inter alia*, the relevant statement was not made by any of the Defendants. (Def. Br. 14-15). The Court agrees with Defendants.

In *Janus Capital Group, Inc.* v. *First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court analyzed the question of what it means for a defendant to "make" a statement under Rule 10b-5. The Court explained that for purposes of Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* at 142. The *Janus* Court further noted that "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by — and only by — the party to whom it is attributed." *Id.* at 142-43; *see*

*generally In re Pfizer Inc. Sec. Litig.*, — F.3d —, No. 14-2853-cv, 2016 WL 1426211, at *11 (2d Cir. Apr. 12, 2016).

Here, the article cited by Plaintiff includes direct quotations from Menon.  The statement that Menon received his Ph.D. from Harvard is not, however, a direct quote.[4]  To the contrary, the story of Menon's receiving a Harvard degree is told in a distinctively narrative, journalistic style, recounting Menon's work with Emil "Tom" Frei, the former physician-in-chief at the Harvard-affiliated Dana-Farber Cancer Research Institute.  (*See* SAC ¶ 22 n.1; Sullivan Decl. Ex. 10).  The writing, and the attendant control over the means of communicating the content, seem clearly to be that of the article's author.[5]

Plaintiff argues that the author's inclusion of direct quotes in other portions of the article renders the entire piece attributable to Menon (Pl. Opp. 14-15); but it simply cannot be the case that the author's use of select quotes renders Menon strictly liable for every other piece of information (or misinformation) the author chose to include.  Plaintiff contends that the Second Circuit's finding that a company may so "sufficiently entangle[] itself with [an] analyst['s] forecasts [as] to render those predictions 'attributable to

---

[4]    Plaintiff states, in a footnote, that "Menon falsely stated for the article:," and then proceeds to quote a section of the article that is neither a direct quote, nor fairly suggested to be a direct quote.  (SAC ¶ 22 n.1).  Plaintiff's brief in opposition makes clear that his allegation that "Menon falsely stated" the excerpted portion of the article is inferred solely from the fact that the article *elsewhere* contains direct quotes.  But, as the body of this Opinion explains, an author's mere use of direct quotations does not give the piece's subject "ultimate authority" over the article's publication, and consequently does not make every sentence contained in the piece "attributable" to the subject.

[5]    Indeed, to the extent that the content is implicitly attributable to a speaker other than the author, the article suggests Dr. Frei as an equally plausible source, insofar as the author purports to represent Frei's mental state in the challenged portion of the article.  (SAC ¶ 22 n.1 ("But Tom was not ready to give up.")).

14

it,'" should be applied to the instant context — and, presumably, that the use of interview quotes evinces such entanglement.  (*Id.* at 14).  *See Elkind* v. *Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980); *see also Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  But even were the Court to extend the holdings of those cases, which involved the manipulation of analysts' reports, to the provision of incorrect information in a personal interview for an online magazine, neither *Elkind* nor *Novak* displaces the Supreme Court's requirement, as set forth in *Janus*, that to "make" a statement the speaker must have "ultimate authority" over its expression.

The Court can imagine scenarios in which a company (or officer of the company) "so entangles" itself with the publication of an article that it effectively exercises "ultimate authority" over the final contents; Plaintiff has not pleaded such entanglement here.  *Cf. In re Pfizer Inc. Sec. Litig.*, 2016 WL 1426211, at *12 ("Notwithstanding that the eight statements to the press were attributed to Searle and Pharmacia employees, Plaintiffs have presented sufficient evidence to permit a reasonable jury to conclude that Pfizer had 'ultimate authority' over the statements' 'content and whether and how to communicate' them."; evidence included statements from a public relations firm jointly employed by Pfizer and Searle and a Co-Promotion Agreement between Pfizer and Searle concerning the drug at issue).  Plaintiff has not alleged that Menon or Cellceutix has any particular relationship with or control over *Future Woman*, and nowhere does the SAC suggest that Menon had "ultimate authority" over the publication of the article in question, such

that he dictated "whether and how to communicate" its content.  *See id.*

Rather, Plaintiff alleges only that Menon participated in an interview with the

article's author, and, per the *Janus* Court's reasoning, may therefore at most

have "suggested" what to say, but did not "'make' [the published] statement in

[his] own right."[6]  Finally, both *Elkind* and *Novak* predate the Supreme Court's

opinion in *Janus*; *Janus*'s detailed analysis regarding what it means to "make"

a statement — and the Second Circuit's subsequent adoption of *Janus*'s

"ultimate authority" test, *see In re Pfizer Inc. Sec. Litig.*, 2016 WL 1426211, at

---

[6]      The Seventh Circuit's reasoning in *Fulton County Employees Retirement System* v. *MGIC Investment Corporation*, 675 F.3d 1047 (7th Cir. 2012), in which plaintiff sought to hold defendant MGIC liable for statements made by two corporate officers of an LLC partially owned by MGIC, further explains *Janus*'s prohibition on holding parties liable for statements that they themselves did not control:

> If MGIC is not liable under § 20(a), Fulton contends, then MGIC and the three MGIC managers named as defendants are directly liable under § 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, because by inviting Williams and Draghi to speak MGIC effectively "made" their statements itself.  That line of argument cannot be squared with *Janus Capital Group, Inc.* v. *First Derivative Traders* ... which holds that the "maker" of a statement is the person with ultimate authority over the language.  We have explained why Williams and Draghi, not MGIC or its officers, had ultimate authority over their own statements.  *Janus Capital* prevents treating MGIC as the statements' maker.

> Fulton proposes to get around *Janus Capital* by asserting that MGIC had a duty to correct any errors Williams or Draghi made.  But no statute or rule creates such a duty — if there were one, *Janus Capital* itself would have come out the other way. The statements at issue in *Janus Capital* appeared in a prospectus of Janus Investment Fund — which, as the author of the prospectus, controlled its contents.  Some propositions in the prospectus were attributed to Janus Capital Management, which plaintiffs sought to hold liable.  The Court held that this would be improper, because the mutual fund and not the investment adviser determined the prospectus's contents. Janus Capital Management could have issued a press release denouncing or correcting the prospectus but didn't.  Just so with MGIC.  It could have added its own footnotes or corrections to what Williams and Draghi said, but it is no more liable than was Janus Capital Management for keeping silent when someone else spoke.

*Id.* at 1051-52.

16

*11; *S.E.C.* v. *Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286-87 (2d Cir. 2013) — are what govern this Court's analysis.

In sum, the statement in *Future Woman* cannot serve as the basis for a claim against Defendants under Rule 10b-5, because under governing Supreme Court and Second Circuit law, Plaintiff has not alleged that Defendants had "'ultimate authority' over the statement['s] 'content and whether and how to communicate' [it]."[7]

### b.    Defendant Ehrlich Adequately Corrected the False Statement Made in Cellceutix's 2009 Form 10-K

Relatedly, the SAC alleges that Ehrlich had an independent duty to correct the false statement, made in Cellceutix's October 8, 2009 Form 10-K, that Menon received his Ph.D. from Harvard University.  (SAC ¶ 24).  While this statement occurred well before the class period, Plaintiff alleges that Ehrlich's unfulfilled duty to correct the statement continued throughout the class period.  (*Id.*).  Defendants argue in response that Ehrlich *did* correct the false statement, and that in any event the alleged misstatement was immaterial.  (Def. Br. 16-17).   Cellceutix's Forms 10-K filed first in 2010, and then in each year after, show that the description of Menon's educational background was in fact corrected.  The biographical information provided about Menon is nearly identical in the forms, save the difference that where the word "Harvard" once appears in the 2009 form, the word "Kerala" appears

---

[7]      Defendants additionally argue that Plaintiff has failed to allege loss causation or scienter adequately in connection with his instant claims.  (Def. Br. 28-30).  Because the Court dismisses Plaintiff's claims on other grounds, it does not address the question of loss causation, and addresses scienter only in relation to Plaintiff's risk disclosure claim.

in the forms for fiscal years ending in June 2010, June 2011, June 2012, June 2013, and June 2014.  (*See* Sullivan Decl. Ex. 3-8).

Plaintiff argues that the mere editing of Menon's biography such that it named the correct university was insufficient to satisfy Ehrlich's duty to correct the misstatement made in the 2009 Form 10-K.  (Pl. Opp. 15-16).  The Court observes, however, that the erroneous information was removed and replaced with accurate information.  In the plain-meaning sense of the word, incorrect information was made correct — it was "corrected."  Plaintiff appears to believe that an affirmative disavowal was required to fully effect a "correction," but has cited to no case law indicating that such an extra step is always required under Rule 10b-5.

The Second Circuit has stated, in the related context of the truth-on-the-market defense, that any "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167 (internal quotation marks omitted).  Here, both prior to and during the class period, correct information was reported in Defendants' publicly filed Forms 10-K — the precise format in which the prior error was published, and thus with an identical degree of "intensity" and "credibility."  Furthermore, whereas the misrepresentation occurred one time

in 2009, the correct information was published consistently from 2010 to 2014, more than "counter-balancing" the previous error.[8]

The June 2009 form states that Menon switched positions in 1982, and that "[t]wo years later, he earned his [Ph.D.] in Pharmacology from Harvard University. Menon's [Ph.D.] work focused on anti-folate therapy of various cancers." (Sullivan Decl. Ex. 3). The Form 10-K filed in June 2010 states that Menon switched positions in 1982, and that "[t]wo year later, he earned his [Ph.D.] in Pharmacology from Kerala University. Menon's [Ph.D.] work focused on anti-folate therapy of various cancers." (*Id.* Ex. 4). The Forms 10-K filed in June 2011, 2012, 2013, and 2014 similarly state that Menon "earned his [Ph.D.] in Pharmacology from Kerala University" while focusing "on anti-folate therapy of various cancers." (*Id.* Ex. 5-8). There can be no question, based on the identical timing, subject of the degree, and focus of the work, that the forms refer to the same degree, and that the latter forms merely correct the name of the institution from which the degree was received. Thus, Plaintiff's allegations that Ehrlich failed to correct a material misrepresentation concerning Menon's education fail to state a claim.

---

[8]     Additionally, "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 337-38 (2d Cir. 2011) (quoting *Brown* v. *E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)). Plaintiff's assertion that Ehrlich failed his duty to correct the 2009 misstatement thus arguably requires not only that a reasonable investor would consider Menon's *alma mater* a material fact in determining how to act, but could additionally view Defendants' Forms 10-K from June 2010 through June 2014 and still believe, based on a Form 10-K filed five years prior, that Menon received a Ph.D. from Harvard. No reasonable investor would or could have such a belief.

### c.  Plaintiff Has Failed to State a Claim Based on Defendants' Statements Regarding Brilacidin

### i.  Relevant Facts

Plaintiff next claims fraud in certain company statements regarding two Cellceutix products, the anti-inflammatory and antibiotic Brilacidin and the cancer treatment drug Kevetrin.  With respect to the former, Cellceutix acquired the rights to develop Brilacidin from the biotech company PolyMedix, Inc., in September 2013.  (SAC ¶ 19).  Brilacidin was, at that time, in Phase II of its development.  (*Id.*).[9]  In 2014, Cellceutix conducted a Phase IIb study of Brilacidin for its treatment of acute bacterial skin and skin structure infection ("ABSSSI") caused by the Staphylococcus bacterium, and in 2015 it began a Phase II study for use of Brilacidin in the treatment of oral mucositis ("OM").  (*Id.* at ¶ 20).[10]  The latter study is slated to end in October 2016.  (*Id.*).

Cellceutix's 2014 Form 10-K stated that "Brilacidin and related compounds have shown antibacterial, anti-biofilm and anti-inflammatory properties in various pre-clinical studies," and, further, that Defendants "believe[d] that the combination of these attributes contribute to the efficacy of

---

[9]  Clinical trials of drugs being developed for FDA approval proceed in four primary phases, each designed to answer separate research questions.  Phase I focuses primarily on safety and side effects; Phase II expands the pool of test subjects and considers a drug's efficacy, but continues to focus on safety; Phase III again increases the pool of subjects to "confirm [the drug's] effectiveness, monitor side effects, compare it to commonly used treatments, and collect information that will allow the drug or treatment to be used safely"; and Phase IV studies are conducted after a drug has gone on the market to gather information about use in different populations and over longer periods.  *Clinical Trial Phases*, National Institutes of Health, *available online at* https://www.nlm.nih.gov/services/ctphases.html (last visited June 5, 2016).

[10]  Oral mucositis is "an atrophying of the mucosal lining of the mouth due to chemotherapy or radiation."  (SAC ¶ 20).

Brilacidin" for treating OM.  (SAC ¶ 27).  This statement was repeated in Cellceutix's quarterly Forms 10-Q dated November 10, 2014, February 9, 2015, and May 11, 2015, respectively.  (*Id.*).

Between April 25 and 28 of 2015, Defendants displayed a poster at the 2015 European Congress of Clinical Microbiology and Infectious Diseases in Copenhagen, Denmark, which poster stated, in relevant part, that "Brilacidin has potent Gram positive activity, Gram negative coverage, but low cytotoxicity against mammalian cells."  (SAC ¶ 25).[11]  Subsequently, in response to the Mako Research allegation that Brilacidin was an ineffective antibiotic, Cellceutix stated in the August 7 Press Release that "Brilacidin is for treating gram positive infections … and was not developed for the treatment of Gram-negative infections."  (SAC ¶ 28; Sullivan Decl. Ex. 2).  The press release went on to explain that "Brilacidin is active against Gram-positive and is active against some, but not all, Gram-negative bacteria."  (Sullivan Decl. Ex. 2).  The August 7 Press Release additionally explains that it is Brilacidin's "unique anti-inflammatory properties," as opposed to its antibiotic properties, that "is the purported mechanism" by which Brilacidin treats OM in cancer patients.  (*Id.*).

---

[11]   Bacteria are classified as "Gram-positive" or "Gram-negative" depending on whether they retain a specific stain color; the classification system was developed in the 1800s by Hans Christian Gram.  Of potential significance to the instant motion, certain types of Gram-negative bacteria have become resistant to existing antibiotic drugs.  *See generally Gram-negative bacteria*, National Institutes of Health, *available online at* https://www.niaid.nih.gov/topics/antimicrobialresistance/examples/gramnegative/ Pages/default.aspx (last visited June 5, 2016).

### ii.      Plaintiff Has Failed to State a Claim Concerning Brilacidin's Gram-Negative Coverage

Plaintiff claims fraud in the fact that Defendants first "touted Brilacidin's ability to kill gram-negative bacteria," but then conceded in the August 7 Press Release that "Brilacidin was not being developed for treating gram negative bacteria and was not likely an effective treatment against a broad spectrum of gram negative bacteria."  (SAC ¶¶ 25-26).  The fulcrum of his claim is the poster displayed at the 2015 European Congress of Clinical Microbiology and Infectious Diseases, which poster stated that "Brilacidin has potent Gram positive activity, Gram negative coverage, but low cytotoxicity against mammalian cells."  (*Id.* at ¶ 25).

Plaintiff has failed to identify any false or misleading statement of material fact.  Contrary to Plaintiff's assertion, the poster does not contradict Defendants' later statement that Brilacidin is "likely not an effective treatment against a broad spectrum of gram negative bacteria."  Rather, the poster merely states that Brilacidin has "Gram negative coverage."  Unlike the poster's claim of "potent … activity" for Gram-positive bacteria, which does suggest a level of efficacy in treatment, the less specific description of Brilacidin as having "coverage" for Gram-negative bacteria asserts only that Brilacidin may be effective against some strains of bacteria that are Gram-negative.  *See Antibiotics Review*, Stanford School of Medicine Internal Medicine Education and Resource, *available online at* http://errolozdalga.com/medicine/pages/OtherPages/AntibioticReview.Chan uRhee.html (last visited June 5, 2016) (describing various antibacterials with

"gram negative coverage," but with widely varying degrees of coverage); *see also* Sandra L. Preston and George L. Drusano, *Penicillins*, Antimicrobe, *available online at* http://www.antimicrobe.org/d24.asp (last visited June 5, 2016) (describing varying levels of efficacy against Gram-negative bacteria among penicillins with "Gram-negative coverage").[12]  Moreover, observers are not left to speculate about what sort of coverage is being referred to: The poster provides graphs of Brilacidin's activity over time against two specific strains of bacteria — one Gram-positive and one Gram-negative — the underlying data for which is neither disavowed by the August 7 Press Release, nor challenged in Plaintiff's SAC.  In other words, Defendants provided a summary statement that Brilacidin has "Gram negative coverage," immediately followed by trial results showing its effects on specific strains of bacteria.  None of this is belied by Defendants' subsequent statement that Brilacidin is "likely not an effective treatment against a *broad spectrum* of gram negative bacteria" (emphasis added).

Plaintiff premises the alleged falsity of the poster's statement on Defendants' statements in the August 7 Press Release.  Significantly, however, that Press Release specifically explains (in addition to clarifying that Brilacidin was not being specifically developed to treat Gram-negative bacteria) that Brilacidin "is active against some, but not all, Gram-negative bacteria."

---

[12]   The Court notes that it does not rely on the substance of the cited medical sources; rather, it cites them solely to illustrate that scientific publications may describe drugs with different levels of efficacy against Gram-negative bacteria as nevertheless having "Gram negative coverage."

23

(Sullivan Decl. Ex. 2). Thus the corrective disclosure pointed to by Plaintiff as showing the falsity of the poster's statements does not, in fact, show that the poster's statement was false. In sum, Plaintiff has failed to allege any reason why the statement actually made by Defendants — that Brilacidin has some unspecified level of "Gram negative coverage" — was inaccurate, as the fact that Brilacidin is "likely not effective" against a "broad spectrum of gram negative bacteria" does not preclude Brilacidin's having some degree of Gram-negative coverage.

The Court fully acknowledges that "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Here, however, the poster containing the statement in question was presented to a highly specialized audience — the attendees of the European Congress of Clinical Microbiology and Infectious Diseases. The individuals to whom the statement was directed could be expected to understand the contrast between "potent … activity" and the much vaguer "coverage," and would not plausibly interpret the cursory description on the poster to contain the significantly larger and more clinically meaningful promise that Brilacidin presented "an effective treatment against a broad spectrum of gram negative bacteria." Hence the statement was not false, nor was it, in light of its "context and manner of presentation," likely to "mislead prospective buyers." *Id.* Consequently, Plaintiff has not alleged a violation of Rule 10b-5 based on the poster's description of Brilacidin.

24

### iii.  Plaintiff Fails to State a Claim Regarding Brilacidin's Antibiotic Properties

Plaintiff makes a second allegation regarding Defendants' description of Brilacidin, pointing to Defendants' statement that

> in animal models of oral mucositis, an oral rinse containing Brilacidin was shown to reduce the occurrence of severe ulcerative oral mucositis by more than 90% compared to placebo.  Brilacidin and related compounds have shown antibacterial, anti-biofilm and anti-inflammatory properties in various pre-clinical studies.  We believe that the combination of these attributes contribute to the efficacy of Brilacidin in these animal models.

(SAC ¶ 27).  This statement appears in Defendants' June 2014 Form 10-K, as well as three subsequent Forms 10-Q filed by Cellceutix between September 2014 and May 2015.  (*Id.*).  Plaintiff contends that this statement constitutes a material misrepresentation because, as Defendants set forth in their August 7 Press Release, it was only Brilacidin's "anti-inflammatory properties," and *not* its antibiotic properties, that were responsible for any efficacy against OM; consequently, when developed as a treatment for OM, Brilacidin would not be eligible to receive a "qualified infectious disease product" (or "QIPD") designation and would not receive the attendant benefits of fast-track approval or an extended period of exclusivity.  (*Id.* at ¶ 28 & n.2).

Plaintiff has not adequately pleaded that Defendants' claim that Brilacidin's multiple properties contributed to its efficacy in treating OM was fraudulent.  Plaintiff states that, as a result of its primarily anti-inflammatory effect, Brilacidin would not be eligible for QIPD designation in relation to its development as a treatment for OM; but, as Plaintiff acknowledges, OM is not

an infectious disease.  (SAC ¶ 20 (stating that OM is caused by chemotherapy or radiation, as opposed to infection); Pl. Opp. 19).  Consequently, it would not matter which of Brilacidin's properties was responsible for its efficacy in treating OM, as QIPD designation is only available for drugs developed to treat certain infectious pathogens.  21 U.S.C. § 355f(g).[13]  To that end, QIPD designation is determined not by a drug's active properties, but rather by the pathogen being treated;[14] such designation would thus not be available for *any* drug designed specifically to treat OM.  *Id.*[15]  Both parties make arguments in their briefing regarding Brilacidin's effect against the lesions

---

[13]     As explained in the U.S. Department of Health and Human Services' *Guidance for Industry: Expedited Programs for Serious Conditions - Drugs and Biologics*,

> Title VIII of FDASIA, Generating Antibiotic Incentives Now (GAIN), provides incentives for the development of antibacterial and antifungal drugs for human use intended to treat serious and life threatening infections.  Under GAIN, a drug may be designated as a qualified infectious disease product (QIDP) if it meets the criteria outlined in the statute.  A drug that receives QIDP designation is eligible under the statute for fast track designation and priority review.

OMB Control No. 0910-0765 (May 2014).  As the statute makes clear, granting a drug QIPD designation requires that it be developed "to treat serious or life-threatening *infections*."  21 U.S.C. § 355f(g) (emphasis added).

[14]     The actual designation received by Brilacidin illustrates the fact that QIPD status turns on the pathogen being treated, rather than the properties of a given drug: While Brilacidin has not received QIPD status for its treatment of OM, Brilacidin *has* received QIPD status for its use in treating ABSSSI.  (SAC ¶ 28 n.2).

[15]     Plaintiff's brief in opposition appears to argue that by describing Brilacidin's efficacy against OM as resulting at least to some degree from its antibiotic properties, Defendants were necessarily implying that Brilacidin would be eligible for QIPD designation, and that to argue otherwise would unfairly require investors to know the causes of OM.  (Pl. Opp. 19).  But this argument assumes that all antibiotics are eligible for QIPD designation, which is not the case.  21 U.S.C. § 355f(g); *see also* Establishing a List of Qualifying Pathogens Under the Food and Drug Administration Safety and Innovation Act, 79 F.R. 32464-01, 2014 WL 2508535 (June 5, 2014) (stating that "a drug that is intended to treat an infection caused by a pathogen on the [qualifying pathogens] list may not always be eligible for QIDP designation").  Consequently, the mere suggestion that Brilacidin's antibiotic properties played a role in the treatment mechanism for OM did not therefore suggest to a reasonable investor that Brilacidin would be eligible for QIPD designation.

that accompany OM — which effect *does* derive from Brilacidin's antibiotic properties — as evidencing the truth or falsity of Cellceutix's representation regarding Brilacidin's combined properties; this line of argument is, however, something of a red herring. Absent some reason why the characterization of Brilacidin's efficacy as stemming from its multiple properties — as opposed to solely from its anti-inflammatory property — was fraudulent, that characterization cannot support a claim for material misrepresentation.

> **d.  Plaintiff Fails to State a Claim Based on Defendants' Statements Regarding Kevetrin**
>
> > **i.  Relevant Facts**

In October 2012, Cellceutix began Phase I trials of a cancer medication, Kevetrin, that is intended to activate the gene p53, mutations of which are a common cause of cancer. (SAC ¶¶ 19-20). Trials of Kevetrin used the gene p21 as a "biomarker"[16] for levels of p53, a decision that Ehrlich discussed in a March 2013 interview, and which was subsequently confirmed in Cellceutix's Forms 10-K and 8-K filed in September 2014. (*Id.* at ¶¶ 29-33).

On January 20, 2015, Defendants issued a press release (the "January 20 Press Release") describing a Stage IV ovarian cancer patient's results on Kevetrin. (SAC ¶ 35). Specifically, the January 20 Press Release states that "[s]ubsequent to the second and third Kevetrin cycles, scans showed the spleen lesion to be essentially undetectable and the patient's disease to be

---

[16]     "Biomarkers are key molecular or cellular events that link a specific environmental exposure to a health outcome." *Biomarkers*, National Institutes of Health, *available online at* http://www.niehs.nih.gov/health/topics/science/biomarkers/ (last visited June 5, 2016).

clinically stable." (*Id.*; Sullivan Decl. Ex. 13).  The January 20 Press Release further quotes Ehrlich as stating that, "The idea that a stage 4 ovarian cancer patient's disease was clinically stabilized, although her CA-125 count was increased in the third month, is remarkable." (Sullivan Decl. Ex. 13).

The Mako Research posting accused Cellceutix of misrepresenting the cancer patient's outcome in its January 20 Press Release by failing to note that the patient had discontinued the trial.  (Sullivan Decl. Ex. 1).  Cellceutix responded in its August 7 Press Release by explaining that, "[a]s explained in [the January 20 Press Release], the patient's CA125 count was elevated (a common occurrence in cancer patients) and she was advised to discontinue the trial by her physician; Cellceutix was provided no further information on [the] rationale behind the decision."  (*Id.* Ex. 2).

### ii. Plaintiff Fails to State a Claim Regarding Defendants' Representation of p21 as a "Biomarker" in Clinical Trials for Kevetrin

Plaintiff alleges that Defendants' statement that p21 is a "biomarker" — which to Plaintiff means "that [p21] is indicative of a clinically meaningful outcome for treatment" — was false or misleading because "[i]n reality, p21 has not been shown to be correlated with improved clinical outcomes for cancer." (SAC ¶ 34).  To be clear, Plaintiff does not dispute Defendants' representations that Kevetrin affected levels of p21 in clinical trials; rather, Plaintiff argues that p21 is not an appropriate or accurate barometer for Kevetrin's efficacy.  (*See also* Pl. Opp. 20 ("The Complaint does not fault the Dana Farber institute for examining P21 activation.  Instead, the Complaint

28

faults Defendants for claiming that activation of P21 is an indication that Kevetrin is an effective cancer treatment.")).

As an initial matter, Plaintiff cannot disaggregate the parameters of the Kevetrin clinical trial from its results in the manner that he suggests; the two are inextricably intertwined. What is more, neither is a proper basis for a claim of fraud. Put simply, securities law is not "a tool to second guess how clinical trials are designed and managed." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13 Civ. 1307 (KBF), 2014 WL 585658, at *1 (S.D.N.Y. Feb. 14, 2014); *see also Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) (finding that plaintiffs' disagreement with drug trial methodology and allegation that company "deviated from the established protocol" for such trials were insufficient to allege falsity). Furthermore, the idea that p21 levels could serve as a meaningful indicator of Kevetrin's effects is non-actionable medical opinion. *See Kleinman*, 706 F.3d at 154 ("Kleinman (and others) may take issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement.").

Plaintiff's SAC alleges at most that there are research scientists who believe that p21 does not correlate with improved prognoses in "low-stage epithelial ovarian cancer." (SAC ¶ 34). As an initial matter, this does not preclude p21 levels from having other clinically meaningful effects; but more importantly, it does not preclude other reasonable research scientists from

disagreeing.[17]  Securities law is simply not a vehicle through which courts will police disagreements in the cancer research community or the parameters of clinical trials.  Consequently, Defendants' use and discussion of p21 as a biomarker in its trials of Kevetrin does not support a claim for securities fraud.

### iii.    Plaintiff Fails to State a Claim Regarding the Kevetrin Trial Patient's Outcome

Plaintiff further alleges that Ehrlich misrepresented a Phase I clinical trial patient's outcome while taking Kevetrin.  Specifically, Plaintiff alleges that Ehrlich's description of the patient's results was misleading, as he claimed that her Stage IV ovarian cancer was "clinically stabilized," yet later that year Cellceutix admitted "that the patient's CA125 count was elevated," and additionally stated that the patient's doctor had recommended she discontinue the trial.  (SAC ¶ 36 (alleging that January 20 Press Release was "misleading for failing to disclose that the reason that the patient had discontinued the trial was that her cancer had returned")).  In this regard, Plaintiff alleges in the SAC that "CA125 is a biomarker for ovarian cancer — meaning that … the

---

[17]    Cellceutix's August 7 Press Release explains that "p21 is a biomarker for p53 activation that we are measuring in the peripheral blood of patients, not in the tumor tissue. p21 is a downstream gene in the p53 signaling activation pathway. Therefore enhancement in p21 gene expression is the indication of p53 activation in peripheral blood cells," and cites to a peer-reviewed article published in the journal *Cancer Research*.  (Sullivan Decl. Ex. 2).  The Court is certainly not in the position to evaluate the scientific validity of this explanation, nor would doing so be within the scope of appropriate considerations upon a motion to dismiss.  Rather, it notes that the very sources relied upon by Plaintiff in bringing this suit acknowledge the existence of multiple medical opinions concerning the use of p21 in assessing a drug's effect on cancer.

patient's cancer had in fact returned" (*id.*), and faults Defendants for not stating that fact in its public statements about the trial.

Defendants argue that determining whether or not the "patient's cancer had in fact returned" requires far more information than the level of a single biomarker.  (Def. Br. 24 n.14).  That is beside the point, however, as the corrective "admission" upon which Plaintiff premises his claim — that the patient's "CA125 count was elevated" — was in fact contained in the original, purportedly misleading statement: In the January 20 Press Release, Ehrlich stated, in relevant part, "The idea that a stage-4 ovarian cancer patient's disease was clinically stabilized, *although her CA125 count was increased in the third month*, is remarkable."  (Sullivan Decl. Ex. 13 at 2 (emphasis added)). The sole fact from which Plaintiff draws his inference that the patient's doctor recommended she discontinue the trial because her "cancer had in fact returned," and thus the fact that Plaintiff claims was misleadingly withheld, *viz.*, the elevation in the patient's CA125 count, was thus contained in the very same press release as the assertion that her disease was "clinically stable."

Plaintiff's pleading might perhaps be construed to object, not to Defendants' failure to disclose the patient's elevated CA125 count, but rather to Ehrlich's representation that her disease was "clinically stable."  However, at no point was a corrective disclosure made by Defendants to suggest that the patient's disease was *not* clinically stable; Plaintiff's claim to the contrary rests on the report of her elevated CA125 count — a fact disclosed by Defendants at the outset — and Plaintiff's own opinion that this elevation betokens a return

31

of the patient's cancer.  (*See* SAC ¶ 36).  The representation that the patient's disease was "clinically stable" constitutes a non-actionable medical opinion, as does Plaintiff's proffered interpretation of the elevated CA125 count.  *See Kleinman*, 706 F.3d at 154.  For all of these reasons, Plaintiff's allegations concerning the January 20 Press Release, and its description of the Kevetrin patient's outcome, cannot support a claim for misrepresentation or omission of a material fact.

**e.   Plaintiff Fails to State a Claim Regarding Defendants' Failure to Disclose Material Risks**

Finally, Plaintiff contends that Defendants failed to disclose two material risks related to Cellceutix's purchase of Brilacidin from PolyMedix, Inc.: (i) that the acquisition of Brilacidin would require a significant increase in fundraising in the short term, and (ii) that none of Defendants' officers had experience in obtaining Phase III approval of a drug, thereby creating a material risk regarding Defendants' ability to plan for and manage the necessary Phase III trials for Cellceutix's newly acquired drug.  (SAC ¶¶ 37-38).  The Second Circuit has "consistently held that 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).  Such a duty may arise when, for instance, a "statute or regulation requir[es] disclosure," or a corporate statement would otherwise be "inaccurate, incomplete, or misleading."  *Glazer* v. *Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (citation omitted); *accord Stratte-McClure*, 776 F.3d at

32

101.  As relevant to the instant matter, Item 303 of Regulation S-K requires companies that make certain SEC filings to disclose "any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  As with claims premised on false or misleading statements, only "material" omissions are actionable.  *Stratte-McClure*, 776 F.3d at 102 (citing 17 C.F.R. § 240.10b-5(b)).

Defendants cannot be held liable for failing to disclose the "trends and uncertainties" attendant to their purchase of Brilacidin, as they in fact made the appropriate disclosures.  In regards to fundraising, the "Risks Specific to Us" portion of Cellceutix's 2013 Form 10-K states, "We will need to raise substantial additional capital in the future to fund our operations and we may be unable to raise such funds when needed and on acceptable terms." (Sullivan Decl. Ex. 7 at 20).  The 2014 and 2015 Forms 10-K make this point even more emphatically, stating, "We need to raise substantial additional capital in the future …, which could prevent us from fully implementing our business, operating and development plans."  (*Id.* Ex. 8 at 24; Ex. 9 at 19). Specifically regarding the need to raise substantial funds to complete Brilacidin's clinical trials, Defendants' 2014 Form 10-K states, "In the event that we cannot obtain acceptable financing, *we would be unable to complete preclinical development projects, and clinical trials for Kevetrin, Prurisol, and Brilacidin.*"  (*Id.* Ex. 8 at 25 (emphases added); *see also id.* at 27 ("***We are a development stage company and have no products approved for***

33

***commercial sale, have never generated any revenues, and may never***

***achieve revenues or profitability***" (bolding and emphasis in original); Ex. 7

at 57 ("We expect to incur losses from operations for the near future.  We

expect to incur increasing research and development expenses, *including*

*expenses related to additional clinical trials*" (emphasis added)).  The relevant

financial "uncertainty" identified by Plaintiff was whether Cellceutix would be

able to raise sufficient funds to complete clinical trials of Brilacidin.

Defendants explicitly disclosed this uncertainty.

Plaintiff's SAC implies that Defendants should have provided

information about the specific dollar amount Defendants would likely need to

raise to support trials of Brilacidin.  (SAC ¶ 37).  Plaintiff has not cited to case

law suggesting that Item 303 requires this level of specificity, particularly

where Defendants have warned investors of the worst-case-scenario outcome.

Moreover, Defendants are not required to provide purely speculative

disclosures, *see Novak*, 216 F.3d at 309; and to the extent that Plaintiff alleges

that future costs were determinable from public information provided by *other*

companies regarding their expenditures on comparable drugs (*see* SAC ¶ 37),

such information was no more accessible to Defendants than it was to

investors, and consequently need not be disclosed.  *In re Bank of Am. AIG*

*Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (information in

the public domain need not be disclosed), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)

(summary order).

34

Plaintiff's allegation regarding Defendants' failure to disclose their lack of experience with Phase III clinical trials fails for substantially the same reasons as his allegation regarding the need for future funding.  To the extent that Plaintiff has identified an "uncertainty," it was in fact disclosed (*see* Sullivan Decl. Ex. 7 at 23 ("We have limited experience in drug development and may not be able to successfully develop any drugs."); Ex. 8 at 28 (same), 31 ("***We have limited experience in conducting or supervising clinical trials and must outsource all clinical trials which expose[s] us to risks which could have a materially adverse effect on our business***." (bolding and emphasis in original)); Ex. 9 at 28 (going into detail regarding risks attendant to Cellceutix's limited trial experience and consequent need to outsource a significant amount of clinical trial work)).  Further, to the extent that Plaintiff claims Defendants should have listed out possible consequences of their lack of experience, such "disclosure" would be wholly speculative and does not constitute an uncertainty "known" to Defendants.  Rather, it is an inference made from Defendants' lack of experience — an inference that investors are no less capable than Defendants of making.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 584 (discussing Item 303's requirement that a trend or uncertainty be "presently known," not merely "reasonably possible") (citing *Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012)); *cf. Novak*, 216 F.3d at 309 ("[A]s long as the public statements are consistent with reasonably available data, corporate

officials need not present an overly gloomy or cautious picture of current performance and future prospects.").

Lastly, while Plaintiff makes numerous allegations regarding Defendants' scienter generally, he fails to plead scienter adequately with respect to this particular class of disclosures. (*See* SAC ¶¶ 51-68). The PSLRA requires a complaint alleging securities fraud to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99; *accord In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 585.

 "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Novak*, 216 F.3d at 307-08). Where a plaintiff fails to satisfy the required showing for motive, he may "raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *Id.* at 198-99 (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). To survive a motion to dismiss, the

strong inference of scienter must be "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged,' considered as a whole." *Zech Capital LLC* v. *Ernst & Young Hua Ming*, — F. App'x —, No. 15-824-cv, 2016 WL 320874, at *1 (2d Cir. Jan. 27, 2016) (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323-24 (2007)), *as amended* (Jan. 28, 2016) (summary order).

Plaintiff has alleged no concrete benefit to Defendants as a result of their purported failure to make required Item 303 disclosures, and thus has not pleaded motive; Plaintiff at most alleges a general desire to present the company as financially stable in order to continue raising money, a desire that could be ascribed to every company that relies on outside funding. *Cf. ECA, Local 134 IBEW Jt. Pension Trust*, 553 F.3d at 201 ("At most, Plaintiffs allege a generalized desire to achieve a lucrative acquisition proposal. Such generalized desires fail to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired." (internal quotation marks omitted)). In the absence of a sufficiently pleaded motive, the Court considers whether Plaintiff has raised a cogent inference based on circumstantial allegations of conscious misbehavior or recklessness that is "at least as compelling as any opposing inference." The Court finds that Plaintiff has not. Plaintiff alleges that "there was no disclosure that the acquisition of [Brilacidin] created a new material risk of Cellceutix's inability to fund expensive clinical trials" in Cellceutix's 2013 Form 10-K; but Cellceutix explicitly states in that form that

it will need to "raise additional capital" to continue, and that it "may be unable to do so," (SAC ¶ 37; Sullivan Decl. Ex. 7 at 20), in addition to stating that the company "expect[ed] to incur losses from operations for the near future," and expected to "incur increasing research and development expenses, *including expenses related to additional clinical trials*" (Sullivan Decl. Ex. 7 at 57 (emphasis added)).  In light of the disclosures actually made by Defendants, both in the 2013 Form 10-K and in subsequent filings during the class period, Plaintiff has failed to raise any inference that Defendants engaged in conscious misbehavior — let alone one strong enough to counterbalance the opposing inference, which is that Defendants did not see a need for further cautionary language in light of the statements already contained within their Forms 10-K.

### 4.   Plaintiff Fails to State a Claim for Control Person Liability Under Section 20(a)

A *prima facie* case of control person liability under Section 20(a) of the Exchange Act requires "[i] a primary violation by the controlled person; [ii] control of the primary violator by the defendant; and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI*, 493 F.3d at 108 (citing *First Jersey Sec.*, 101 F.3d at 1472).  Plaintiff has failed to allege a primary violation.  Consequently he has failed to make a *prima facie* showing under Section 20(a).[18]

---

[18]   In addition to arguing for dismissal, Defendants argue that the Early Class Notice was deficient in light of Plaintiff's amended pleading and must therefore be republished: The initial Early Class Notice covered the class period from May 10, 2013, to August 6, 2015, but the SAC extends the class period to September 11, 2015.  (Def. Br. 12; SAC ¶ 1).  However, in light of Plaintiff's failure to state an actionable claim, the Court need not address whether the previously published Notice would otherwise suffice.

**CONCLUSION**

For the reasons stated in this Opinion, Defendants' motion to dismiss Plaintiff's SAC is GRANTED.   Plaintiff has requested leave to replead, without presenting any concrete means of remedying the deficiencies identified in this Opinion.  Because Plaintiff has previously been given leave to replead, and because the Court finds that any further repleading would be futile, Plaintiff's request is DENIED.  *See Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (identifying futility as a proper ground for denying leave to replead); *see generally United States ex rel. Ladas* v. *Exelis, Inc.*, — F.3d —, No. 14-4155-cv, 2016 WL 3003674, at *9 (2d Cir. May 25, 2016).  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      June 8, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge