USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  March 29, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                        :
GARY ZAGAMI, *individually and on behalf of* :
*all others similarly situated,*               :
                                        :
                          Plaintiff,    :        15 Civ. 7194 (KPF)
                                        :
              v.                        :        OPINION AND ORDER
                                        :
CELLCEUTIX CORPORATION,                 :
LEO EHRLICH, and KRISHNA MENON,         :
                                        :
                          Defendants.   :
                                        :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

In an Opinion and Order dated June 8, 2016, this Court granted the motion of Defendants Cellceutix Corporation ("Cellceutix"), Leo Ehrlich, and Krishna Menon (together, "Defendants") to dismiss the Second Amended Complaint filed by Plaintiff Gary Zagami. *See Zagami* v. *Cellceutix Corp.*, No. 15 Civ. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016), *appeal withdrawn* (Sept. 6, 2016). Shortly thereafter, Defendants moved pursuant to the mandatory review provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(c)(1), for a finding that the lawsuit amounted to "abusive litigation," and for the consequent imposition of sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. For the reasons set forth in the remainder of this Opinion, Defendants' motion is denied.[1]

---

[1]     Defendants' motion papers repeatedly request that the Court find that the complaints filed in the instant lawsuit amounted to "abusive litigation," such that sanctions are

## BACKGROUND[2]

### A.   Factual Background

Critical to resolution of the instant motion is an understanding of the events underlying the filing of the three complaints in this matter. That history is presented, with appropriate detail, in this section. Familiarity with the Court's prior decision on Defendants' motion to dismiss, and with the scientific and financial terminology discussed therein, is presumed.

### 1.   The Parties to the Action

Cellceutix is a clinical-stage biotechnology company developing several drugs for approval by the Food and Drug Administration (the "FDA"), including the drugs Kevetrin and Brilacidin. (SAC ¶¶ 2, 13). Defendant Krishna Menon has served as President, Chief Scientific Officer, Director, and Chairman of the Board of Cellceutix since 2007. (*Id.* at ¶ 14). Defendant Leo Ehrlich has served as Chief Financial Officer and Director of Cellceutix since 2007, and as the company's Chief Executive Officer since 2010. (*Id.* at ¶ 15).

---

warranted, but do not specify against whom such sanctions should be imposed. Inasmuch as most of their arguments are directed to Plaintiff's counsel, the Rosen Law Firm, and most of the claims relate to legal deficiencies, the Court will assume that sanctions are sought against the Rosen Law Firm. *See Chien* v. *Skystar Bio Pharmaceutical Co.*, 256 F.R.D. 67, 72 (D. Conn. 2009) ("Sanctions for the legal insufficiency or frivolousness of the complaint must run against the attorney alone." (citing, *inter alia*, Fed. R. Civ. P. 11(c)(5)).

[2]   This Opinion draws from the parties' submissions in both the motion to dismiss and the motion for sanctions, in particular, the declarations submitted in support and in opposition to the motions and the exhibits thereto. These declarations are cited using the conventions "[Name] MTD Decl." and "[Name] Sanctions Decl." In addition, the underlying Complaint (Dkt. #1) is referred to as "Compl."; the First Amended Complaint (Dkt. #10) as "FAC"; and the Second Amended Complaint (Dkt. #32) as "SAC." For convenience, Defendants' brief in support of their motion for sanctions (Dkt. #63) will be referred to as "Def. Sanctions Br."; Plaintiff's brief in opposition (Dkt. #67) as "Pl. Sanctions Opp."; and Defendants' reply brief (Dkt. #69) as "Def. Sanctions Reply."

Plaintiff Gary Zagami purchased Cellceutix securities during the class period alleged in the SAC.  (SAC ¶ 12).

### 2. The Mako Research Report

On August 6, 2015, a short seller of Cellceutix securities using the pseudonym "Mako Research" posted an article (the "Mako Research Report") on the website *Seeking Alpha*; the author contended that Cellceutix was a "sham" company and purported to identify (and explain the falsity of) misrepresentations and omissions of material fact in the company's public statements.  (*See* Sullivan MTD Decl., Ex. 1 (Mako Research Report); *see also* SAC ¶ 5 (alleging that Defendants' fraud "began to be exposed" with publication of the Mako Research Report)).[3]

The Mako Research Report was the crux of Plaintiff's claims of fraud, and is now the crux of Defendants' motion for sanctions; it thus merits a detailed analysis.  The Report is 38 pages long when printed out, with certain pages taken up by graphs, charts, and photographs.  The thesis of the article was stated up front; it is lengthy, but worth repeating:

> Cellceutix is run out of what appears to be an empty office building, and no one answers the phone — it appears that this is nothing more than a shell corporation.

---

[3]    Curiously, Plaintiff and his counsel refer to the Mako Research Report in their opposition papers as the "Pump Stopper Report."  (*See, e.g.*, Pl. Opp. 5).  The name Pump Stopper appears nowhere in the Mako Research Report.  While the Court does not need to, and thus will not, take judicial notice of same, it observes that Mako Research may simply be a more current *nom de net* of the short-seller formerly known as Pump Stopper.  *See* http://investorshub.advfn.com/boards/read_msg.aspx?message_id=116165363 (last visited Mar. 28, 2017).

CTIX science is demonstrably unviable, rendering this public shell likely worth substantially less than its current value.

The company is run by a management team with a long history of self-enrichment and shareholder value destruction.

One of these insiders has repeatedly issued false statements about his background.

CTIX is a black hole of related party transactions, enriching consulting agreements, and financing arrangements with known Ponzi scheme fraudsters as financing partners.

The company's fair value is 96-99% lower than the current price. CTIX should be avoided. This stock is dangerous.

I have been a professional investor for nearly a decade and have researched over 1,000 stocks, and I believe that Cellceutix is far and away the worst public company I have ever seen. The company is rife with unethical conflicts of interest from insiders who appear to be recycling a historically effective playbook that has resulted in self-enrichment at the expense of minority shareholders. This team of insiders has been involved in numerous stock market wipeouts that have cost shareholders untold fortunes.

The "company" is run out of a shell office that was leased to CTIX by the company's president. Numerous calls to management went unanswered.

There is a strong probability that (OTCPK:CTIX) is manipulated by stock promoters and overseas boiler rooms, which is explained below.

Additionally, after hiring an independent scientist with a Doctorate in Biochemistry to review Cellceutix's "science," I have concluded that the company's drug pipeline is without merit and is likely entirely without value, as detailed below.

I value shares of Cellceutix at $0.09 in a best-case scenario, which is 96% lower than the current price,

> and recommend that investors avoid this company entirely. It's clear to me that Cellceutix is very likely to end up as a complete wipeout for shareholders over time, and stands to continue declining significantly if we experience more near-term market volatility. I am appalled that this company is even allowed to remain public, and recommend that the SEC immediately begin an investigation into all related parties and trading activity in CTIX stock.

(Sullivan MTD Decl., Ex. 1 at 1).

In the succeeding 37 pages, the author added flesh to the bones of his thesis. On the issue of Cellceutix's office space (which presumably went to the *bona fides* of the company's endeavors), the author included pictures of the office "taken in early August 2015 during business hours." (Sullivan MTD Decl., Ex. 1 at 2-3). The pictures show no one, and were presented to supplement the author's contention that repeated efforts to contact Cellceutix personnel by telephone were unsuccessful. (*Id.*).

The author then spent six pages debunking the science behind the three pharmaceutical products that are the lifeblood of Cellceutix, prefacing his comments as follows:

> As my research below demonstrates, the entire pipeline of drugs that the company boasts about continuously in its press releases is likely to be entirely without value. My conclusion is based on due diligence conducted by an independent Doctor of Biochemistry, who spent weeks researching CTIX's claims. This person is a published medical researcher who has extensive clinical trial research experience.

(Sullivan MTD Decl., Ex. 1 at 4). Addressing first the antibiotic Brilacidin, the author contended that the drug (i) was ineffective and caused adverse side effects in patients; (ii) had been purchased from a bankrupt company named

5

PolyMedix (suggestive to the author of a prior market determination that the product had no value); (iii) would be "difficult to commercialize"; (iv) did not work as to most types of bacterial infections (particularly Gram-negative infections);[4] and (v) was ineffective in reducing the risk of infection for those experiencing oral mucositis.  (*Id.* at 4-7).  Proceeding next to the cancer-treatment drug Kevetrin, the author maintained that the drug did not target cancer stem cells, and was touted because of its effects on a biomarker gene, p21, that the author characterized as "invalid."  (*Id.* at 7-8).[5]  Finally, and more summarily, the author criticized Cellceutix's anti-psoriatic drug Prurisol, which the author claimed was less effective than other drugs and had worse side effects.  (*Id.* at 9).

From here, the author proceeded to attack Cellceutix's senior management, beginning with Menon, who was alleged to have misstated or overstated his resume (including by reporting a degree from Harvard University that he did not receive), and to have had ties to other biochemical companies that "all … appear to be shell companies designed to enrich insiders."  (Sullivan MTD Decl., Ex. 1 at 10; *see also id.* at 9-12).  Along with his co-defendant in this case, Menon was identified as part of the "Ehrlich-Menon Value Destruction Team," with charts purporting to demonstrate the

---

[4]     *See Zagami* v. *Cellceutix Corp.*, No. 15 Civ. 7194 (KPF), 2016 WL 3199531, at *9 n.11 (S.D.N.Y. June 8, 2016) (distinguishing Gram-positive and Gram-negative bacteria).

[5]     Relatedly, the author derided Cellceutix's clinical-trial protocols.  (*See, e.g.*, Sullivan MTD Decl., Ex. 1 at 8 ("To overcome these clinical problems, Kevetrin should be tested alongside other medications, including conventional anti-cancer drugs, to see the potential drug interactions.  But in the clinical trials, Cellceutix has not co-administered any other drugs.")).

loss in value of securities at two other companies with which the two were involved, StatSure Diagnostics and NanoViricides.  (*Id.* at 12-15).  The two officers were also alleged to have been "tied up with Ponzi scheme financiers." (*Id.* at 16; *see generally id.* at 16-32).

The post ended as it began:  The author importuned investors to "completely avoid CTIX stock, as I estimate it has 96-99% downside from the current price."  (Sullivan MTD Decl., Ex. 1 at 35).

### 3. The Filing of the Equity Alert

A few hours after the Mako Research Report was posted, Plaintiff's counsel issued an "Equity Alert" news release, which stated in relevant part:

> The Rosen Law Firm, a global investor rights law firm, announces it is investigating potential securities claims on behalf of shareholders of Cellceutix Corporation (OTC: CTIX) resulting from allegations that Cellceutix may have issued materially misleading business information to the investing public.

> On August 6, 2015, *Seeking Alpha* published an article revealing that Cellceutix misrepresented the efficacy of its drug candidates Brilacidin, Kevetrin, and Prurisol. On this news, shares of Cellceutix fell sharply during intraday trading on August 6, 2015, damaging investors.

> The Rosen Law Firm is preparing a class action lawsuit to recover losses suffered by Cellceutix investors.  If you purchased shares of Cellceutix before August 6, 2015, please visit the firm's website at http://rosenlegal.com/cases689.html for more information[.]

(Sullivan MTD Decl., Ex. 18; *compare id.* at 1 (reflecting issuance of Equity Alert at 12:41 p.m. Eastern Daylight Time), *with id.*, Ex. 1 at 1 (reflecting posting of Mako Research Report at 10:30 a.m. Eastern Time)).  The original

plaintiff in this action, Nicole O'Connell, authorized the filing of a securities

class action complaint that same day; she certified that she had read the

Rosen Law Firm's proposed complaint and authorized its filing, but no

complaint was in fact filed that day.  (Compl., Ex. 1).

### 4.    Cellceutix's Response

The next day, Cellceutix responded with a press release (the "August 7

Press Release") that provided information regarding, among other things, four

clinical trials in which it was involved.  (*See* Sullivan MTD Decl., Ex. 2; SAC

¶¶ 26, 28, 45-47; *see also* SAC ¶ 5 (alleging that press release confirmed the

falsity of certain of Defendants' prior public statements)).

The August 7 Press Release comprised nine pages of small-font type,

and endeavored to address each science-based criticism contained in the

Mako Research Report by summarizing the criticism and then setting forth

facts designed to refute it.  First, as an easy retort, Cellceutix presented

competing office photographs that depicted some of its employees.  (Sullivan

MTD Decl., Ex. 2 at 1-2).  It then addressed more substantive matters, such

as the Report's criticisms of Brilacidin, noting in part that:

> The hyper-linked table provided by the shorter is
> misleading and irrelevant as it focuses exclusively on
> key Gram-negative bacteria.  Brilacidin is for treating
> [G]ram[-]positive infections such as acute bacterial
> skin and skin structure infections (ABSSSI) caused by
> Staphylococcus aureus, including methicillin-
> resistant strains (MRSA), and was not developed for the
> treatment of Gram[-]negative infections.

(*Id.* at 2; *see also id.* at 2-6 (setting forth additional point-by-point refutations

of the scientific criticisms proffered by the author of the Mako Research Report

concerning Brilacidin; noting, in particular, that arguments based on the drug's status as a peptide failed because Brilacidin was in fact a nonpeptidic mimic of an antimicrobial peptide)).  And with respect to the Mako Research Report's claims regarding Kevetrin, Cellceutix rejoined that (i) the drug was still in a Phase 1 clinical trial; (ii) it had shown significant activity in combating cancer cells; (iii) it did not, and did not claim to, have any effect on cancer stem cells; and (iv) the clinical trial maligned by the poster was developed in consultation with experts at the Dana-Farber Cancer Institute. (*Id.* at 6-8).

### 5.    Other Reports

Other reports were published in response to the Mako Research Report. First, on August 11, 2015, Dr. Richard W. Scott of the Fox Chase Chemical Diversity Center wrote to *Seeking Alpha* seeking a retraction of the Mako Research Report.  (Def. Sanctions Reply, Ex. 3).[6]  Scott detailed his prior involvement with the development team at PolyMedix (the entity from which Cellceutix had purchased Brilacidin), as well as the reasons why he considered the Mako Research Report's reference to an "unviable science" to be "patently untrue."  (*Id.* at 1).[7]  Scott also dismantled arguments in the Mako Research Report that were, to him, so "specious and in certain instances

---

6      Dr. Scott's letter was published on *Seeking Alpha*.  *See* http://seekingalpha.com/instablog/21116141-ellaruth/4277526-dr-richard-scott-responds-seeking-alpha-article-mako-research (last visited Mar. 28, 2017).

7      In his submission, Dr. Scott also disclosed that he was consulting with Cellceutix on "preclinical development of ... other defensin mimetics in several therapeutic indications."  (Def. Sanctions Reply, Ex. 3 at 2).

laughable" that they caused him to doubt the author's references to consultation with an "independent scientist with a Doctorate in Biochemistry." (*Id.*).

Separately, Don Seiffert, the Life Sciences Editor of the *Boston Business Journal*, sought to investigate the Mako Research Report's "empty office" claims.  On August 14, 2015, he published an article entitled, "My Visit to Cellceutix, the biotech that a short seller recently called a sham."  (Def. Sanctions Reply, Ex. 2).  In preparation for the article, Seiffert met with Ehrlich and Menon to discuss Cellceutix's technology, and took a tour of the 12,000-square-foot facility, including its labs.  (*Id.* at 2).

## B.   Procedural Background

### 1.   The Complaint and the First Amended Complaint

Just over one month after the publication of the Mako Research Report, on September 11, 2015, the Rosen Law Firm filed a class action complaint on behalf of Nicole O'Connell against Defendants.  The Complaint recited violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (Dkt. #1).

The Complaint relied heavily on the Mako Research Report, which it discussed in detail under the heading, "The Truth Emerges."  (*See* Compl. ¶ 23).  However, not every contention in the Report found its way into the Complaint, and documents and materials that were not discussed in the Report were discussed in the Complaint.  In brief, the Complaint focused on

(i) a statement in an article in the online magazine *Future Woman* that Menon had obtained his Ph.D. from Harvard University (*id.* at ¶ 17); (ii) a September 9, 2013 Cellceutix press release discussing the acquisition of Brilacidin from PolyMedix and the efficacy of the drug in "patients with acute bacterial skin and skin structure infections ('ABSSSI') caused by Staphylococcus aureus" (*id.* at ¶ 18); (iii) a second press release discussing the reaction of a Stage 4 ovarian cancer patient to Kevetrin (*id.* at ¶ 19); (iv) a Cellceutix poster at the 2015 European

Congress of Clinical Microbiology and Infectious Diseases ("ECCMID") in Copenhagen, Denmark, that touted Brilacidin's efficacy in combating bacterial infections (*id.* at ¶ 20); and (v) a poster at the 2015 American Society of Clinical Oncology ("ASCO") Annual Meeting in Chicago, Illinois, that touted Kevetrin's anti-tumor activity (*id.* at ¶ 21).

The Complaint concluded:

> The statements referenced in ¶¶17-21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, products, and directors' backgrounds, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Brilacidin is not effective; (2) Kevetrin does not activate the p-53 gene, which is a tumor suppressor; and (3) Defendant Menon did not earn his PhD in Pharmacology from Harvard University. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

(Compl. ¶ 22).

11

The First Amended Complaint was filed as of right on September 24, 2015.  (Dkt. #10).  It replaced Nicole O'Connell with Plaintiff Gary Zagami.  In all substantive respects, the allegations of securities fraud remained the same.

### 2.    The Selection of a Lead Plaintiff and Lead Plaintiff's Counsel

On October 8, 2015, Plaintiff notified the Court that he had published the Early Class Notice, as required by the PSLRA, *see* 15 U.S.C. § 78u-4(a)(3)(A), on September 11, 2015.  (Dkt. #11).  On October 8, 2015, the Court issued an Order — amended by Order issued on October 29, 2015 — setting November 10, 2015, as the deadline for members of the putative class to move to serve as lead plaintiff, and December 10, 2015, as the deadline for opposition to any motion for appointment of lead plaintiff.  (Dkt. #12-13).

Plaintiff filed the only motion to serve as lead plaintiff, moving also to appoint the Rosen Law Firm as counsel, on November 10, 2015.  (Dkt #14).  The Court granted the motion in its entirety following a conference on December 18, 2015.  (Dkt. #25).  The Court additionally granted Plaintiff's request to file a Second Amended Complaint (the "SAC"), and set a briefing schedule for Defendants' proposed motion to dismiss.  (Dkt. #24).

### 3.    Defendants' Rule 11 Notice

Meanwhile, on October 22, 2015, counsel for Cellceutix served a fourteen-page letter on the Rosen Law Firm, pursuant to Fed. R. Civ. P. 11, demanding that Plaintiff withdraw the FAC, which was then the operative complaint in the matter.  (Def. Sanctions Br., Ex. 2).  Counsel began by offering background on both Cellceutix and Mako Research, noting several

"sensational 'reports'" that the latter had submitted to *Seeking Alpha* in the

preceding two months, each of which recited Mako Research's status as a

short-seller of securities issued by the subject of the report.  (*Id.* at 2-3).

Counsel also discussed the various articles purporting to rebut the Mako

Research Report, including the Seiffert and Scott writings discussed *supra* at

9-10.  Finally, after summarizing the procedural history of this case and the

standards under Rule 11, counsel for Cellceutix detailed various reasons why

Cellceutix believed that it was unreasonable for Plaintiff to rely on the Mako

Research Report.  (*Id.* at 6-14).

### 4.    The Second Amended Complaint

Plaintiff did not withdraw his complaint.  Instead, Plaintiff filed the

Second Amended Complaint on January 11, 2016.  (Dkt. #32).  The SAC was

longer (34 pages as opposed to 21) and considerably more detailed than its

predecessors.  Among other things, the SAC presented a more nuanced theory

of how certain of the purported misstatements and omissions in Cellceutix's

public statements amounted to securities fraud:

> 3.    Throughout the class period, Defendants
> misrepresented numerous aspects of Cellceutix's
> business. Defendants exaggerated the usefulness of
> Brilacidin, claiming that it could be used to treat
> notoriously difficult to treat gram-negative bacteria
> and that it could be used as an antibiotic for "oral
> mucositis," a common side effect of chemotherapy.
> Defendants also misrepresented the nature of the
> clinical trials they were performing on Kevetrin,
> claiming that a test they were performing during the
> Phase 1 clinical trial demonstrated Kevetrin's efficacy,
> when in fact the scientific evidence indicates the
> opposite.  Defendants misrepresented the difficulty
> and expense of taking Brilacidin to market, failing to

disclose that in order to complete the work required to obtain FDA approval of Brilacidin Cellceutix must [raise] drastically more money than it had raised previously. Defendants also failed to disclose that nobody at Cellceutix had any experience with Phase 3 trials.

4.     In addition, Krishna Menon, Cellceutix's president and chief scientific officer misrepresented his own credentials, claiming to have invented two drugs he only played an insignificant role in working on, and pretending to have received a PhD from Harvard. His fabricated record helped drive up the price of Cellceutix stock by giving the Company unearned credibility.

5.     This fraud began to be exposed when the short seller Mako Research issued a report on August 6, 2015, stating that 1) Brilacidin was ineffective against gram-negative bacteria, and was ineffective as an antibiotic oral rinse; 2) that Kevetrin's Phase 1 trial did not establish Brilacidin's efficacy, contrary to Defendants' misrepresentations; 3) that Menon lied about receiving a PhD from Harvard; 4) that Menon was not the inventor of the blockbuster drugs as he had claimed. These revelations corrected misrepresentations in the market and drove down the price of Cellceutix's stock. The next day, Defendants issued a press release attacking the Mako Research report, but in doing so they admitted 1) that Brilacidin was not effective against gram-negative bacteria; 2) that Defendants did not believe that Brilacidin was an effective antibiotic when used as an oral rinse to treat oral mucositis; 3) that Menon did not attend Harvard; and 4) that a patient who had been treated with Kevetrin and who Defendants claimed as a result had "essentially undetectable" levels of cancer cells, when in fact tests showed signs of her cancer returning, causing her doctor to discontinue treatment with Kevetrin.  As a result, Cellceutix's rebuttal failed to sway the market, and Cellceutix's price remained deflated.

(SAC ¶¶ 3-5).  The SAC advanced a new theory of liability, namely, that

Cellceutix had misstated its experience with clinical trials, and had not

disclosed prior to September 11, 2015, that no one at the company had experience with Phase III clinical trials. (*Id.* at ¶ 6; *see also id.* at ¶¶ 37-38 ("This omission was material and should have been disclosed in Defendants['] 10-Ks that were filed in September of 2013 and 2014 because Defendants['] inexperience with Phase 3 trials raised a material risk with respect to the hiring of personnel, Defendants' ability to realistically budget for, and manage, the clinical trials, the likelihood of future investors agreeing to raise capital, and whether Defendants would make mistakes in the drug development process due to their inexperience.")).

Separately, the SAC contained a more detailed discussion of the element of scienter, with lengthy recitations, as to Menon, of his "long history of wildly exaggerating and outright misrepresenting his professional qualifications and accomplishments" (SAC ¶¶ 51-60), and as to Ehrlich, of his "serial violations of Regulation FD" (*id.* at ¶¶ 61-62), his abetting of Menon's exaggerations (*id.* at ¶ 63), and the access to information he must have had concerning Cellceutix products in light of the company's small size and his significant position in it (*id.* at ¶¶ 65-67).

### 5. The Motion to Dismiss and Its Resolution

Defendants filed their motion to dismiss the SAC, as well as a request for the Court to take judicial notice of certain documents, on February 10, 2016. (Dkt. #36-39). Plaintiff filed his opposition to Defendants' motion on March 11, 2016 (Dkt. #41), as well as his own request for judicial notice and his partial opposition to Defendants' request for judicial notice (Dkt. #43-45).

Defendants filed their reply in support of their motion to dismiss on March 25, 2016, thereby concluding the briefing of the instant motion.  (Dkt. #46).

The Court issued its decision granting Defendants' motion on June 8, 2016.  (Dkt. #49).  After addressing preliminary issues concerning venue and judicial notice (*id.* at 8-12), the Court addressed Plaintiff's proffered categories of fraud largely in the order in which they appeared in the SAC.  Turning first to the *Future Woman* article, the Court found that Defendants were not liable for the purported misstatements therein because those statements were not directly attributable to Menon, nor could he have been said to have had "ultimate authority" over the final contents.  (*See id.* at 12-17 (citing, among other authorities, *Janus Capital Group, Inc.* v. *First Derivative Traders*, 564 U.S. 135 (2011) (addressing what it means to "make" a statement under Rule 10b-5), and *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016) (building on statement in *Janus* that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it")).  It then rejected the related claim that Ehrlich had committed securities fraud in failing to correct an erroneous statement about Menon's education in Cellceutix's October 2009 Form 10-K, noting that the statement was in fact corrected in subsequent public filings and that an investor would have determined the truth with even minimal diligence.  (*Id.* at 17-19).

The Court then considered the proffered misstatements and omissions concerning Brilacidin.  (Dkt. #49 at 20-27).  With respect to the poster

presented at the ECCMID conference in 2015, the Court found that there were
no misstatements about the drug's efficacy (or lack thereof) vis-à-vis Gram-
negative bacteria.  (*Id.* at 22-23).  It further noted that the audience for that
poster — attendees at a conference on microbiology and infectious diseases —
would not have been misled by the statements contained in it.  (*Id.* at 23-24).
And as for Brilacidin's efficacy in patients with oral mucositis, the Court found
that Plaintiff had not alleged an actionable falsity in Cellceutix's statement
concerning the drug's multiple properties, i.e., "antibacterial, anti-biofilm and
anti-inflammatory."  (*Id.* at 25-27).

    As for Plaintiff's contentions about Cellceutix's public statements
regarding Kevetrin, the Court found that most were the product of a
disagreement with the scientific underpinnings, and thus not actionable under
the securities laws.  (*See* Dkt. #49 at 28-30 (citing, *inter alia*, *Kleinman* v. *Elan
Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) (finding that plaintiffs'
disagreement with drug-trial methodology and allegation that company
"deviated from the established protocol" for such trials were insufficient to
allege falsity))).  The claim of misstatement concerning the trial patient's
outcome, in turn, was rejected because the true statement was reported in the
original Cellceutix statement.  (*Id.* at 30-32).

    Finally, the Court addressed the set of claims that had been added in
the second set of amendments to Plaintiff's pleadings, namely, claims that
Cellceutix had insufficiently disclosed two classes of material risk to the
company: (i) that the acquisition of Brilacidin would require a significant

increase in fundraising in the short term, and (ii) that none of Defendants' officers had experience in obtaining Phase III approval of a drug, thereby creating a material risk regarding Defendants' ability to plan for and manage the necessary Phase III trials for Cellceutix's newly acquired drug.  (Dkt. #49 at 32-38 (citing SAC ¶¶ 37-38)).  These claims, too, were rejected by the Court based on findings that the company had made appropriate (if not as particularized as Plaintiff sought) disclosures in their public statements and that Plaintiff had alleged scienter insufficiently.  (*Id.*).

### 6. The Motion for Sanctions

On June 13, 2016, Defendants submitted a letter to the Court seeking guidance regarding (i) their contemplated motion for sanctions under Fed. R. Civ. P. 11 and (ii) the Court's correlative obligation to make Rule 11 findings under the PSLRA.  (Dkt. #51).  The Court held a pre-motion conference on Defendants' application on July 15, 2016 (Dkt. #64), and thereafter set a schedule for briefing (Dkt. #59).  Defendants' motion papers were filed on August 16, 2016 (Dkt. #62-63); Plaintiff's opposition papers were filed on September 23, 2016 (Dkt. #67-68); and Defendants' reply memorandum was filed on October 7, 2017 (Dkt. #69).

**DISCUSSION**

**A.     Applicable Law**

**1.      Sanctions Under Rule 11**

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that

> [b]y presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  The rule imposes on attorneys "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing."  *Bus. Guides, Inc.* v. *Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

The Second Circuit recently offered the following guidance concerning the imposition of sanctions under Rule 11:

> "A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is

> warranted by existing law or a good faith argument for
> the extension, modification or reversal of existing law."
> *Kropelnicki* v. *Siegel*, 290 F.3d 118, 131 (2d Cir. 2002)
> (internal quotation marks omitted).  For example, Rule
> 11 is violated "where it is patently clear that a claim
> has absolutely no chance of success under the existing
> precedents."  *Eastway Constr. Corp.* v. *City of New
> York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on
> other grounds by rule.*

*Sorenson* v. *Wolfson*, — F. App'x —, No. 16-1224, 2017 WL 1043073, at *1 (2d

Cir. Mar. 16, 2017) (summary order); *see also Star Mark Mgmt., Inc.* v. *Koon*

*Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012)

(noting that Rule 11 sanctions for pleadings are subject to an "objective

unreasonableness" standard); *cf. Fishoff* v. *Coty Inc.*, 634 F.3d 647, 654 (2d

Cir. 2011) ("The fact that a legal theory is a long-shot does not necessarily

mean it is sanctionable.  The operative question is whether the argument is

frivolous, i.e., the legal position has 'no chance of success,' and there is 'no

reasonable argument to extend, modify or reverse the law as it stands.'"

(internal citations omitted)).

"Sanctions that involve monetary awards (such as a fine or an award of

attorney's fees) may not be imposed on a represented party for causing a

violation of subdivision (b)(2), involving frivolous contentions of law.  Monetary

responsibility for such violations is more properly placed solely on the party's

attorneys." Fed. R. Civ. P. 11, 1993 Advisory Committee Notes.  "Whether an

attorney's conduct was unreasonable should be determined not with the

benefit of hindsight, but rather on the basis of what was objectively reasonable

to believe at the time the pleading, motion or other paper was submitted.

Furthermore, all doubts must be resolved in favor of the signer of the pleading." *In re IPO Secs. Litig.*, 399 F. Supp. 2d 369, 371 (S.D.N.Y. 2005) (citations omitted).

### 2.    Sanctions in Private Securities Actions

In other types of litigation, even where Rule 11 is violated, "sanctions under Rule 11 are discretionary, not mandatory." *Ipcon Collections LLC* v. *Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012).  Not so in the private securities litigation context.  Instead, at the conclusion of any private securities lawsuit, the district court is obligated under the PSLRA both to consider the plaintiff's submissions under Fed. R. Civ. P. 11, and to impose sanctions if violations of that rule are found:

> (1) **Mandatory review by court**:  In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.
>
> (2) **Mandatory sanctions**:  If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure.  Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 78u-4(c)(1)-(2); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009) ("*ATSI*"); *Rombach* v. *Chang*, 355 F.3d 164, 178 (2d Cir. 2004).

"The express congressional purpose" of this provision of the PSLRA is "to increase the frequency of Rule 11 sanctions in the securities context, and thus tilt the 'balance' toward greater deterrence of frivolous securities claims." *ATSI*, 579 F.3d at 152; *accord Gurary* v. *Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 219-22 (2d Cir. 2002) ("*Gurary III*"); *Simon DeBartolo Grp., L.P.* v. *Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166-67 (2d Cir. 1999).  *See generally* 5A Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1338.1 (3d ed. 2004); William B. Rubenstein, *Newberg on Class Actions* § 19.28 (5th ed. 2011).

Significantly, however, "[t]he PSLRA … does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found."  *Simon DeBartolo Grp.*, 186 F.3d at 167.

### 3.    The Presumption for Substantial Violations of Rule 11

Section 78u-4(c)(3) states a presumption concerning the appropriate fees to impose and its rebuttal:

> (3) Presumption in favor of attorneys' fees and costs
>
> (A) In general:  Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction — (i) for failure of any responsive pleading or dispositive motion

to comply with any requirement of Rule 11(b) of the
Federal Rules of Civil Procedure is an award to the
opposing party of the reasonable attorneys' fees and
other expenses incurred as a direct result of the
violation; and (ii) for substantial failure of any
complaint to comply with any requirement of Rule
11(b) of the Federal Rules of Civil Procedure is an
award to the opposing party of the reasonable
attorneys' fees and other expenses incurred in the
action.

(B) Rebuttal evidence:  The presumption described in
subparagraph (A) may be rebutted only upon proof by
the party or attorney against whom sanctions are to be
imposed that — (i) the award of attorneys' fees and
other expenses will impose an unreasonable burden on
that party or attorney and would be unjust, and the
failure to make such an award would not impose a
greater burden on the party in whose favor sanctions
are to be imposed; or (ii) the violation of Rule 11(b) of
the Federal Rules of Civil Procedure was de minimis.

(C) Sanctions:  If the party or attorney against whom
sanctions are to be imposed meets its burden under
subparagraph (B), the court shall award the sanctions
that the court deems appropriate pursuant to Rule 11
of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(c)(3).

The term "substantial violation" is not defined in the statute.  In *Gurary*

v. *Nu-Tech Bio-Med, Inc.*, 303 F.3d 212 (2d Cir. 2002) ("*Gurary III*"), the Second

Circuit sought to delimit the term, and, in so doing, to resolve the related

issues of "whether a complaint containing both frivolous and nonfrivolous

allegations triggers the statutory presumption, and, if so, whether the

presence of nonfrivolous allegations, by itself, rebuts that presumption[.]"  *Id.*

at 219.  After identifying various categories of non-frivolous claims that might

appear in a private securities action,[8] the Second Circuit concluded that "once a substantial violation is found, the existence of some nonfrivolous claims does not suffice to rebut the statutory presumption on the ground that full sanctions would be an unreasonable and unjust burden." *Id.* at 222. That led the Court naturally to define what constituted a "substantial violation":

> [A] substantial violation occurs whenever the nonfrivolous claims that are joined with frivolous ones are insufficiently meritorious to save the complaint as a whole from being abusive. Under this interpretation, the district court must examine the qualitative substance of the nonfrivolous claims in order to assess whether these claims were, in fact, legitimate filings that had the potential of prevailing or whether they patently lacked merit and only narrowly avoided being deemed frivolous themselves.

*Gurary III*, 303 F.3d at 222. The Court confirmed, however, that "even if no substantial failure existed under the PSLRA, partial sanctions might still be assessable under ordinary Rule 11 standards to punish not the bringing of the whole suit, but only of the frivolous claim." *Id.*

## B.   Discussion

The Court understands Defendants' frustration at having to defend against a class action lawsuit that proceeded from, and perpetuated, ominous

---

8       *See Gurary* v. *Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 220-21 (2d Cir. 2002):

> A securities complaint may, however, present frivolous claims joined with nonfrivolous claims in a wide variety of ways, including the combination of frivolous claims with [i] valid, winning claims; [ii] claims lost before a jury but which are meritorious enough to survive summary dismissal; [iii] claims that, though properly dismissed at summary judgment because capable of resolution as a matter of law, presented novel legal issues that could well have gone in the plaintiff's favor; and [iv] summarily dismissed claims that, while not legally frivolous, lack any merit.

reports about Cellceutix's long-term prospects for survival.  The fact that it was able to do so successfully does not mean, however, that it is entitled to sanctions from Plaintiff or his counsel.  Plaintiff's claims before this Court failed, but, with one possible exception discussed *infra*, it was not objectively unreasonable for Plaintiff to bring them.

### 1.    Preliminary Observations

In arguing that the three complaints filed in this case amounted to "abusive litigation," Defendants present a wealth of background facts, such as information concerning the Rosen Law Firm's "Equity Alert" and the signed certifications of putative plaintiffs who responded to that alert.  The Court has considered all of these facts.  However, the Court is unwilling to make the logical leap that the Rosen Law Firm's prompt (Defendants would say precipitous) conduct in soliciting purchasers of Cellceutix securities, standing alone, renders the instant litigation "abusive," or suggests that sanctions are appropriate.[9]

The record suggests the Rosen Law Firm, more than any particular investor, was the driving force behind this litigation.  That, however, is not proscribed by the PSLRA:  While the statute exists to stem the tide of frivolous private securities actions, it of course recognizes that private actions are

---

[9]    The Court understands that Defendants are *not* saying that this pre-litigation and pre-SAC conduct alone warrants sanctions, but is part of a larger collection of sanctionable conduct by the Rosen Law Firm.  The Court's point is that Defendants spend so much of their submissions reminding the Court of facts extraneous to the pleadings that the Court feels obligated to place these facts in context.  (*See, e.g.*, Def. Sanctions Br. 8-12, 14, 16, 23; Def. Sanctions Reply 8-9).

sometimes warranted, and it does not prohibit attorneys from soliciting investors who seek to vindicate their rights under the securities laws. Indeed, the very existence of § 78u-4(c) incentivizes law firms to ensure that those actions they do file (and certify) are objectively reasonable.

Of note, the PSLRA requires this Court to review and make Rule 11 findings about "any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). It does not require a comparable review of the Equity Alert, the plaintiff certifications, or the draft complaints in this matter. To be clear, the Court understands Defendants' concerns about certifications signed just a few hours after the release of the Mako Research Report, and their concomitant arguments that such certifications necessarily mean that the Complaint was sanctionable. However, the Court has also considered the record evidence that: (i) the Complaint was not in fact filed until nearly a month after the Report was issued (Dkt. #1); (ii) Rosen Law Firm attorneys "reviewed the allegations contained in the [R]eport ... [by] reviewing the sources cited therein, and verifying that the sources relied upon by the [author] are reliable, and that the [author] accurately reflected their contents" before filing the Complaint (Rosen Sanctions Decl. ¶ 2); and (iii) the two plaintiffs in this case had received (and presumably reviewed) the final versions of the Complaint and the FAC prior to their respective filings (*id.* at ¶ 3).[10] The Court will focus more on the objective reasonableness of the

---

[10]     Nor, given these facts, does the Court believe it necessary to undertake an *in camera* review of precisely what investigative steps were completed by the Rosen Law Firm prior to filing each complaint.

complaints, and less on the sequence of events immediately prior to their filing.

A second fact to which Defendants ascribe considerable significance is that the progenitor of this litigation was an anonymous poster to the *Seeking Alpha* website. (*See* Def. Sanctions Reply 3-4). Contrary to Defendants' arguments, the Court is not prepared to find, as a matter of law, that it was objectively unreasonable for Plaintiff and his law firm to rely on information provided by a first-time, anonymous poster to a website. (*Compare* Def. Sanctions Br. 14-15, *and* Def. Sanctions Reply 3 n.1, *with* Pl. Sanctions Opp. 5-7 (discussing cases in which courts have permitted reliance on anonymous or short-seller reports)). While it is true that the author was anonymous, the report was posted to a website that aggregated information about the stock markets and the financial sector. The author made clear his biases by announcing himself as a short-seller. (Def. Sanctions Br., Ex. 2 at 1). Most importantly, the post was 38 pages long, exhaustively detailed, and complemented by supporting photographs, graphs, and charts.

What is more, Plaintiff and the Rosen Law Firm did not rely exclusively on the Mako Research Report. As discussed *supra*, the Rosen Law Firm avers that its lawyers separately reviewed the contentions in the Mako Research Report, as well as the underlying source documents, prior to filing the complaints in this case. (Rosen Sanctions Decl. ¶ 2). Resolution of this argument further confirms for the Court that the proper focus is on the

reasonableness *vel non* of Plaintiff's arguments, rather than any background facts.

### 2.    The Court Will Consider All Three Complaints

Defendants contend that the Court must conduct its Rule 11 review of all three complaints.  (Def. Sanctions Br. 5-6, 12-13).  Plaintiff protests, claiming that Second Circuit precedent requires only consideration of the SAC, and, alternatively, that Defendants were not prejudiced by the Complaint and the FAC because (i) the only change in the first two iterations was the replacement of the plaintiff and (ii) Plaintiff notified Defendants of his intention to amend promptly after receiving Defendants' Rule 11 notice.  (Pl. Sanctions Opp. 1-3).

The Court here adopts the conclusion of Judge Cote in *In re Australia and New Zealand Banking Group Limited Securities Litigation*, 712 F. Supp. 2d 255, 266-67 (S.D.N.Y. 2010), that a district court's review must include all iterations of the complaint filed, even if the defendant did not respond to them. *See id.* at 266 ("Plaintiff's counsel have identified no authority for the proposition that the filing of an amended complaint overwrites a Rule 11 violation contained in an original pleading and thereby prevents the imposition of sanctions under the PSLRA."); *see also* 15 U.S.C. § 78u-4(c)(1) (specifying a mandatory review of "*any* complaint, responsive pleading, or dispositive motion" (emphasis added)).  That said, the Court agrees with Plaintiff that some guidance must be drawn from the Second Circuit's conclusion that sanctions under the PSLRA might not be appropriate where a plaintiff, with

leave to amend, was able to assert a cognizable claim for securities fraud.  (*See* Pl. Sanctions Opp. 4-5).  Specifically, in *Gurary* v. *Winehouse*, 235 F.3d 792 (2d Cir. 2000) ("*Gurary II*"), the Second Circuit concluded:

> Because we do not believe that the PSLRA was designed to mandate sanctions in all cases for a complaint that, if properly pleaded, could state a cognizable claim under the securities laws, we examine Gurary's case to determine whether an amendment could have stated such a claim.

> Had Gurary been afforded the opportunity to amend his complaint to allege Feigenbaum's misrepresentations with proper specificity, as he apparently sought to do, Gurary could have asserted a cognizable claim under Rule 10b-5 with respect to his second two purchases.

*Id.* at 801-02.  Here, Plaintiff sought and obtained leave to file the SAC after (i) receiving Defendants' Rule 11 letter and (ii) participating in a pre-motion conference before the Court concerning Defendants' anticipated motion to dismiss.  This conduct reflected an effort to plead a cognizable claim that, while ultimately unsuccessful, warrants caution in awarding sanctions for the Complaint and the FAC.

   This Court is guided by both of these decisions, as well as the text and legislative history of the PSLRA.  It believes that the proper course is to consider the allegations in all of the pleadings, but also to consider, in determining the objective unreasonableness of an earlier pleading, whether amendments could have cured the proffered deficiencies, and the manner and degree to which a later pleading modified claims made in an earlier pleading to make them more viable.  Here, for example, the Complaint and the FAC appear to be deficient in their allegations of scienter; however, Plaintiff was

given an opportunity to, and attempted to, remedy these deficiencies in the SAC. *See Fishoff*, 634 F.3d at 655 ("We also agree with the district court that a party's failure to plead with the requisite particularity does not necessarily warrant sanctions. Accordingly, we conclude that the district court did not abuse its discretion in denying sanctions."). Moreover, in this case, the misrepresentations and omissions of material fact alleged in the SAC amplify the claims made in the Complaint and the FAC. This is not, therefore, a case in which Plaintiff filed a "placeholder" complaint that was wholly bereft of actionable allegations, with the hope of amending the complaint at some point in the future to forestall Rule 11 sanctions. The claims are effectively the same across the three complaints; the Court will address their merits as presented in the SAC.

### 3. Plaintiff's Claims, While Legally Erroneous, Were Not Objectively Unreasonable

Resolution of this motion has not caused the Court to doubt in any way the correctness of its June 8, 2016 decision. That said, the current inquiry is not whether Plaintiff's claims were ultimately successful, but whether it was objectively unreasonable for Plaintiff and his counsel to advance them. *See Charles* v. *Levitt*, Nos. 15 Civ. 9334, 15 Civ. 9758 (PAE), 2016 WL 3982514, at *6 (S.D.N.Y. July 21, 2016) ("When a party's legal contentions are challenged as violating Rule 11, '[t]he operative question is whether the argument is frivolous, i.e., the legal position has no chance of success, and there is no reasonable argument to extend, modify, or reverse the law as it stands.'" (quoting *Fishoff*, 634 F.3d at 654)).

Reviewing carefully Plaintiff's claims in this case, the Court finds them (with one possible exception discussed *infra*) unsuccessful, but not indefensible.  To start, Defendants' arguments about the claims relating to Menon's educational background overlook one critical fact — there *were* false statements that Menon obtained his Ph.D. from Harvard University in both the *Future Woman* article and the Cellceutix October 2009 Form 10-K.  And Plaintiff had a colorable argument that the statements were material, given Menon's criticality to Cellceutix.

The contested legal issue regarding the *Future Woman* article was whether any false statements therein were fairly attributable to Menon or Cellceutix.  Here, the Court agrees with Plaintiff (*see* Pl. Sanctions Opp. 9-10) that the Supreme Court's decision in *Janus* did not foreclose an argument that the statement, surrounded as it was by what appeared to be direct quotes from Menon, could fairly be attributed to Menon, or that Menon had so entangled himself in the publication of the article that he (or Cellceutix generally) could be deemed to have exercised "ultimate authority" over the statement.  (*See* Dkt. #49 at 13-16, and cases discussed therein).  The Court disagreed, but it was not inappropriate for Plaintiff to obtain clarification of *Janus* in this setting.[11]  This is especially the case where the Second Circuit

---

[11]     Relatedly, Plaintiff had a colorable, if ultimately unavailing, argument that correction of the error in the October 2009 Form 10-K in subsequent public statements was inadequate, and that Cellceutix should have acknowledged more affirmatively the error and its correction.  The Second Circuit precedent on which the Court relied required that "corrective information ... be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *Ganino* v. *Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)).

issued a helpful decision, *In re Pfizer Inc. Securities Litigation*, 819 F.3d 642 (2d Cir. 2016), after the parties had concluded briefing on Defendants' motion to dismiss.

Plaintiff's arguments regarding Kevetrin failed for different reasons, but these, too, were permissible attempts to seek clarity in the law. Plaintiff principally challenged Cellceutix's use of the p21 gene as a "biomarker"; citing *Kleinman*, 706 F.3d 145, the Court found that "[s]ecurities law is simply not a vehicle through which courts will police disagreements in the cancer research community or the parameters of clinical trials." (Dkt. #49 at 30). However, Plaintiff is correct (*see* Pl. Sanctions Opp. 9) in noting that courts have grappled with the interplay of the *Kleinman* decision and the Supreme Court's earlier decision in *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27 (2011). *See, e.g.*, *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (distinguishing the actionable "failure to disclose adverse events" in *Matrixx* with the non-actionable "failure to disclose differences in methodology and interpretation" in *Kleinman*). Plaintiff and his counsel were not objectively unreasonable in advancing arguments at the border of these two lines of cases in suggesting that Defendants were hiding the ball as to the appropriate gene marker.

A third category of claims relates to the particularity and placement of Cellceutix's risk disclosures, including its disclosures regarding (i) the effect of

---

Plaintiff was within his rights to argue that the corrections in subsequent Cellceutix public filings were not sufficient.

Kevetrin on a clinical trial patient, (ii) the short-term increase in funding required by the acquisition of Brilacidin from PolyMedix; and (iii) the lack of experience in conducting Phase III clinical trials for the drugs it was developing.  (*See* Dkt. #49 at 30-36).  The Court found the disclosures to be sufficient under the governing statutes, regulations, and case law.  However, in this category, too, the Court concludes that it was not objectively unreasonable for Plaintiff to argue that specialized, additional disclosures were needed given the nature of Cellceutix's business.[12]

Finally, Plaintiff's claims regarding Brilacidin require more discussion, but even here the Court cannot say that they were objectively unreasonable. To recapitulate, the Mako Research Report had offered various criticisms of Brilacidin, including claims that (i) Brilacidin would be "difficult to commercialize," because of, among other things, the high costs of developing a successful antimicrobial peptide ("AMP"); (ii) Brilacidin, which the author considered an AMP, did not work on "7/8 types of bacterial infection,

---

[12]     *See generally* 17 C.F.R. § 229.305 (Item 305 of Regulation S-K):

> (b) Qualitative information about market risk.
>
> (1) To the extent material, describe: (i) The registrant's primary market risk exposures; (ii) How those exposures are managed. Such descriptions shall include, but not be limited to, a discussion of the objectives, general strategies, and instruments, if any, used to manage those exposures; and (iii) Changes in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods.
>
> (2) Qualitative information about market risk shall be presented separately for market risk sensitive instruments entered into for trading purposes and those entered into for purposes other than trading.

including the most common types of infection"; (iii) there was evidence that Brilacidin would not work for the remaining "1/8 type of infection"; and (iv) the drug caused "adverse side effects and will likely not be approved." (Sullivan MTD Decl., Ex. 1 at 4-5; *see also id.* at 7 (referring to Brilacidin as "a cationic AMP")).  Relatedly, the Mako Research Report questioned the efficacy of Brilacidin in an oral-rinse format for use by certain cancer patients in order to treat oral mucositis and thereby prevent infection.  (*Id.* at 7 ("Our review on the 'science' of Brilacidin has contradicted the claimed benefits, especially the antimicrobial activity.  Hence, the efficacy and safety of Brilacidin oral rinse are now questionable.")).  In its August 7 Press Release, Cellceutix addressed each of these contentions.  As relevant here, the company noted that (i) Brilacidin was *not* an AMP, but rather was a fully synthetic "nonpeptidal mimic of an antimicrobial peptide," to which most of the Mako Research Report's AMP-based criticisms did not apply; (ii) the drug "[wa]s for treating Gram-positive bacteria … and was not developed for the treatment of Gram-negative infections"; and (iii) Brilacidin's efficacy with respect to oral mucositis derived from its anti-inflammatory, and not its antimicrobial, properties. (Sullivan MTD Decl., Ex. 2 at 7).[13]

---

[13]     *See also* Sullivan MTD Decl., Ex. 2 at 6:

> While patients with oral mucositis are at risk of infection through open ulcers, the disease is not caused by infection.  Accordingly, [B]rilacidin's efficacy in oral mucositis is not based on its antibiotic properties.  Rather, it is based on its immunomodulatory properties.  Indeed, positive data from reliable animal models of oral mucositis (without evidence of concomitant bacterial infection) support an immunomodulatory, rather than antimicrobial, mechanism of action.

In the Complaint and the FAC, Plaintiff claimed that two statements made by Cellceutix concerning Brilacidin were materially false, and that this falsity was demonstrated by the Mako Research Report and Cellceutix's own August 7 Press Release.  First was the September 9, 2013 press release concerning the acquisition of assets from PolyMedix, where Cellceutix described Brilacidin as "a first-in-class defensin-mimetic antibiotic that has completed a Phase 2a clinical trial demonstrating safety, tolerability and efficacy in patients with acute bacterial skin and skin structure infections ('ABSSSI') caused by Staphylococcus aureus."  (Compl. ¶ 18; FAC ¶ 18). Plaintiff claimed that this statement was false by citing to the Mako Research Report's discussion of the drug's ineffectiveness, including specifically its ineffectiveness against Gram-negative bacteria strains.  (Compl. ¶¶ 22, 25; FAC ¶¶ 22, 25).  Second was the poster from the 2015 ECCMID conference in Copenhagen, which poster stated that (i) "Brilacidin has potent Gram positive activity, Gram negative coverage, but low cytotoxicity against mammalian cells," and (ii) the drug could be used to treat oral mucositis.  (Compl. ¶ 20; FAC ¶ 20).  Again, Plaintiff claimed that the statements were false, because, as the Mako Research Report explained, Brilacidin was "not effective."  (Compl. ¶ 22; FAC ¶ 22).

By the time of the Second Amended Complaint, Plaintiff had sharpened his theory; the Court presumes that this occurred, at least in part, because of Defendants' Rule 11 letter.  Rather than claiming broadly that Brilacidin was ineffective, Plaintiff claimed that Defendants had misstated — in public

35

statements prior to the August 7 Press Release — that Brilacidin was effective against Gram-negative bacteria and as an antibiotic oral rinse.  (SAC ¶ 5). Plaintiff continued to focus on the ECCMID poster — which, as now conceived by Plaintiff, falsely "touted Brilacidin's ability to kill gram-negative bacteria such as Escherichia coli ('E. coli')."  (*Id.* at ¶ 25).  However, Plaintiff now cited statements contained in several of Cellceutix's Form 10-Qs for 2014 and 2015 (*id.* at ¶ 27); these statements concerned the effectiveness of Brilacidin on oral mucositis on account of its "antibacterial, anti-biofilm and anti-inflammatory properties" (*id.* at ¶ 28).[14]  According to Plaintiff, Cellceutix's own statements confirmed that "Brilacidin's alleged antibiotic properties could not be effective in treating oral mucositis."  (*Id.*).  Moreover, Plaintiff alleged that, as developed, Brilacidin would not be able to be designated a "qualified infectious disease product" (or "QIPD"), which designation brought with it benefits including fast-track approval and a period of exclusivity.  (*Id.* at ¶ 28 & n.2).

As distinguished from Plaintiff's other claims, which involved attempts to expand or clarify existing law, the Brilacidin claims failed largely for pleading insufficiencies.  That is, while the Court understood the points Plaintiff sought to make, it found Plaintiff's actual challenges to Cellceutix's

---

[14]   *See* SAC ¶ 27 (quoting from Cellceutix September 2014 Form 10-K) (emphasis added):

> [I]n animal models of oral mucositis, an oral rinse containing Brilacidin was shown to reduce the occurrence of severe ulcerative oral mucositis by more than 90% compared to placebo.  Brilacidin and related compounds have shown antibacterial, anti-biofilm and anti-inflammatory properties in various pre-clinical studies. *We believe that the combination of these attributes contribute to the efficacy of Brilacidin in these animal models.*

public statements to be unnecessarily exacting, if not pedantic.  (Dkt. #49 at 22-27).  With respect to the ECCMID poster, the Court distinguished — and, more importantly, found that attendees at the conference would be able to distinguish — "Gram positive *activity*" from "Gram negative *coverage*," and would understand that this meant only that Brilacidin *may* be effective against some strains of Gram-negative bacteria, despite being designed for Gram-positive bacteria.  (*Id.* at 22-24).  The Court also found that attendees at the conference would be able to understand the coverage to which Cellceutix was referring because of the inclusion of graphs of Brilacidin's activity against two specific strains of bacteria, one Gram-positive and one Gram-negative.  (*Id.* at 23).

And as for Brilacidin's utility in treating patients with oral mucositis, the Court found that Plaintiff erred in parsing Cellceutix's statements and in focusing on the QIPD designation.  (Dkt. #49 at 25-26).  Beginning with the latter, the Court found that Plaintiff erred in assuming that the mere mention by Cellceutix of Brilacidin's antibiotic properties was designed to trick investors into believing the drug could qualify for QIPD designation.  (*Id.* at 26 n.15).  Such an assumption was unwarranted, because oral mucositis was not an infectious disease, and as such would not be eligible for QIPD designation.  Accordingly, there was no fraud in stating that Brilacidin's efficacy derived from multiple properties.  (*Id.* at 27).

There is a difference between hair-splitting — which Plaintiff and his counsel may have been guilty of with respect to the Brilacidin claims — and

objective unreasonableness.  For this reason, the Court can conclude that

Plaintiff's Brilacidin claims were his most aggressive (or, perhaps, his least

defensible), but cannot conclude that they were frivolous.  *Cf. In re IPO Secs.*

*Litig.*, 399 F. Supp. 2d at 371 ("Furthermore, all doubts must be resolved in

favor of the signer of the pleading." (citations omitted)).  Even if they were, the

Court could not find a substantive violation of Rule 11.  The Second Circuit in

*Gurary III* instructed district courts to "examine whether nonfrivolous claims

have been joined and, if so, whether these claims — whatever their

number — are of a quality sufficient to make the suit as a whole nonabusive

and the Rule 11 violation not substantial."  *Gurary III*, 303 F.3d at 223.  Here,

Plaintiff raised several claims with legitimate, if ultimately unavailing, legal

arguments.  These claims are "[]sufficiently meritorious to save the complaint

as a whole from being abusive."  *Id.* at 222.[15]

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion for sanctions

is DENIED.   The Clerk of Court is directed to terminate the motion pending at

docket entry 62.

SO ORDERED.

Dated:      March 29, 2017
            New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge

---

[15]      As *Gurary III* suggests and as Defendants request in the alternative, the Court has
considered whether to impose partial sanctions for the Brilacidin claims.  After careful
consideration, and largely for the reasons set forth in the text, it does not believe such
sanctions are warranted.